# EXHIBIT 3

# PENNSYLVANIA BULLETIN

Volume 28          Number 35

Saturday, August 29, 1998 • Harrisburg, Pa.

Pages 4233—4498

See Part II page 4319 for
Environmental Quality Board
Municipal Waste

See Part III page 4431 for
Environmental Quality Board's
Water Quality

## Part I

**Agencies in this issue:**

The Courts
Area Transportation Authority of North
   Central Pennsylvania
Department of Banking
Department of Education
Department of Environmental Protection
Department of General Services
Department of Labor and Industry
Department of Revenue
Department of Transportation
Environmental Quality Board
Fish and Boat Commission
Independent Regulatory Review Commission
Insurance Department
Pennsylvania Public Utility Commission
Philadelphia Regional Port Authority

**Detailed list of contents appears inside.**

**PRINTED ON 100% RECYCLED PAPER**

> **Latest Pennsylvania Code Reporter**
> **(Master Transmittal Sheet):**
>
> **No. 285, August 1998**

# PENNSYLVANIA  BULLETIN

(ISSN 0162-2137)

published weekly by Fry Communications, Inc. for the Commonwealth of Pennsylvania, Legislative Reference Bureau, 647 Main Capitol Building, State & Third Streets, Harrisburg, Pa. 17120, under the policy supervision and direction of the Joint Committee on Documents pursuant to Part II of Title 45 of the Pennsylvania Consolidated Statutes (relating to publication and effectiveness of Commonwealth Documents). Subscription rate $82.00 per year, postpaid to points in the United States. Individual copies $2.50. Checks for subscriptions and individual copies should be made payable to ''*Fry Communications, Inc.*'' Periodicals postage paid at Harrisburg, Pennsylvania.

Orders for subscriptions and other circulation matters should be sent to:

Fry Communications, Inc.
Attn: *Pennsylvania Bulletin*
800 W. Church Rd.
Mechanicsburg, PA 17055-3198

Postmaster send address changes to:

FRY COMMUNICATIONS
Attn: *Pennsylvania Bulletin*
800 W. Church Rd.
Mechanicsburg, Pennsylvania 17055-3198
(717) 766-0211 ext. 340
(800) 334-1429 ext. 340 (toll free, out-of-State)
(800) 524-3232 ext. 340 (toll free, in State)

Copyright © 1998 Commonwealth of Pennsylvania
ISBN 0-8182-0004-9

Editorial preparation, composition, printing and distribution of the *Pennsylvania Bulletin* is effected on behalf of the Commonwealth of Pennsylvania by FRY COMMUNICATIONS, INC., 800 W. Church Road, Mechanicsburg, Pennsylvania 17055-3198.

# PROPOSED RULEMAKING

## ENVIRONMENTAL QUALITY BOARD

### [25 PA. CODE CHS. 92, 93 AND 95—97]
### Water Quality

The Environmental Quality Board (Board) proposes to amend Chapters 92, 93, 95 and 97, and to add Chapter 96 (relating to water quality standards implementation) to read as set forth in Annex A.

This notice is given under Board order at its meeting of June 16, 1998.

A. *Effective Date*

These proposed amendments will be effective upon publication in the *Pennsylvania Bulletin* as final rulemaking.

B. *Contact Persons*

For further information on Chapters 92 and 97 contact Glenn Maurer, Director, Bureau of Water Quality Protection, 11th Floor, Rachel Carson State Office Building, P. O. Box 8465, Harrisburg, PA 17105-8465, (717) 787-2666, or William S. Cumings, Jr., Assistant Counsel, Bureau of Regulatory Counsel, 9th Floor, Rachel Carson State Office Building, P. O. Box 8464, Harrisburg, PA 17105-8464, (717) 787-7060.

For further information on Chapters 93, 95 and 96 contact Stuart I. Gansell, Director, Bureau of Watershed Conservation, 10th Floor, Rachel Carson State Office Building, P. O. Box 8555, Harrisburg, PA 17105-8555, (717) 787-5267 or William J. Gerlach, Assistant Counsel, Bureau of Regulatory Counsel, 9th Floor, Rachel Carson State Office Building, P. O. Box 8464, Harrisburg, PA 17105-8464, (717) 787-7060.

Persons with a disability may use the AT&T Relay Service by calling (800) 654-5984 (TDD users) or (800) 654-5988 (voice users) and request that the call be relayed. This proposal is available electronically through the Department of Environmental Protection's (Department) Web site (http://www.dep.state.pa.us).

C. *Statutory Authority*

These proposed amendments are made under the authority of sections 5(b)(1) and 402 of The Clean Streams Law (CSL) (35 P. S. §§ 691.5(b)(1) and 691.402), and section 1920-A of The Administrative Code of 1929 (71 P. S. § 510-20), which authorize the Board to develop and adopt rules and regulations to implement the provisions of the CSL.

D. *Background and Purpose of the Amendment*

The purpose of this proposal is to revise existing water quality management regulations including Chapters 92, 93, 95 and 97, and create a new Chapter 96, as part of the Regulatory Basics Initiative (RBI). A new chapter on water quality standards implementation is needed to consolidate requirements from existing regulations and incorporate Total Maximum Daily Loads (TMDLs) into the regulatory calculus. The RBI is a multistep process to evaluate regulations considering several factors including whether requirements: are more stringent than Federal regulations without good reason; impose economic costs disproportionate to the environmental benefit; are pre-scriptive rather than performance-based; inhibit green technology and pollution prevention strategies; are obsolete or redundant; lack clarity; or are written in a way that causes significant noncompliance.

These regulatory revisions attempt to streamline and clarify regulatory requirements, update the regulations to be consistent with Federal regulatory changes, and consolidate certain chapters. These proposed amendments may affect persons who discharge wastewater into surface waters of this Commonwealth, or otherwise conduct activities which may impact these waters. The parties affected could include municipalities, municipal authorities, individuals, industries and other entities required to obtain an NPDES wastewater discharge permit.

Advisory committees were involved in the development of these regulatory proposals. On April 17, 1997, the Air and Water Quality Technical Advisory Committee (AWQTAC) provided comments on the proposed revisions to Chapters 92, 93, 95 (portions of which have since been renumbered 96) and 97, and discussed them with Department staff involved in development of the proposals. Additionally, on June 16, 1997, the Water Resources Advisory Committee (WRAC), a successor committee to AWQTAC, commented on and discussed versions of these draft regulations which were revised as a result of AWQTAC's comments on the April 17th proposals. WRAC submitted formal comments to the Department on the proposed revisions by a letter dated July 11, 1997. Specific issues in this proposal relating to the agricultural community were presented to the Agricultural Advisory Board on December 17, 1997, for their information and comment. Finally, comments were received by the Department on the draft proposals published on the Department's Web site. All of these comments were considered in the development of these proposed amendments.

Many of the recommendations were incorporated into the rulemaking. Some of the major comments raised on the proposed changes to Chapter 92 are as follows:

Several comments addressed proposed changes to § 92.7 (relating to reporting of new or increased discharges). The Department has revised the section to provide that a new permit application must be submitted if the "wastestream" is changed in a manner which would result in a violation of effluent limits. The Department did not adopt WRAC's suggestion to limit notification of facility expansions, production increases, and process modifications to those which may result in effluent limit violations, since to do so may violate Federal regulations at 40 CFR 122.41(l). In addition, WRAC had concerns regarding the authority in § 92.41 (relating to monitoring) for the Department to require additional monitoring when pollutants are identified in a discharge which are not subject to effluent limits in an NPDES permit. WRAC agreed that there may be circumstances where this authority is appropriate, but suggested that the regulations identify those situations in which the authority will be used and provide discretion for the requirement of the follow-up activities. The Department is concerned that limiting its authority to specific circumstances will limit its flexibility to react to discharges of toxic or other pollutants which fall outside the identified circumstances but which still pose a problem.

Section 92.81(a)(5) (relating to general NPDES permits), which currently precludes the issuance of NPDES general permits to point sources which discharge toxic or

4432                                  PROPOSED RULEMAKING

hazardous pollutants or other substances which may cause or contribute to increased mortality or morbidity or pose a substantial hazard to health or the environment, is proposed to be revised to provide that dischargers under a general permit must satisfy any effluent limitations established in the general permit for toxic or hazardous substances which may be discharged. WRAC considered this revision and was unable to reach a consensus on it. Some members believe it is inappropriate for general permits to cover the discharge of these types of substances, while others assert that it is appropriate. There is no comparable provision in the Federal regulations with respect to NPDES general permits.

A member of WRAC commented on the proposed deletion of the 0.5 mg/l default technology-based effluent limit for Total Residual Chlorine (TRC) in the proposed § 92.2d(3) (relating to technology-based standards) (moved from current § 93.5(f)), and the clarification of the inclusion of Instantaneous Maximum (IMAX) effluent limits in § 92.57 (relating to effluent limitations). After considering the comments, the Department has decided not to make a change to the existing language in § 93.5(f)(1)(i); the existing language as transferred to § 92.2d(3) provides flexibility for site-specific limits other than 0.5 mg/l. The provisions in § 92.81 and § 92.83 (relating to inclusion of individual discharges in general NPDES permits) have not been amended, as suggested in initial discussion drafts, to eliminate the requirement for the consideration of the individual and cumulative impacts of discharges.

WRAC also recommended that the public notification process outlined in § 92.61 (relating to public notice of permit application and public hearing) be revised to provide that an applicant for an NPDES permit for a new discharge must publish a notice of the applicant's intent to submit an application. The notice would be published in a newspaper of general circulation, once a week for 4 weeks with a 60-day public comment period. The intent of this suggestion is that comments received as a result of the publication could be used by the applicant to help guide future actions related to the permit application. The Committee also recommended that the Department publish an additional notice in the *Pennsylvania Bulletin* upon receipt of an application for a new discharge. To obtain more input into when and how often to provide opportunities for public comment on newly proposed NPDES discharges, the Board solicits comments and suggestions on the recommendations.

With regard to Chapter 93, the following comments were made. One commentator requested that the definition of "water quality criteria" in § 93.1 (relating to definitions) be clarified. The Department has done so. Another commentator requested that the language for the protection of Statewide uses in § 93.4(a) (relating to Statewide water uses) be modified and clarified. The Department has made these changes in response to the comment. Finally, several comments were received on proposed revisions to the aluminum, turbidity and osmotic pressure criteria. No changes have been made in response to these comments: explanations were given that the turbidity standard was being moved to § 93.9(e) (relating to designated water uses and water quality criteria), not eliminated; the ability for site-specific criteria for osmotic pressure is no longer necessary because the provision it applies to (§ 93.5(d)) is proposed to be deleted, and § 93.8 (relating to development of site-specific water quality criteria) sets forth provisions for site-specific criteria development; and the aluminum acute criteria is being revised to match the Federal EPA

criteria, while the Federal chronic aluminum criteria is not proposed for adoption because it is based on dubious science.

Several comments were made on the proposed new water quality standards implementation chapter (Chapter 96). Several commentators questioned the procedures for Load Allocations (LAs) for nonpoint sources, and TMDLs. In response, a definition of "significant pollution source" has been added, and proposed § 96.4(g) (relating to total maximum daily loads (TMDLs)) has been amended. Other comments were received asking how the Department would implement effluent trading. The Department responded that it would implement effluent trading in a TMDL, basin plan or remediation plan, and that it needed more experience in this area before guidance could be developed. Finally, in response to comments, a new public participation section (§ 96.7 (relating to public participation)) has been added to allow for public input in the formulation of lists of impaired waters prepared under section 303(d) of the Clean Water Act, and TMDLs.

E. *Summary of Regulatory Revisions*

These regulatory revisions attempt to streamline and clarify regulatory requirements, update the regulations to be consistent with Federal regulatory changes, and consolidate certain chapters into other chapters. More specifically, Chapter 92 has been modified to incorporate portions of Chapters 93, 95 and 97 that address the permitting of wastewater discharges into surface waters, and contains a new subchapter for civil penalties for violations of NPDES Permits. Chapter 93 is amended by moving, and in some cases modifying, the water quality standards implementation provisions in that chapter to the newly proposed Chapter 96, and the wastewater discharge provisions to Chapter 92. In addition, several water quality criteria are proposed to be modified to reflect the latest scientific information. Portions of Chapter 95, including §§ 95.2, 95.7 and 95.8, are being moved, sometimes in modified form, to Chapter 92. Other portions, including §§ 95.3 and 95.6 are being incorporated, sometimes in modified form, into proposed Chapter 96. Section 95.1 is retained, except for subsection (a) which appears, in modified form, as newly proposed § 92.2a. Proposed Chapter 96 incorporates, sometimes in modified form, existing provisions of Chapters 93, 95 and 97. It also includes new language describing policies and procedures addressing TMDLs and individual water quality-based effluent limitations. The proposed changes to Chapter 97 involve the relocation of some provisions to Chapter 92 and proposed Chapter 96 to consolidate related provisions in a single chapter.

By making these modifications, revised Chapters 92, 93, 95 and 96 present a more streamlined and understandable description of the regulatory provisions for NPDES permitting, water quality standards development and water quality standards implementation.

*Detailed Description of Proposed Revisions by Chapter and Section*

### Chapter 92.  National Pollutant Discharge Elimination System

*Note*: Sections not listed are not proposed to be modified by this proposed rulemaking.

*Section 92.1.  Definitions.*

This section contains a number of new or revised definitions which are necessary to track numerous updates to the Federal regulations at 40 CFR Part 122

which have been made since the Pennsylvania NPDES regulations were last substantially amended.

Terms or phrases added or newly defined are: "application," "average annual discharge limitation," "average monthly discharge limitation," "average weekly discharge limitation," "BAT—best available technology," "BMP—best management practices," "bypass," "CSO—combined sewer overflow," "combined sewer system," "complete application," "concentrated animal feeding operations," "concentrated aquatic animal production facility," "CCW—contact cooling water," "conventional pollutant," "daily discharge," "draft permit," "effluent limitations guideline," "existing discharge," "facility or activity," "industrial waste," "instantaneous maximum effluent limitation," "large municipal separate storm sewer system," "LA—load allocation," "loading capacity," "log sorting and log storage facilities," "major facility," "maximum daily discharge limitation," "medium municipal separate storm sewer system," "municipal separate storm sewer," "natural quality," "new discharger," "new source," "noncontact cooling water," "nonconventional pollutant," "NOI—notice of intent," "NPDES primary industry categories," "operator," "owner," "pollution prevention," "primary industrial facility," "process wastewater," "publicly owned treatment works," "rock crushing and gravel washing facilities," "sanitary sewer overflow," "separate storm sewer overflow," "separate storm sewer," "sewage," "silvicultural point source," "single residence sewage treatment plant," "stormwater," "stormwater associated with construction activity," "stormwater discharge associated with industrial activity," "surface waters," "TMDL—total maximum daily load," "WLA—wasteload allocation," "water quality-based effluent limitation," "water quality standards," "wetlands," "whole effluent toxicity" and "WETT—whole effluent toxicity testing."

Terms or phrases that are revised are: "applicable effluent standards and limitations," "applicable water quality standards," "discharge," "effluent limitation or standard," "Federal Act," "industrial user," "minor discharge," "NPDES form," "NPDES permit," "NPDES reporting form," "person," "point source," "pollutant" and "toxic pollutant."

Terms that are deleted are: "Department," "director," "EPA," "navigable waters," "NPDES application," "Refuse Act," "Refuse Act application" and "Refuse Act permit."

As noted previously, the definition of "pollutant" has been revised. The existing language, which outlines the types of substances which do and do not constitute pollutants, has been simplified. However, the types of substances listed in the current definition which are excluded from the definition of pollutants for the purposes of Chapter 92, and are thus excluded from the requirement for obtaining a permit, have been transferred largely intact to § 92.4(a)(4)—(5).

It is to be noted that the current and revised definitions of "toxic pollutant" are broader than the Federal definition of this term. The Pennsylvania definition includes, but is not limited to, any pollutant listed as toxic under section 307(a)(1) of the Federal Act (33 U.S.C.A. § 1317(a)(1)). The Board believes this broader definition, and thus more stringent requirement, is justified to continue the Department's authority to establish water quality criteria and discharge limits for substances that may pose a threat to human health or aquatic life but are not one of the 126 priority pollutants listed by EPA under section 307(a) of the Federal Act. The Board believes the Department should have the authority to address toxics which may not happen to be EPA priority pollutants, but

which the Department believes poses concern to human health or aquatic life of the Commonwealth, without having to await the time-consuming and National focus on the procedure envisioned by section 307(a) of the Federal Act.

*Section 92.2. Incorporation of Federal Regulations by reference.*

This section provides that specified Federal regulations outlined in 40 CFR Parts 122 and 125, which relate to the administration of the NPDES program, are incorporated by reference. This section is proposed to update the Commonwealth's NPDES regulations and track the Federal regulations without substantially lengthening the text of the current regulations. Also incorporated by reference are all appendices, future amendments and supplements to these Federal regulations to the extent the provisions are applicable and not contrary to Commonwealth law. If there is a conflict between the Federal regulations and the provisions of Chapter 92, or the provisions of Chapter 92 are more stringent than the applicable Federal requirement, the provisions of Chapter 92 would apply.

Subsection (b) outlines those provisions of the Federal regulations which specifically are proposed to be incorporated by reference. After careful review, the Federal provisions not incorporated were determined to be unnecessary, redundant, or inconsistent with the Commonwealth's NPDES program.

Proposed subsection (c) provides that any Federal regulation promulgated after the proposed amendments become final and effective which creates a variance to existing substantive or procedural NPDES permitting requirements would not be incorporated by reference.

*Section 92.2a. Treatment requirements.*

Existing § 95.1(a) (relating to general requirements) is transferred to § 92.2a(a) with modifications, including a reference to the water quality protection levels in proposed § 96.3 (relating to water quality protection levels), and a clarification that the overflows being described are combined sewer overflows. The remainder of § 95.1 is retained in that chapter and renumbered.

Proposed subsection (b) is moved from § 93.2(b) (relating to scope) and modified to provide that in the event an interstate or international agency under an interstate compact or international agreement establishes effluent requirements applicable to dischargers in this Commonwealth which are more stringent than those required by Commonwealth law or regulation, the more stringent requirements would apply. This subsection is intended to address situations where a river basin commission or international commission, such as the Delaware River Basin Commission, Ohio River Valley Sanitation Commission, or the International Joint Commission, promulgates effluent requirements which are more stringent than those established in Pennsylvania law or regulation.

Subsection (c) is adopted from a regulatory proposal published at 27 Pa.B. 1459 (March 22, 1997). This provision clarifies the Department's authority to limit discharges when necessary to ensure the protection of Pennsylvania and Federal Endangered and Threatened Species and their habitat.

*Section 92.2b. Pollution prevention.*

This section incorporates and modifies the provisions of existing § 97.14, and outlines examples of pollution control methods. The mandatory language of the existing § 97.14 ("wastes shall be reduced") regarding pollution

prevention is proposed to be changed to "the pollution load of wastes generated should be reduced." The title of the section is proposed to be changed from "measures to be used" to "pollution prevention" to emphasize and highlight the importance of pollution prevention. In addition, the text is modified slightly to include additional examples of pollution prevention such as materials substitution and recycling of water. Section 97.14 is proposed to be deleted.

### Section 92.2c. Minimum sewage treatment requirements.

This section incorporates and revises parts of existing §§ 95.2 and 95.7 (relating to waste treatment requirement; and effective disinfection). Subsection (a) incorporates § 95.2(a) (relating to waste treatment requirement), with a revision providing that sewage, except that discharged from a combined sewer overflow which meets the requirements of the newly proposed § 92.21a(f) (relating to additional application requirements for classes of discharges), is to be given a minimum of secondary treatment. This is consistent with Federal case law interpreting the applicability of secondary treatment requirements to combined sewer overflows (*Montgomery Environmental Coalition v. Costle*, 646 F.2d 568 (D.C. Cir. 1980)). Subsection (b) is a slightly revised version of § 95.2(b). Section 95.2(c), which currently provides secondary treatment requirements for wastes other than sewage is proposed to be deleted. Secondary treatment requirements for many industrial operations are addressed in the Federal effluent limitation guidelines at 40 CFR Parts 405—471 and the newly added § 92.2d.

### Section 92.2d. Technology-based standards.

Section 92.2d (relating to technology-based standards) describes the minimum technology-based treatment requirements applicable to dischargers subject to this chapter, as applicable. The provisions of paragraphs (1) and (2) are partially based on the existing provisions of § 97.15 (relating to quality standards for industrial wastes), which are proposed for deletion. Among the minimum requirements proposed are effluent limitation guidelines promulgated by EPA under section 304(b) of the Clean Water Act and, in the case of industrial categories for which no effluent limitations have been established, Department-developed technology-based limitations established in accordance with 40 CFR 125.3 (relating to technology-based treatment requirements).

Paragraph (3) outlines proposed technology-based treatment requirements for facilities utilizing chlorine. This paragraph incorporates the provisions of existing §§ 93.5(f)(1)(i) and (2), in modified form. Also, the jurisdictional scope of this subsection is clarified to apply to "surface waters."

Paragraph (4) outlines proposed technology-based treatment requirements for oil-bearing waste waters. To a large extent, the proposed requirements incorporate the existing provisions of § 97.63(b)—(d) (relating to oil-bearing waste waters). However, the provisions of paragraphs (1)—(7) of § 97.63(d) are being deleted, as well as § 97.63(a) and (e), because those provisions concern analytical techniques and oil-water separator design requirements which are either obsolete or overly prescriptive. Also, the jurisdictional scope of this subsection is clarified to apply to "surface waters."

### Section 92.3. Permit requirements.

This section is slightly modified to make it clear an NPDES permit authorization is required for the discharge of pollutants to "surface waters" of this Commonwealth, rather than navigable waters as currently provided. The

term "surface waters" is consistent with the jurisdictional extent of the Federal NPDES program in the definition of "Waters of the United States" in 40 CFR 122.2.

### Section 92.4. Exclusions from permit requirements.

Subsection (a) outlines types of activities or discharges which are excluded from obtaining an NPDES permit.

Subsection (a)(1) is proposed to be modified to track applicable Federal regulations at 40 CFR 122.3(e) and (f) to make it clear that agricultural nonpoint sources and irrigation return flows are excluded from NPDES permit requirements. Several exclusions are proposed to be added to be consistent with the other Federal exclusions outlined at 40 CFR 122.3, and the Federal definition of "pollutant" at 40 CFR 122.2. The added exclusions relate to discharges of sewage from vessels, deep well injection relating to the production of oil or gas, dredge or fill material, discharges of waste into a sewage treatment plant, and discharges associated with emergency instructions relating to cleaning up spills. Note that the exclusion relating to deep well injection is based on clause (b) of the definition of "pollutant" found at 40 CFR 122.2.

The Federal exclusion relating to the introduction of sewage, industrial wastes or other pollutants into privately or publicly owned treatment works by indirect discharges is not proposed to be fully incorporated because it is inconsistent with section 307(a) of the CSL (35 P. S. § 691.307(a)). In the case of these discharges, the Department may require that an indirect discharger of sewage, industrial waste or other pollutants obtain a permit to discharge into a treatment works where necessary to assure protection of the waters of this Commonwealth in certain situations such as when the indirect discharger has failed to take adequate measures to pretreat its discharge prior to conveying the discharge to the treatment works, or is otherwise resulting in interference with proper operations of the POTW, upsets at the POTW or pass-throughs of pollutants.

### Section 92.5a. Concentrated animal feeding operations.

A new section is proposed to provide a permit by rule for certain types of concentrated animal feeding operations (CAFOs). It is proposed that owners or operators of concentrated animal feeding operations will be deemed to have an NPDES general permit-by-rule if: (1) the operation has a nutrient management plan under § 83.261 (relating to general) which has been approved by the applicable county conservation district in accordance with the requirements of Chapter 83 (relating to State Conservation Commission) and the operation has 301—1,000 animal equivalent units; (2) the operation does not have or is not proposing a discharge to surface waters; (3) the operation is in compliance with applicable provisions of the nutrient management regulations outlined in Chapter 83; and (4) the operator implements and maintains a nutrient management plan in accordance with the requirements of Chapter 83. The permit by rule would not apply to CAFOs which have more than 1,000 animal equivalent units as defined in the Nutrient Management Act (3 P. S. §§ 1701—1718), or for which the Department may require a permit on a case-by-case basis. Those CAFOs must apply for and obtain an individual NPDES permit.

### Section 92.6a. Persons who must apply when a facility is owned by one person, but operated by another.

The existing provisions of § 92.6, which address NPDES permits issued by the Regional Administrator of the EPA prior to 1978, are proposed to be deleted because they are obsolete. A new § 92.6a is proposed which

provides that where a facility or activity is owned by one person, but operated by another, it is the responsibility of the person operating the facility or activity to obtain an NPDES permit. The term "operator" in this context refers to one who has financial control over the operation of the facility (usually through a lease agreement); it does not refer to a person or consultant who was contracted specifically to run the treatment plant. Thus, where one entity owns a facility and another entity is entirely responsible for its operation and maintenance, the entity responsible for operation and maintenance needs to obtain the NPDES permit (see for example, *Sun Company, Inc. v. Pennsylvania Turnpike Commission,* 708 A.2d 875 (Pa. Cmwlth. 1998). On the other hand, where a contract consultant is hired to run a plant, and is merely a hired service, that contract consultant is not an "operator" required to obtain an NPDES permit. The proposed provisions are consistent with the requirements of 40 CFR 122.21(b).

*Section 92.7. New or increased discharges, or change of waste streams.*

This section currently outlines the types of new or increased discharges which must be reported to the Department. This section has been revised to provide that a new permit application must also be submitted if the "wastestream" is changed in a manner which would result in a violation of effluent limits.

*Section 92.8a. Changes in treatment requirements.*

The existing provisions of §§ 95.8 and 93.5(e)(4) are proposed to be incorporated into this section. Subsections (a) and (b) would incorporate the provisions of existing § 95.8(a) and (b) substantially intact, with the addition of pollution prevention provisions and some new references to additional provisions. The additional provisions outline the duties of a permittee whenever there is a change in Chapter 92, 93, 95 or 96, or whenever the Department makes a determination which would change existing or impose additional water quality criteria or treatment requirements. These duties become effective upon notice from the Department.

Subsection (c) incorporates the provisions from existing § 93.5(e)(4). This subsection relates to the establishment of more stringent effluent limitations for the discharge of certain enumerated types of pollutants to protect the point of water withdrawal whenever a new potable water supply not previously considered is identified by an update to the State Water Plan or a river basin commission plan or by an application for a water allocation permit from the Department. The revisions propose to delete the requirement for the Department to notify a discharger of phenolics that more stringent limitations are needed to protect the point of withdrawal. Existing § 93.5(e)(4) is proposed to be deleted.

*Section 92.9. Duration of permits.*

The term "Director" is replaced by "Department." Subsection (b) is amended to delete the phrase "pending the issuance of a new permit."

*Section 92.11. Duration of standards for certain new sources.*

Currently, this section essentially provides that any point source constructed so as to meet all applicable standards of performance is not subject to any more stringent standard of performance for 10 years following completion of construction or during the period of depreciation or amortization of the facility for the purposes of section 167 or 169 of the Internal Revenue Code. To

ensure consistency with 40 CFR 122.29(d), this section is proposed to be revised to make it clear that the facility must have been constructed to meet all applicable requirements, rather than standards of performance, and that the facility would not be subject to more stringent treatment technology standards, rather than more stringent standards of performance as currently provided. A facility also would not be subject to any more stringent technology standard for 10 years from the date the source begins to discharge process or other nonconstruction wastewater. A sentence is also added clearly stating that this section, including the 10 year exception, does not apply to water quality-based effluent limitations.

*Section 92.13. Reissuance of permits.*

This section outlines the requirements for the submission of a new NPDES application whenever a permittee wishes to continue to discharge after the expiration date of its NPDES permit.

Subsection (a) is maintained largely intact except for a minor revision replacing "Director" with "Department." In addition, the term "NPDES application" is replaced with the term "application" throughout this proposal because the term "application" is now defined in § 92.1 as an application for approval to discharge pursuant to an NPDES permit.

Subsection (b) outlines two determinations which must be made before a permit may be reissued. Paragraph (1) currently provides that it must be determined that the permittee is in compliance with all existing NPDES permit terms, conditions, requirements and schedules of compliance. A new clause is proposed to provide that any noncompliance with the existing permit that has been resolved by an appropriate compliance action or by the terms and conditions of the permit is also a basis for that determination. Paragraph (2) provides that it must also be determined that the discharge is consistent with applicable water quality standards and other legally applicable requirements. This paragraph is proposed to be revised to add a provision stating that it must be determined that the discharge is, or will be pursuant to a compliance schedule issued under § 92.55 (relating to schedules of compliance), consistent with the requirements listed in the paragraph. These proposed revisions would enable the Department to issue NPDES permits containing conditions which will ensure compliance of a discharge currently in noncompliance, and is consistent with the requirements of 40 CFR 122.4 and § 92.55.

*Section 92.13a. Effect of modification of permit.*

A new section is proposed which clarifies that when an NPDES permit is modified, only those permit conditions which are new or are materially changed in the modified permit will be reopened. All other conditions of the permit are to remain in full force and effect and remain administratively final. This section codifies Commonwealth case law regarding administrative finality and is consistent with the language of 40 CFR 122.62 which states that "[W]hen a permit is modified, only the conditions subject to modification are reopened."

*Section 92.15. Regional Administrator's right to object to the issuance or modification of certain permits.*

A minor editorial change is being proposed to clarify that this section applies to the Department's activities, not activities of the Director of the Bureau of Water Quality Management.

*Section 92.17. Other chapters applicable.*

This section generally provides that to the extent provisions of certain enumerated chapters of Title 25 pertain to a discharge for which an NPDES permit is required, the provisions of those chapters govern whenever their application produces a more stringent effluent limitation than that which would be produced by application of Federal requirements. References to two of the enumerated chapters are proposed to be deleted since those chapters (97 and 101) are being deleted in this and another rulemaking (see 27 Pa.B. 4343 (August 23, 1997)). References to Chapters 102 and 105 (relating to erosion and sedimentation control; and dam safety and waterways management) are proposed to be added. With these changes, the provisions of Chapters 102 and 105 would now also govern whenever their application produces a more stringent effluent limitation than would be produced by application of Federal requirements.

*Section 92.21. Applications.*

This section sets forth application requirements for individual NPDES permits. Subsection (a) outlines the general requirement for the submission of applications for individual NPDES permits. Minor changes to the text of this subsection are proposed for clarity.

Existing subsection (b) outlines requirements for Refuse Act applications. Since this is now obsolete, the existing language of subsection (b) is proposed to be deleted and replaced with new provisions outlining the minimum materials and information which must be submitted by all applicants for an individual NPDES permit. Unless otherwise specified, the following must be submitted by all applicants for individual NPDES permits: (1) applicable fees; (2) written proof of notification to the municipality in which the activity is located; (3) proof of publication in a newspaper in the locality in which an industrial waste discharge is to be located; and (4) a description of the activities which require an NPDES permit and other identifying information specified.

A new subsection (c) provides that the Department may require an applicant to submit any other information or data which the Department may need to assess the discharges of the facility and the impact of such discharges on a receiving water and to determine whether to issue an NPDES permit or what conditions or effluent limitations, including water quality-based effluent limitations, to place in the permit. The types of additional information include effluent assessments, waterbody assessments, whole effluent toxicity testing, and quantitative data and bioassays to assess the relative toxicity of discharges to aquatic life and to determine the cause of any toxicity. In addition, the Department may require information relating to the biological, physical and chemical characteristics of water and habitat immediately upstream and downstream of the facility, and results of pollutant source or waterbody monitoring.

Existing subsection (c) provides that four copies of applications must be submitted. This subsection is renumbered as subsection (d), and is revised to provide that three copies of complete applications must be submitted. Existing subsections (d) and (e) are proposed to be renumbered as subsections (e) and (f) with minor modifications.

*Section 92.21a. Additional application requirements for classes of dischargers.*

This is a new section which incorporates Federal requirements relating to additional application requirements for certain classes of dischargers. To a large extent, the provisions in subsections (a)—(d) and (g) are based

on, and incorporate by reference, requirements outlined in parts of 40 CFR 122.21. The classes of discharges are existing industrial waste discharges, new sources and new discharges, nonprocess industrial waste discharges, stormwater discharges associated with industrial activity, and large and medium municipal separate storm sewers.

Subsection (e) proposes to establish additional application requirements for new and existing sewage dischargers, as applicable, except where aquatic communities are excluded, pollution cannot be remedied or water quality data indicates no trend of water quality improvement in the waterbody. Sewage dischargers with design influent flows of at least one million gallons per day, and/or those sewage dischargers with approved pretreatment programs, or who are otherwise required to develop a pretreatment program, are required to provide results of whole effluent toxicity testing to the Department, except in certain specified circumstances. The Department may require other sewage dischargers to submit the results of toxicity tests upon a consideration of enumerated factors such as the variability of the pollutants or pollutant parameters in the sewage effluent, dilution of the effluent in the receiving water, existing controls on point or nonpoint sources, receiving stream characteristics or other considerations which the Department determines could cause or contribute to adverse water quality impacts. Toxicity testing must be conducted utilizing EPA's methods or other established protocols approved by the Department and must have been done since the last NPDES permit issuance or major modification of the permit.

Subsection (f) provides that dischargers with approved pretreatment programs are to provide the Department with an evaluation of the need to revise local limits under 40 CFR 403.5.

Subsection (g) outlines additional application requirements applicable to combined sewer overflows (CSOs). The additional information which must be submitted includes the results of an evaluation determining the frequency, extent and cause of the CSO discharge, an evaluation of the water quality impacts of the CSO discharge on receiving waters, and a description of the best management practices utilized at the facility to minimize or eliminate the impact of the CSO discharge on receiving water quality. CSOs which comply with these requirements are not subject to secondary treatment as prescribed in § 92.2c(a).

Subsection (h) provides that operators of large and municipal separate storm sewers are to submit the information required in 40 CFR 122.26(d) in their permit applications.

*Section 92.22. Application fees.*

Minor editorial changes are proposed for this section.

*Section 92.23. Identity of signatories to NPDES forms.*

Minor editorial changes are proposed for this section.

*Section 92.25. Incomplete applications or notices of intent.*

This section provides that the Department will not complete processing of an application or notice of intent which is incomplete or otherwise deficient. Provisions are proposed to be added which describe what constitutes a complete application, or a notice of intent (NOI) to participate in an NPDES general permit. An application for an individual NPDES permit would be complete when the Department receives an application form and any other supplemental information which are completed in accordance with the requirements of Chapter 92. An NOI

to participate in an NPDES general permit issued by the Department would be complete when the Department receives a notice of intent containing information specified by the terms of the general permit.

*Section 92.31. Effluent standards or limitations.*

This section provides that permits for discharges of pollutants will not be issued unless the discharge is in compliance with eight enumerated requirements, including effluent limitations, standards of performance for new sources and certain more stringent limitations. The existing provisions are proposed to be incorporated into a new subsection (a) with certain changes. The lead-in sentence is proposed to be modified to create an exception, which is more fully explained in this Preamble. Subsection (a)(1) would be slightly revised to correct references to the codified Federal law. Subsection (a)(5) contains a requirement relating to more stringent limitations required to implement any applicable water quality standard. Currently such limitations include any legally applicable requirements necessary to implement total maximum daily loads established under section 303(d) of the Federal Clean Water Act and incorporated in the continuing planning process approved under that section. This language is proposed to be revised by adding a reference to total maximum daily loads established under proposed Chapter 96 (retaining the reference to section 303(d)) and deleting the existing language relating to incorporation in the continuing planning process approved under section 303(c).

Subsection (a) prohibits the issuance of permits to dischargers who are not in compliance with all of the applicable requirements listed in that subsection. A discharger subject to this permit bar should have an opportunity to continue operations so long as it meets certain requirements in a legally enforceable schedule ensuring that the requirements will be attained. Accordingly, a new subsection (b) is proposed to be added to authorize the issuance of a permit to dischargers who do not meet the requirements of subsection (a) by allowing them to meet such requirements pursuant to a compliance schedule in a reissued or amended permit.

*Section 92.41. Monitoring.*

Except as noted as follows, minor editorial changes are being proposed and existing subsections would be renumbered.

Proposed subsection (b) is intended to better explain the Department's monitoring requirements. Except for sewage discharges from single residence sewage treatment plants, dischargers may be required to monitor and report all toxic, conventional, nonconventional and other pollutants in their discharges at least once a year or on a more frequent basis if requested by the Department or required by a permit condition. Results would be reported to the Department by July 1st each year or on a more frequent basis as outlined in the text of the proposal. If monitoring results indicate the existence of pollutants which are not limited in the permit, the permittee would be required to identify the pollutants and their concentrations on the monitoring report and explain how the discharge of these pollutants will be eliminated or whether a permit amendment will be sought.

Existing subsection (d)(2) (subsection (e)(2) of the proposal) is proposed to be slightly revised to more closely mirror 40 CFR 122.44(i)(2). The revision provides that the 3-year retention period for monitoring records may be extended during the course of unresolved litigation. Currently, the retention period must be extended in these circumstances.

Proposed subsection (g), based on 40 CFR 122.44(i)(4), is amended to provide that the requirements for the reporting of monitoring results from stormwater discharges associated with industrial activity are established on a case-by-case basis with a frequency dependent on the discharge. Stormwater discharges which are subject to an effluent limitation guideline or an NPDES general permit would be exempted from the requirement.

*Section 92.51. Standard conditions in all permits.*

Existing paragraphs (1)—(5) are retained with minor editorial changes. Existing paragraph (5) provides a standard condition relating to any toxic effluent standard or prohibition established under section 307(a) of the Federal Clean Water Act. The language of that subsection is proposed to be revised to include toxic effluent standards or limitations established under certain other sections of the Federal Clean Water Act. Thus, if a toxic effluent standard or prohibition under the Federal Clean Water Act for a toxic pollutant is more stringent than the permit limitation, the Department will revise or modify the permit and notify the permittee.

A new standard condition is proposed to be added as paragraph (6) to provide that there be no discharge of such substances as floating material, oil, grease, scum, foam, sheen and substances which produce color, taste, turbidity or form deposits and which are not limited in the permit in concentrations or amounts sufficient that may harm human, animal, plant or aquatic life. This section provides a tie-in for dischargers to the general water quality criteria set forth at § 93.6.

*Section 92.52a. Site-specific permit conditions.*

This is a new section which is proposed to provide that the Department may establish special permit conditions in an NPDES permit as needed, on a case-by-case basis, to ensure protection of surface waters of the Commonwealth. Among the special conditions which may be established are a requirement to identify best management practices, toxic reduction activities or other measures which eliminate or substantially reduce releases of pollutants at their source. Permittees are also encouraged to achieve compliance with performance-based permit conditions through the implementation of pollution prevention plans.

*Section 92.53. Additional standard conditions in permits for publicly-owned treatment works which serve industrial users.*

Minor editorial changes are proposed to this section.

*Section 92.55. Schedules of compliance.*

This section sets forth the procedures for establishing remedial actions in an NPDES permit where a discharge is not in compliance with effluent standards and limitations. Subsection (a) is proposed to be revised in two respects. First, the subsection is clarified to apply to existing discharges. Second, a sentence is proposed to be added providing that if a deadline specified in section 301 of the Federal Clean Water Act has passed, a schedule of compliance specified in the permit must require compliance with enforceable effluent limits as soon as practicable, but in no case longer than 3 years, unless a court issues an order allowing a longer time for compliance.

Subsection (b) provides for the establishment of a compliance schedule in an NPDES permit with interim requirements and dates for their achievement where the period of time for compliance specified in subsection (a) is longer than 9 months. This time frame is proposed to be changed to 1 year to more closely mirror 40 CFR 122.47(a)(3).

4438 PROPOSED RULEMAKING

*Section 92.57. Effluent limitations.*

This section provides that NPDES permits must specify certain effluent limitations. This section is proposed to be revised to clarify the Department's existing authority to include instantaneous maximum provisions in NPDES permits (*Borough of Ridgway v. DER,* 1994 EHB 1090), and provide that NPDES permits may also include best management practices, pollution prevention measures or other limitations as may be necessary.

*Section 92.59. Documentation for permit conditions.*

A minor editorial change is proposed for this section.

*Section 92.61. Public notice of permit application and public hearing.*

This section outlines the public notice and public hearing requirements applicable to applications for NPDES permits. Subsection (a) sets forth the minimum information which must be included in public notices of applications. Existing subsection (a)(5) provides that where there is a tentative determination to issue a permit, the public notice must include a statement of the proposed effluent limitations for those effluents proposed to be limited, a proposed schedule of compliance and a brief description of any proposed special conditions which would have a significant impact upon the discharge.

A new subsection, (a)(6), is proposed to provide that the public notice must identify the location of the nearest downstream potable water supply which was considered in establishing proposed effluent limitations or a finding that no potable water supply will be affected by the proposed discharge. Existing subsections (a)(6) and (7) are proposed to be renumbered.

*Section 92.63. Public access to information.*

This section outlines the process by which the Department protects confidential information contained in NPDES forms. Subsection (b) currently provides that information other than effluent data would be treated as confidential information if a person shows that such information would divulge confidential commercial information or trade secrets. The subsection also outlines the procedure to be followed by the Department for consultation with EPA where a claim of confidentiality is made. This subsection is proposed to be revised to more closely mirror the requirements of section 607 of the CSL (35 P. S. § 691.607) and 40 CFR 122.7 by providing that the Department may protect as confidential documents which are not public records under section 607 of the CSL, such as documents pertaining to the analysis of the physical and chemical properties of the coal (except information about toxic content).

*Section 92.65. Notice to other government agencies.*

This section outlines the procedures the Department uses in notifying other agencies of an application and in responding to comments. Minor editorial changes are proposed with respect to subsection (b).

Subsection (d) outlines notification procedures with respect to the Army Corps of Engineers. The subsection is proposed to be revised to make it clear that the Corp's objection to an NPDES permit is to be based on whether the issuance of the permit would impair anchorage and navigation of any of the surface waters. This is consistent with the requirement of section 402(b)(6) of the Clean Water Act (33 U.S.C.A. § 1342(b)(2)).

*Section 92.71a. Transfer of permit.*

This is a new section which would outline the procedure to be followed in the event of any pending change in control or ownership of any facility with an authorized discharge. These changes are consistent with procedures outlined at 40 CFR 122.61(b). The permittee would be required to provide written notification to the Department at least 30 days prior to the change in ownership and include a written agreement between the existing permittee and the new owner or operator. The agreement is to contain a specific date for transfer of permit responsibilities, coverage and liability between them. The permit transfer would be effective on the transfer date if the Department does not notify the existing permittee and the proposed new permittee of its intent to modify or revoke and reissue the permit.

*Section 92.72a. Cessation of discharge.*

A new section is proposed to address those situations where a permittee intends to cease operations or cease a discharge for which an NPDES permit has been issued. The permittee would be required to notify the Department of its intent to cease an operation or discharge at least 180 days prior to the cessation, unless the Department has granted permission for a later date.

*Section 92.73. Prohibition of certain discharges.*

This section provides that no NPDES permit will be issued authorizing the discharge of certain types of warfare agents or high-level radioactive waste or any discharge which is in conflict with a plan or amendment approved under section 208(b) of the Federal Clean Water Act. The section is proposed to be revised to clarify the language of subsection (a), renumber subsections (a) and (b) as paragraphs (1) and (2) and to add paragraphs (3)—(8). Subsection (a) is revised to provide that no permits will be issued authorizing the discharge of any radiological, chemical or biological warfare agent or high-level radioactive waste. Paragraphs (3)—(8) prohibit the issuance of a permit when an applicant has not obtained a required State water quality certification or other appropriate certification under section 401 of the Federal Clean Water Act; where the EPA has objected to the issuance of a permit; when the conditions cannot ensure compliance with the applicable water quality requirements of other affected states; when anchorage and navigation on surface waters would be substantially impaired; to a new source or new discharges if its discharge would contribute to a violation of water quality standards; or to a discharger with a sanitary sewer overflow unless the discharger can demonstrate it is taking measures to eliminate the overflows.

*Section 92.75. Transmission of NPDES forms.*

Minor editorial changes are proposed to this section.

*Section 92.77. Requirement of additional data in certain cases.*

Minor editorial changes are proposed to this section.

*Section 92.79. Reports of violations.*

Minor editorial changes are proposed to this section.

*Section 92.81. General NPDES permits.*

This section outlines the procedures for the issuance of general NPDES permits by the Department. Subsection (a) outlines requirements which must be met for coverage under a general permit. Subsection (a)(5) requires that a point source not discharge toxic or hazardous pollutants. This provision is proposed to be revised to provide that effluent limitations for any toxic or hazardous substance may be established in the general permit. The provisions of subsection (a)(8) and § 92.83(b)(8), which preclude the issuance of general permits for discharges to waters

classified as "special protection" under Chapter 93, are proposed to be amended to continue to prohibit the use of NPDES permits in "Exceptional Value Waters" as defined in Chapter 93 and allow them on an activity-by-activity basis in High Quality Waters. See 27 Pa.B. 1549 (March 22, 1997).

Existing subsection (b) contains provisions relating to the administration of NPDES general permits. Minor editorial changes are proposed to this subsection.

New subsection (c) allows an eligible person who submits a complete notice of intent to be authorized to discharge in accordance with the terms of the general permit either after a waiting period specified in the general permit, on a date specified in the general permit, upon receipt of notification of inclusion by the Department or upon receipt of the notice of intent by the Department. This regulatory proposal is based on language in the Federal regulations at 40 CFR 122.28 (b)(2)(iv).

New subsection (d) would authorize the Department to allow a discharge under an NPDES general permit in certain instances without the submission of a notice of intent. This authority specifically would not apply to discharges from publicly owned treatment works, combined sewer overflows, primary industrial facilities and stormwater discharges associated with industrial activity. This regulatory proposal is based on language in the Federal regulations at 40 CFR 122.28(b)(2)(v).

New subsection (e) provides that the Department may notify a discharger that it is covered by a general permit, even if the discharger has not submitted an NOI to be covered. This regulatory proposal is based on language in the Federal regulations at 40 CFR 122.28(b)(2)(vi).

*Section 92.82. Public notice and public hearing.*

Subsection (a)(5) is proposed to be revised in concert with the proposed revisions to § 92.81(c)—(e), to provide limited exceptions to existing public notice procedures for general NPDES permits which are issued pursuant to these provisions.

*Section 92.83. Inclusion of individual dischargers in general NPDES permits.*

This section outlines the application procedure for coverage under a general NPDES permit. Subsections (a), (b), and (f) are proposed to be amended to clarify that the documents submitted by those seeking NPDES general permit coverage are "NOI" and not "applications."

Subsection (a)(1) outlines the minimum NOI requirements for this coverage. Among other things, the NOI must demonstrate that each source meets the eligibility requirements for inclusion in the general permit and demonstrate that the discharge from the point sources, individually or cumulatively, will not result in a violation of an applicable water quality standard. Instead of the NOI "demonstrating" that the point source meets the requirements described in the previous sentence, the NOI requirements are proposed to be changed to require that the discharger "certify" that the point source meets those requirements.

Subsection (a)(2) outlines how the Department formally notifies a discharger whose NOI for coverage under a general permit is acceptable. A change is proposed to incorporate an exception to this process for certain dischargers in order to accompany the proposed revisions to § 92.81(c)—(e).

Subsection (a)(3) currently provides that the Department will provide notice of each NOI for coverage under a

general NPDES permit and of each approval for the coverage by publication of a notice in the *Pennsylvania Bulletin*. This subsection is proposed to be revised to indicate that the procedure for notices of intent and approval would be indicated in the publication of a general permit. Under the proposal, the Department would have three options: (1) provide notice in the *Pennsylvania Bulletin* of each notice of intent for coverage under an applicable general NPDES permit and of each approval for such coverage; (2) provide notice only of every approval of coverage; or (3) provide no notice of notice of intents or approvals of coverage.

Subsection (b) describes eight conditions which result in the denial of a notice of intent for coverage under a general NPDES permit. The lead-in sentence to subsection (b) is proposed to be revised to provide that the Department has discretion to deny a notice of intent if any of the eight conditions exist. Subsection (b)(2) provides that a notice of intent may be denied if the discharger has a significant history of noncompliance with a prior NPDES permit issued by the Department rather than any prior permit. Subsection (b)(8) was proposed to be revised to continue to prohibit the use of NPDES permits in "Exceptional Value Waters" as defined in Chapter 93 and allow them on an activity-by-activity basis in High Quality Waters. See 27 Pa.B. 1549.

*Section 92.91. Applicability.*

A new subchapter entitled "Civil Penalties for Violations of NPDES Permits" is proposed to be added. Sections 92.91—92.94 outline the procedure and factors to be used in assessing civil penalties for violations of NPDES requirements pursuant to section 605(a) of the CSL (35 P. S. § 691.605(a)).

*Section 92.92. Method of seeking civil penalty.*

This section provides that the Department may seek a civil penalty in one of two ways: (1) by filing a complaint for civil penalties before the Environmental Hearing Board; or (2) assessing a civil penalty, after an opportunity for an informal hearing.

*Section 92.93. Procedure for civil penalty assessments.*

This section outlines the procedure which would be used in those cases where the Department assesses a civil penalty under § 92.92. The procedures relate to service of the proposed civil penalty assessment, informal hearing and appeal of the final assessment.

Subsection (a) provides that the Department will serve a proposed civil penalty assessment upon the discharger by registered or certified mail or by personal service. If delivery of the mail at an address specified in the permit or where the discharger is located is refused or not collected, the service requirements shall be deemed to have been complied with.

Subsections (b) and (c) outline the procedure for an informal hearing. A discharger would have 30 days to request by registered or certified mail that the Department hold an informal hearing. Subsection (b) provides that if no timely request for a hearing is made, the failure to submit a request operates as a waiver of the opportunity for a hearing and the proposed assessment of the Department becomes a final assessment upon the expiration of the 30-day time period, unless the Department determines to hold a hearing on the proposed assessment pursuant to the procedures in (c).

Subsection (c) provides that if a timely request for hearing is made, the Department would then assign a representative to hold an informal hearing, establish a

hearing date and post notice of the informal hearing at least 5 days prior to the hearing. The Department is to consider all relevant information in making a decision on the final assessment.

Subsection (d) provides that a person subject to a final assessment may contest the penalty assessment by filing a timely appeal with the Environmental Hearing Board.

*Section 92.94. Disbursement of funds pending resolution of appeal.*

This section outlines the effect of certain types of actions on the final penalty. Subsection (a) provides that where a person fails to file an appeal to the Environmental Hearing Board, the penalty assessed becomes due and payable. Similarly, subsection (b) provides that where a final decision results in an order increasing the penalty, the difference to the Department is due and payable within 30 days after the order is mailed. Failure to pay under both subsections will result in the amount due being collected in any manner provided by law. In addition, subsection (b) provides that a person who fails to pay the amount in full may be precluded from obtaining or renewing any Department permits.

Subsection (c) provides that funds collected under §§ 92.91—92.94 are to be deposited into the "Clean Water Fund" upon completion of administrative and judicial review.

### Chapter 93.   Water Quality Standards

*Section 93.1.   Definitions.*

The following terms are proposed to be deleted from this section because they would no longer be used in the chapter: "ambient stream concentration," "ambient temperature," "application factor," "balanced indigenous aquatic community," "carcinogenesis," "cumulative pollutant," "effluent limits," "existing potable water supply," "existing sensitive industrial water supply," "$LC_{50}$ value," "maximum allowable daily load (MDL)," "no demonstrable adverse effect on an ecological community," "noncumulative pollutant," "$Q7_{-10}$," "representative important species," "safe concentration value," "State water plan," "test water" and "water quality-based effluent limitations."

A new definition of the term "critical use" is added. This definition is currently housed in § 93.7(c) under Table 3. A new definition of the term "natural quality" is proposed to be added to replace "ambient stream concentration" to be consistent with EPA's terminology. Additionally, a new definition of "30 day average" is proposed to be added.

The term "designated uses" is proposed to be revised to clarify that it applies to all Statewide uses as well as the uses specified in the stream drainage lists. The term "epilimnion" is modified to correct a typographical error. Also, a modification is proposed to clarify the definition of "nonthreshold effect" by referring to carcinogenic effects. In addition, a minor reference change is made to the definition of "Clean Water Act." Finally, the definition of "water quality criteria" is proposed to be revised to clarify the term in response to comments by WRAC. This definition is consistent with the Federal definition of the term at 40 CFR 131.3(b).

*Section 93.2.   Scope.*

This section is proposed to be revised to reflect the scope and applicability of water quality standards to "surface waters" by adding the word "surface" to subsections (a) and (b). Also, grammatical and editorial changes to subsection (b) are proposed in order to enhance clarity.

*Section 93.3.   Protected water uses.*

The category of "Recreation" is proposed to be changed to "Recreation and Fish Consumption" to clarify the applicability of uses to both recreation and fish consumption. In addition, the water use "Fishing" is being modified to include the taking of fish for consumption purposes, as well as for recreational purposes. These changes reflect the Department's ongoing commitment to provide human health protection standards for the consumption of fish.

*Section 93.4.   Statewide water uses.*

This section is proposed to be modified to provide that, except where otherwise specified, the uses set forth in Table 2 are applicable to all surface waters in the Commonwealth. Some situations where the uses are "otherwise specified" include: (1) the specification of aquatic life uses and the deletion of certain uses for certain waters set forth in the stream drainage lists in §§ 93.9a—93.9z; and (2) uses protected as existing uses under § 93.4(d)(1) and 40 CFR 131.32(a).

A sentence is proposed to be added to subsection (a) providing that the uses set forth in Table 2 shall be protected in accordance with Chapter 95 and the newly proposed water quality standards implementation chapter (Chapter 96), and other applicable State and Federal laws and regulations.

Another change which is proposed is the elimination of "warm water fishes" as a Statewide use in Table 2. This change has been proposed because aquatic life uses (Cold Water Fishes (CWF), Warm Water Fishes (WWF), Trout Stocking Fishery (TSF), and Migratory Fishery (MF)) are assigned on a water segment-specific basis in the drainage lists in §§ 93.9a—93.9z, and it is therefore unnecessary to include it in this section.

Subsection (b) is proposed to be modified to more closely mirror the companion Federal regulations at 40 CFR 131.10(g) which set forth the circumstances for the removal of a designated use which is not an existing use.

In the proposed rulemaking, potable water supply has been retained as a Statewide water use so that, except in three specified circumstances, water quality criteria for the protection of potable water supply are applicable to all surface waters. The Board is soliciting comment on whether protection of potable water supply should continue to be a Statewide use, or whether it should be changed so that applicable water quality criteria are only applied at existing or planned potable water supply intakes. It should be noted that if this change is made, public health based fish consumption criteria would continue to be applied Statewide, because of the proposed change to the "Fishing" use category in § 93.3.

*Section 93.5.   Application of water quality criteria to discharge of pollutants.*

This section is proposed to be deleted. Many of the provisions relating to design conditions and other specifications which are currently in this section are proposed to be either: (1) incorporated into the newly proposed water quality standards implementation chapter (Chapter 96); (2) incorporated into Chapter 92; or (3) eliminated because they are redundant with other provisions of the chapter. These changes are being proposed for the following reasons:

First, subsection (a) currently provides that water quality criteria do not constitute point source discharge effluent limitations. The newly proposed § 96.3, "water quality protection levels," continues the conceptual frame-

work that water quality criteria do not constitute effluent limits. Section 96.3 is explained in more detail as follows.

Subsection (b) currently outlines design conditions for the application of water quality criteria. Design condition specifications are proposed to be part of the "water quality protection levels" and "total maximum daily loads" sections of the newly proposed Chapter 96; these provisions are explained in more detail below.

Subsection (c) presently addresses situations where water quality criteria are exceeded under natural conditions. These situations are proposed to be dealt with in the newly proposed § 93.7(c) and in Chapter 96, which are explained in more detail as follows.

Subsection (d) outlines a procedure for determining and applying an alternative osmotic pressure criterion for the protection of aquatic life. This section is proposed to be eliminated because the application factor procedure is obsolete. If needed, site-specific osmotic pressure criterion can be developed under § 93.8.

Subsection (e) addresses the application of water quality criteria for total dissolved solids, nitrite-nitrate, phenolics and fluoride for the protection of potable water supplies. Paragraph (1), with the exception of phenolics, is proposed to be part of § 96.3. The criteria for phenolics are deleted; toxic phenols are listed in Chapter 16 (relating to water quality toxics management strategy—statement of policy) and must continue to be achieved in all surface waters at least 99% of the time. Paragraph (2), which requires public notification of the location of the nearest downstream potable water supply in NPDES permit applications, is proposed to be moved to § 92.61(a)(6). Paragraph (3), which addresses the application of these criteria in High Quality and Exceptional Value Waters, is replaced by § 96.3(d). Paragraph (4), which covers situations such as needed revisions to NPDES permits when a new potable water supply location is identified, is proposed to be moved to newly proposed § 92.8a(c).

Subsection (f) addresses the application of total residual chlorine (TRC) criteria. Paragraph (1) establishes technology-based point source effluent limitations. The proposal proposes to move the requirements of paragraph (1) to § 92.2d(3)(i). Paragraph (2), which addresses discharges of TRC to Exceptional Value Waters, and High Quality waters where social or economic justification (SEJ) has not been demonstrated, is proposed to be moved, in modified form, to § 92.2d(3)(ii). Paragraph (3), which deals with the development of site-specific TRC criteria, is being eliminated because it is redundant with § 93.8. Paragraph (4), which deals with compliance with effective disinfection requirements is also being eliminated because it is redundant with the effective disinfection requirements for NPDES discharges which may be found in newly proposed § 92.2c(b).

*Section 93.6. General water quality criteria.*

The word "waste" is proposed to be deleted in § 93.6(a) because it is not relevant as a descriptor for point and nonpoint source discharges.

*Section 93.7. Specific water quality criteria.*

Subsections (a), (b), (d) and (e) are proposed to be deleted. They are no longer necessary because the provisions of these sections which specify waters for which specific criteria have been established, and Statewide water criteria and Statewide water uses, have been reformatted and more clearly set forth in proposed revisions to § 93.4 (Statewide designated water uses),

§ 93.7(c) (proposed as § 93.7(a) specific water quality criteria), and §§ 93.9a—93.9z which have been revised to more clearly reflect the relationship to § 93.4. Newly proposed subsection (a) modifies existing subsection (c) to more clearly describe the applicability of the criteria in Table 3.

Table 3 is being modified as follows:

• All Delaware River Basin Commission (DRBC) criteria are proposed to be deleted from the table and referenced in the appropriate segments where they are applicable in §§ 93.9c and 93.9e. The DRBC criteria are proposed to be deleted because they are not Department derived or sponsored, and the Department is unable to modify the criteria; this request must be made with the DRBC. The DRBC criteria which are being deleted from the table are: Alkalinity ($Alk_3$ and $Alk_4$); Bacteria ($Bac_4$ and $Bac_5$); Chloride ($Ch_3$ and $Ch_4$); Dissolved Oxygen ($DO_3$ and $DO_4$); Hardness ($Hd_1$ and $Hd_2$); Methylene Blue Active Substance ($MBAS_1$ and $MBAS_2$); pH ($pH_2$ and $pH_4$); Phenolics ($Phen_2$); Radioactivity (Rad); Temperature ($Temp_4$, $Temp_5$, $Temp_6$, $Temp_7$, $Temp_8$, and $Temp_9$); Total Dissolved Solids ($TDS_3$ and $TDS_4$); and Turbidity ($Tur_1$, $Tur_2$, $Tur_5$, $Tur_6$ and $Tur_7$).

• The "Critical Uses" column is proposed to be modified for all parameters. Instead of using a separate set of symbols (actually numbers), the symbols from Table 1 in § 93.3 are used. This clarifies which criteria are associated with each designated use, and facilitates the elimination of Tables 4 and 5 from the section. Tables 4 and 5 have, on occasion, been the cause of confusion concerning which criteria apply to individual stream segments in §§ 93.9a—93.9z.

• Aluminum—The current criterion for protection of aquatic life is site-specific based on a factor (0.1) applied to literature toxicity data or bioassay test developed toxicity data tailored to the ambient quality of the receiving water. The existing criterion is proposed to be modified to track the EPA National criterion for acute protection (Criteria Maximum Concentration) of 750 ug/l and moved to Table 1, Chapter 16—Water Quality Toxics Management Strategy—Statement of Policy, where other metals water quality criteria are listed.

• Alkalinity—The $Alkalinity_1$ criterion is proposed to be clarified by eliminating unnecessary language, resulting in a simpler, more straightforward expression of criteria. The $Alkalinity_2$ criterion is proposed to be eliminated because the changes to the $Alkalinity_1$ criterion make it identical to the existing $Alkalinity_2$ criterion.

• Ammonia Nitrogen—The design condition specification for design flow ($Q_{30-10}$) is proposed to be deleted from this section because it is proposed to be consolidated with other design condition specifications in the newly proposed Chapter 96.

• Bacteria—The $Bac_1$ category is proposed to be amended by adding the words "fecal coliforms/100 ML." Also added, is the provision that a minimum of 5 consecutive samples are to be collected during a 30-day period. The $Bac_3$ category is proposed to be deleted because use protection is more adequately protected under categories $Bac_1$ and $Bac_2$.

• Chloride—$Ch_1$, 150 mg/l, is proposed to be deleted and replaced with the Statewide chloride criterion of 250 mg/l, which is a secondary maximum contaminant level (SMCL) specified in the Safe Drinking Water Act regulations at 40 CFR 143.3. The Department believes that the SMCL number is more appropriate for the protection of the potable water supply use; the 150 mg/l number was

developed many years ago and may be outdated. The six surface waters for which $Ch_1$ is proposed to be deleted are: § 93.9p—Allegheny River, Main Stem, Source to PA-NY State Border; Oswayo Creek, Main Stem, Source to Honeoye Creek; Honeoye Creek, Main Stem, PA-NY State Border to Mouth; Oswayo Creek, Honeoye Creek to PA-NY State Border. Section 93.9q—Allegheny River, Main Stem, PA-NY State Border to Clarion River; Brokenstraw Creek, Main Stem, PA-NY State Border to Mouth.

• Color—$Col_1$, maximum 50 units on the platinum cobalt scale, no other colors perceptible to the human eye, is proposed to be deleted from Table 3. Since the criterion applies to only one surface water in the State, it will be specified for that water in § 93.9o (Codorus Creek, Main Stem Oil Creek to Mouth). Color category $Col_2$ (proposed to be Col) of 75 units on the platinum cobalt scale will continue to be applied Statewide as required. Specific references for $Col_2$ are proposed to be deleted from §§ 93.9a—93.9z since they are no longer necessary and their specification is redundant and confusing.

While use of the platinum cobalt scale is an appropriate unit of measure for many sources and types of color found in the water, the Department seeks public input and comment on alternative methods of analysis for color for those situations for which a more accurate method of analysis may be appropriate.

• Fluoride—$F_2$, 4-day average 0.01 of the 96-hour LC50; 1 hour average 0.05 of the 96-hour LC50 for representative important species determined through substantial available literature data or bioassay test tailored to the ambient quality of the receiving water, or both, is proposed to be deleted. This general application factor method of developing criteria is proposed to be withdrawn because it may be outdated and not based on current science for criteria development.

• Iron—It is proposed to split iron criteria into two categories to differentiate between the aquatic life protection (1.5 mg/l as total recoverable iron) and potable water supply (0.3 mg/l as dissolved iron) uses.

• Manganese—The Mn criterion is proposed to be clarified by specifying that it is a total recoverable number.

• Nitrite plus Nitrate—A nonsubstantive reference change is proposed for this criterion.

• Osmotic Pressure—The provision for development of site-specific criteria in accordance with § 93.5(d) is proposed to be deleted because § 93.5(d) is proposed to be deleted. Site-specific criteria development for the osmotic pressure criterion is proposed to be addressed in accordance with the provisions of § 93.8.

• pH—The $pH_3$ category, 7.0 to 9.0 inclusive, is proposed to be deleted. The $pH_1$ category, from 6.0 to 9.0 inclusive, is proposed to be applied Statewide.

• Phenolics—It is proposed that $Phen_1$, 0.005 mg/l, based on taste and odor considerations, and the $Phen_3$, four-day average 0.02 mg/l; 1-hour average 0.1 mg/l, based on aquatic life protection, be deleted. These criteria were developed based on an evaluation of available literature in the 1980s, and may not be consistent with current national guidelines for criteria development. The major phenolics of concern are listed in Chapter 16—Water Quality Toxics Management Strategy—Statement of Policy.

• Temperature—The 2°F per hour maximum change allowance, and case-specific exceptions to thermal maxima criteria under § 97.82(a)(2), are proposed to be deleted under the $Temp_1$ through $Temp_3$ categories and are proposed to be included in a modified form in the newly proposed § 96.6. Additionally, protection for existing uses is proposed to be added. Finally, the presentation of the temperature criteria has been modified by combining the existing criteria charts to improve clarity.

• Threshold Odor Number—The basis for the Threshold Odor Number (TON) criterion, 24 at 60°C is uncertain. The Safe Drinking Water Act lists a Secondary Contaminant level of 3 TON for finished potable water; USEPA has no comparable category for ambient waters. Although the TON criterion is specified for 156 surface waters in §§ 93.9a—93.9z, it is not included in any major NPDES permit in the Commonwealth, nor does the Department's Bureau of Laboratories have any records of performing analyses for this analyte. Given these considerations it is proposed that this criterion be deleted from Table 3 and from the 156 surface waters for which it is specified in §§ 93.9a (3 surface waters), 93.9c (2 surface waters), 93.9g (2 surface waters), 93.9p (1 surface water), 93.9q (25 surface waters), 93.9r (109 surface waters), 93.9u (1 surface water), 93.9v (1 surface water), 93.9w (5 surface waters) and 93.9x (2 surface waters). Nuisance odors continue to be subject to provisions of § 93.6, General water quality criteria.

• Total Dissolved Solids—$TDS_2$, Maximum 1,500 mg/l, is proposed to be deleted. This criterion has been utilized for protection of aquatic life; it is unnecessary and redundant to retain this criterion because aquatic life protection is more properly provided for this parameter through the osmotic pressure criterion.

• Turbidity—The turbidity criteria categories $Tur_3$ and $Tur_4$ are specified for 18 surface waters in the State. These surface waters are all in § 93.9e. It is proposed that these turbidity categories be deleted from Table 3 and included in § 93.9(e) where they are applicable.

Existing subsection (f), now proposed as subsection (b), is amended to provide that the Department may develop a criterion for a substance using the best available scientific information. A new subsection (c) is proposed to clarify that where the natural quality of a surface water is determined by the Department to be lower than the applicable water quality criterion, the natural quality becomes the criterion following publication of the draft determination in the *Pennsylvania Bulletin* and a public comment period of 30 days or more. The subsection also establishes a mechanism for listing surface water segments where the natural quality criteria apply.

*Section 93.8. Development of site-specific water quality criteria.*

Subsection (a)(1) is proposed to be amended to reference the TMDL process in the newly proposed chapter 96. Section (c) is proposed to be deleted to conform to changes proposed in § 93.7(c). Section (f) is proposed to be revised to reflect the proposed deletion of § 93.5.

*Section 93.8a. Toxics substances.*

The design conditions specification in subsection (e) are proposed to be deleted and replaced with a reference to the newly proposed Chapter 96, which will contain all design condition specifications. Existing subsection (h), which allows the Department to require effluent toxicity testing, is proposed to be deleted from this section. Authorization to require whole effluent toxicity testing and establish water quality-based effluent limitations is provided in proposed §§ 92.21(c) and 92.52a.

*Section 93.9. Designated water uses and water quality criteria.*

Subsection (a) is proposed to be modified to cross-reference the section to proposed new Chapter 96—Water Quality Standards Implementation. The subsection has also been modified to clarify the relationship of § 93.9 to Statewide uses. In addition, the DRBC water quality criteria, deleted from § 93.7, the Ohio River Valley Sanitation Commission (ORSANCO) water quality criteria, and the Great Lakes Water Quality Agreement (GLWQA) water quality criteria, have been incorporated by reference in the appropriate sections of the drainage list descriptions, §§ 93.9a—93.9z.

### Chapter 95. Wastewater Treatment

As described, many existing sections of this chapter are proposed to be incorporated into other chapters.

*Section 95.1. General requirements.*

Subsection (a), which concerns the establishment of specific treatment requirements and effluent limitations, is proposed to be transferred to § 92.2a(a) with some modifications relating to citations of relevant regulatory and statutory provisions. The basic requirements would remain the same.

Existing subsections (b)—(d) were proposed to be revised and transferred to proposed § 93.4 in a separate rulemaking (27 Pa.B. 1459). It is proposed to retain these subsections in this proposal until such time as the proposal outlined in the March 22, 1997, *Pennsylvania Bulletin* notice becomes final. Accordingly, existing subsections (b)—(d) would be renumbered as subsections (a)—(c).

*Section 95.2. Waste treatment requirement.*

This section provides that wastes are to be given a minimum of secondary treatment and outlines secondary treatment requirements. Subsection (a), which provides a general requirement that waste receive a minimum of secondary treatment, is proposed to be transferred to § 92.2c(a) with modifications that make it inapplicable to combined sewer overflows which are in compliance with proposed § 92.21a(f).

Subsection (b), which outlines the secondary treatment requirements for discharges from POTWs, would be transferred to proposed § 92.2c(b) with some modifications, including the addition of a definition for effective disinfection to control disease producing organisms in paragraph (2).

Subsection (c), which establishes secondary treatment requirements for waste discharges other than sewage discharges, is proposed to be deleted and replaced with newly proposed § 92.2d, with some modifications.

*Section 95.3. Wasteload allocations.*

This section describes procedures and other considerations for making wasteload allocations for continuous point source discharges. With the exception of subsection (i), it will be replaced by provisions in proposed Chapter 96.

Existing subsection (a) is being replaced by a definition of wasteload allocations in proposed § 96.1.

Existing subsection (b) is replaced by proposed § 96.4(d), which describes how wasteload allocations are to be used to set effluent limitations in the NPDES program.

Existing subsection (c) is replaced by proposed § 96.4(a) and (b).

Existing subsection (d) is being replaced and updated by proposed § 96.4(c).

Existing subsection (e) is being replaced by proposed § 96.4(f).

Existing subsection (f) is being replaced and modified to provide greater consideration of nonpoint sources in proposed § 96.4(c), (g) and (h).

Existing subsection (g) is replaced by § 96.4(i) and (l).

Existing subsection (h) is being replaced by proposed § 96.4(k).

Existing subsection (i) is being eliminated because it is redundant with other point source monitoring requirements under the NPDES program.

Existing subsection (j) is being replaced by proposed § 96.4(m).

Existing subsection (k) is being replaced by proposed § 96.4(h).

*Section 95.6. Discharges to lakes, ponds and impoundments.*

All provisions in this section will be replaced by proposed § 96.5.

*Section 95.7. Effective disinfection.*

This section is being moved to § 92.2c(b)(2) without substantive revision.

*Section 95.8. Change in treatment requirements.*

This section is being moved to § 92.8a, without substantive change.

*Section 95.9. Phosphorus discharges to streams.*

This section is being replaced by proposed § 96.5.

### Chapter 96. Water Quality Standards Implementation
### (proposed new chapter)

*Section 96.1. Definition.*

This section is proposed to provide definitions for key words and terms used in the new chapter including: "allowable discharge concentration," "concentration," "conservative substance," "continuous point source discharge," "cumulative loading," "design discharge flow," "dilution ratio," "harmonic mean flow," "impaired surface water," "lake, pond, or impoundment," "load allocation," "loading capacity," "margin of safety," "mass load," "NPDES" or "National Pollutant Discharge Elimination System Permit," "natural quality," "nonconservative substance," "nonpoint source best management practice," "nonpoint source discharge," "nonpoint source remediation plan," "precipitation induced point source discharge," "point source discharge," "pollutant," "potable water supply," "$Q_{7-10}$ flow," "$Q_{30-10}$ flow," "significant pollutant source," "steady state modeling," "surface waters," "total maximum daily load," "wasteload allocation," "water quality criteria duration," "water quality protection levels," "water quality standards" and "wetlands."

*Section 96.2. Purpose.*

The purpose of Chapter 96 is the establishment of a process for achieving and maintaining water quality standards in surface waters.

*Section 96.3. Water quality protection levels.*

This section incorporates, and in some cases, modifies provisions of existing § 93.5; that section is proposed to be deleted. Existing § 93.5(a) provides that water quality criteria do not necessarily constitute effluent limits, but rather are one of the major factors to be considered in

developing specific effluent limitations. Current § 93.5(b) establishes "design conditions" at which water quality criteria and standards are to be achieved.

Proposed § 96.3(a) provides that existing and designated surface water uses shall be protected; and subsection (b) provides that the antidegradation requirements set forth in Chapters 93, 95 and 105 apply in waters classified as High Quality or Exceptional Value Waters. The antidegradation requirements of Chapter 105 are implemented through the administration of that chapter by the Department. In particular, the regulation at § 105.18a(1) is an antidegradation provision which prohibits the permitting of structures and activities in "Exceptional Value Wetlands" if the activity would have any "adverse" impact on the wetland. Subsection (c) specifies that the water quality criteria described in Chapter 93 shall be achieved at least 99% of the time in all surface waters of this Commonwealth unless otherwise specified in this regulation; subsection (d) establishes special provisions for the applicability of water quality criteria for total dissolved solids, nitrite-nitrate and fluoride for the protection of the potable water supply use. This proposed subsection reflects existing § 93.5(e), but deletes the phenolics requirement because the phenolics criteria are being deleted from Table 3.

Proposed subsection (e) provides that if a water quality criterion cannot be attained at least 99% of the time due to natural quality, the natural quality that is achieved at least 99% of the time is the applicable protection level; this provision is a modification of existing § 93.5(c). Subsection (f) is a modified version of existing § 93.5(b)(1) which provides that if the minimum flow of a stream is determined or estimated to be zero, applicable water quality criteria shall be achieved at least 99% of the time at the first downstream point where the stream is capable of supporting existing or designated uses. Finally, subsection (g) provides that the functions and values of wetlands shall be protected under Chapter 105. The protection of the values and functions of wetlands in Chapter 105 was incorporated into the water quality standards program at 24 Pa.B. 922 (February 12, 1994).

*Section 96.4. Total maximum daily loads (TMDLs).*

This section incorporates, and in some cases, modifies provisions of existing §§ 93.5(b), 93.7(c), 93.8a(e) (which are proposed to be deleted from Chapter 93), and § 95.3. Overall, it describes when and how TMDLs, which are an estimate of the pollutant loading capacity of a surface waterbody, shall be developed, and how associated wasteload allocations (WLAs) for point sources and load allocations (LAs) for nonpoint sources shall be developed and used in the establishment of water quality-based effluent limitations for point source discharges, and in the development of recommended remediation plans for nonpoint sources. The new section further describes specific factors that the Department must consider in developing TMDLs, WLAs and LAs; the allocation procedure to establish individual WLAs and LAs and how alternative procedures (including "effluent trading") may be considered by the Department is also described. Finally, the most significant additions provide for fuller consideration of nonpoint source pollutant loadings in the water quality management process where it is demonstrated that they are causing or contributing to the nonattainment of water quality protection levels.

Subsection (a) provides that the Department will identify surface waters that require TMDLs, prioritize these waters for TMDL development, and then develop TMDLs for these waters. This newly proposed subsection mirrors the Federal TMDL development process set forth at 40 CFR 130.7. Subsection (b) is proposed to provide that, in addition to the TMDLs developed under subsection (a), TMDLs for other waters shall be developed under § 96.4 when: (1) the Department determines that the Water Quality Protection Levels (WQPLs) specified in § 96.3 are or would be violated after the imposition of applicable technology-based limitations; and (2) one or more point sources are or would be the primary cause of the violation of the WQPLs.

Subsection (c) is proposed to specify that the sum of WLAs and LAs may not be greater than the loading capacity of the surface water, after allowances are made for natural quality, seasonal variations, and a margin of safety. Subsection (d) specifies that WLAs developed in accordance with this chapter shall serve as the basis for water quality-based effluent limitations for pollutant sources regulated under Chapter 92.

Subsection (e) specifies that in developing TMDLs, WLAs and LAs, the Department shall: (1) consider relevant design factors; (2) treat all pollutants as conservative unless information indicates otherwise; and (3) include a margin of safety. The Department may also consider any increase in pollutant loadings that may be reasonably expected over a 10-year period.

Subsection (f) sets forth an allocation procedure. Subsection (f)(1) provides that WLAs and LAs assigned to individual pollutant sources shall be the more stringent of: (1) the pollutant loading authorized to be discharged under applicable technology-based requirements; (2) the pollutant loadings under §§ 96.5 and 96.6; and (3) the pollutant loadings that can be discharged by the source that will achieve the WQPLs specified in § 96.3. In addition, subsection (f)(2) provides that WLAs and LAs for significant pollutant sources shall be made more stringent if the cumulative loading exceeds the TMDL.

Subsection (g) provides that the Department may approve effluent trading, provided that: (1) all pollutant sources comply with applicable technology-based requirements; (2) WQPLs specified in § 96.3 are achieved in all portions of the surface water under consideration; and (3) the Department has published a description of the effluent trading procedure in the *Pennsylvania Bulletin* and solicited comments thereon.

Subsection (h) provides that steady State modeling at the design flow conditions listed in Table 1 shall be used to develop TMDLs, WLAs, and LAs, where continuous point sources are the primary cause of a violation of WQPLs, unless an alternative method is approved. The "design condition" specifications of existing § 93.5(b), and Table 3 of § 93.7(c) (relating to ammonia-nitrogen) for continuous point source discharges have been retained in § 96.4(i). In addition, design conditions for the application of carcinogen criteria under § 93.8a have been clarified. Also, this subsection provides that an LA may be a total allotment for nonpoint source loadings and need not be assigned to individual nonpoint sources.

Subsection (i) provides that the Department shall revise WLAs and LAs because of new or increased pollutant loadings. WLAs shall be incorporated into applicable NPDES permits at or before the expiration date of the permit. Subsection (j) states that where mathematical modeling techniques are used to determine TMDLs, WLAs and LAs, they should be generally accepted in the scientific community. Subsection (k) provides that the Department may require NPDES dischargers and other persons subject to the CSL to conduct appropriate moni-

toring of pollutant sources and waters to obtain data to develop TMDLs, WLAs and LAs, and to determine their effectiveness. Finally, subsection (l) sets forth the burden of proof for persons challenging TMDLs, WLAs or LAs prepared by the Department.

*Section 96.5.  Nutrient discharges.*

This section incorporates provisions from existing §§ 95.6 and 95.9 and simplifies the regulatory language to make it easier to understand.

Proposed § 96.5(a) is an adaptation of existing § 95.9(b)(5) which requires that, whenever feasible, and environmentally sound, land disposal of wastewater shall be used to prevent or minimize the discharge of nutrients if the discharge would threaten surface water quality. Section 96.5(a) applies to both point and nonpoint source discharges of nutrients. Nutrients include both phosphorous and nitrogen because both have been identified as potential sources of impairment. Other reasons to include nitrogen are as follows. Excess total nitrogen may be present in the water column in several chemical species including ammonia, nitrite and nitrate. Under certain conditions of temperature and pH, ammonia can be directly toxic to fish and aquatic life. Also, nitrite-nitrogen has been identified as a potential human health risk in water supplies. If the concentrations of ammonia and nitrite are below toxic levels, both will exert an oxygen demand in converting to the more stable nitrate form. In lakes and impoundments, and occasionally in streams, nitrogen may be the limiting nutrient and control the growth of algae and other aquatic plants, thus, using dissolved oxygen and blocking the penetration of sunlight which is needed for the growth of submerged aquatic vegetation (SAV); SAV serves as important habitat for aquatic life. In addition, the Chesapeake Bay program requires the reduction of nitrogen. This change makes this provision consistent with that important program and furthers the goal of ensuring a healthy and viable Chesapeake Bay.

The newly proposed subsection (b) is based on existing § 95.6(a) and provides that to control eutrophication in a lake, pond or other impoundment, the Department will develop a TMDL and associated WLAs, and LAs based on annual loading estimates. Eutrophication occurs due to increased levels of nutrients in a lake and is manifested in algal blooms. Lake trophic status is based on Carlson's Trophic Status Index (TSI). If a lake indicates TSI values of 50—80, the Department requires phosphorus controls for point sources discharging into the lake or discharging into waters flowing into the lake.

Finally, proposed subsection (c) is based on existing § 95.9(a) and (b)(1) and provides that if the discharge of phosphorous contributes to impairment of existing or designated uses in a free flowing surface water, phosphorous discharges from point sources shall be limited to 2 mg/l, or less if a TMDL has been developed.

*Section 96.6.  Heated wastewater discharges.*

This section modifies provisions from existing §§ 97.81 and 97.82 which are proposed to be deleted. Heated wastewater discharges are discharges that increase, or have the potential to increase, the temperature of the receiving surface water such that thermal water quality criteria are or may be violated. Typically, heated waste discharges include the discharge of noncontact cooling water from power plants and other industrial facilities. Subsection (a) provides that WLAs for point source discharges of heated wastewater must comply with all applicable state and Federal requirements; subsection (b)

limits the rate of change in surface water temperature to no more than 2° during any 1 hour period from a point source discharge. Subsection (c) provides that a heated wastewater discharge is limited to: (1) no more than the applicable temperature criteria established in § 93.7; or (2) an amount based on a specific evaluation conducted under section 316(a) of the Federal Clean Water Act.

*Section 96.7.  Public participation.*

This section outlines public participation procedures for the listing of surface waters requiring TMDLs, and for the development of TMDLs. This section assures that interested and affected parties are made aware of and are involved in TMDL determinations.

Subsection (a) provides that the Department shall publish a notice in the *Pennsylvania Bulletin* of the availability of draft and final lists of surface waters requiring TMDLs under § 96.4(a), setting forth a 30-day public comment period. Subsection (b) provides that the Department shall publish a notice in the *Pennsylvania Bulletin* of the availability of any draft or final TMDL prepared under this chapter, setting forth a 30-day public comment period, with an opportunity for a public hearing if there is significant public interest. Where a TMDL is prepared under § 96.4(b), the notice may be included in the notice of permit application prepared under § 92.61(a).

### Chapter 97.  Industrial Wastes

The provisions of Chapter 97 are proposed to be deleted in their entirety. Sections 97.15 and 97.63 are proposed to be incorporated into §§ 92.2b, 92.2d(1) and (2) and 92.2d(4) respectively. The reader should refer to the discussion of the provisions of Chapter 92 in this Preamble for a discussion of the provisions of Chapter 97 proposed to be incorporated in this rulemaking. Chapter 97 generally outlines requirements applicable to the discharge of industrial wastes to waters of the Commonwealth. Many of the deleted provisions involve the pretreatment of industrial wastes by industrial users. The Department has not received delegation from the EPA to administer an industrial waste pretreatment program and does not intend to seek delegation to administer this program. Accordingly, the pretreatment provisions of existing Chapter 97 are proposed to be deleted because they are unnecessary. The Department's authority to regulate pretreatment, as affirmed in *Borough of Ridgway v. DER*, 1994 EHB 1090, is retained in other provisions of these regulatory amendments.

### F.  Benefits, Costs, and Compliance

Executive Order 1996-1 provides for a cost/benefit analysis of the proposed amendments.

*Benefits*

Overall, the citizens of this Commonwealth will benefit from these recommended changes because they provide appropriate protection of designated and existing uses of surface waters in this Commonwealth in a more efficient and easily administerable manner. The proposed amendments reorganize and consolidate existing water management regulations in a more understandable manner, and should help to assure that pollution control actions are as cost-effective as possible and that pollution control costs are equitably distributed. The proposed language should also make it easier for citizens to understand how NPDES permits are developed and administered, and how water quality standards are developed and implemented.

These revisions also assure compliance with applicable Federal requirements. Under the proposed revisions to Chapter 92, persons required to obtain a new or renew an existing NPDES permit may benefit because of the clarification provided in the amendments, as well as improved consistency with Federal regulations. In addition, such persons may benefit by the modification of some requirements which are more stringent than Federal regulations without a compelling public interest. Among the sections modified to make them more closely mirror Federal requirements are § 92.4 (relating to exclusions from permit requirements), which adds a number of activities which would be excluded from the requirement to obtain an NPDES permit; § 92.11 (relating to duration of standards for certain new sources), which adds a third event, the date the discharge begins in the calculation of the 10-year period during which a point source would not be subject to a more stringent treatment technology standard; existing § 92.41(d) and (e) (relating to monitoring) by providing that the retention period for maintaining monitoring records may be extended during the course of any unresolved litigation (as opposed to the current requirement that the records shall be maintained) and incorporating the language of 40 CFR 122.44(i)(4) relating to the establishment of monitoring requirements for stormwater discharges not subject to an effluent limitation on a case-by-case basis into a new subsection (g); § 92.55 (relating to schedules of compliance), which is revised to provide a 1-year window for compliance before a compliance schedule is required in a permit as opposed to the current 9-month window; § 92.65 (relating to notice to other government agencies), which is revised to limit the circumstances in which the District Engineer of the Corps of Engineers may object to the issuance of a permit consistent with the requirement of section 402(b)(6) of the Federal Clean Water Act (33 U.S.C.A. § 1342(b)(6)); and § 92.83 (relating to inclusion of individual discharges in general NPDES permits) which has been revised to provide that an eligible discharger "certify" that its discharge meets the requirements for coverage under a general permit and to provide options for notification of coverage under the general permit consistent with the provisions of 40 CFR 122.28(b). In addition, a proposed amendment which would allow the Department to grant coverage to an applicant under a general NPDES permit without the submittal of an NOI will result in a cost savings.

### Compliance Costs

The proposed amendments to Chapters 92 and 93 are not expected to impose any significant additional compliance costs on the regulated community. Under the proposed revisions to Chapter 96, it is possible that some activities, including some point source and nonpoint source activities, may experience additional compliance costs. For example, § 96.4(f)(2) provides that WLAs and LAs shall be made more stringent if the cumulative loading in the waterbody exceeds the TMDL. In addition, § 96.4(k) may impose some additional monitoring costs on NPDES discharges and other persons subject to regulation under the CSL if these entities are required to develop TMDLs. Decisions on when to require additional monitoring will be made on a case-by-case basis and cannot, therefore, be estimated in advance.

Since the TMDLs, WLAs and LAs developed under this rulemaking will be used as the basis for regulating point and nonpoint pollutant dischargers, the regulation may impose additional costs on some of these entities. Other entities may experience a reduction in treatment costs as a result of these regulations; the regulations have been designed to equitably allocate the responsibility for pollution control among both point and nonpoint source pollutant contributors. Overall, these regulatory changes are not expected to increase total pollution control expenditures over that which would otherwise be required under existing regulations.

### Compliance Assistance Plan

The proposed amendments to Chapter 92 are primarily intended to consolidate existing requirements into a single chapter, clarify existing requirements and make the State regulations more closely mirror Federal regulations. Compliance assistance is provided to applicants through numerous guidance documents the Department has made available for permit applicants and permittees, and by Department staff through contacts with permittees.

Chapter 96 is primarily aimed at describing how and when the Department will develop TMDLs, WLAs, LAs and nonpoint source remediation plans. The Department is currently undertaking efforts to develop program guidance to address the various issues relating to TMDL development. Other guidance is in place for conducting additional monitoring, and for allocating pollution treatment costs equitably when more stringent treatment costs are required, and is being developed for the achievement of LAs and WLAs. These guidances should aid regulated entities in complying with the regulatory requirements.

### Paperwork Requirements

These regulatory revisions should have no significant paperwork impact on this Commonwealth, its political subdivisions or the private sector. The development of TMDLs by the Department under Chapter 96 may require some additional paperwork.

### G. Pollution Prevention

In keeping with Governor Ridge's interest in encouraging pollution prevention solutions to environmental problems, Chapter 92 of these proposed amendments incorporates language encouraging the use of pollution prevention techniques, and suggesting measures to be taken to achieve environmental benefits. The existing mandatory pollution prevention language contained in existing § 97.15 has been deleted and replaced with other language which does not require, but instead suggests and encourages pollution prevention efforts. Additionally, the newly proposed Chapter 93 prevents pollution by incorporating the latest science into the water quality standards. Chapter 95 retains existing antidegradation implementation measures, thereby preventing pollution. Finally, Chapter 96 prevents pollution by more closely addressing point and nonpoint pollutant sources and measures to achieve water quality standards in waters which are threatened or impaired.

### H. Sunset Review

These proposed amendments will be reviewed in accordance with the sunset review schedule published by the Department to determine whether the amendments effectively fulfill the goals for which they were intended. In addition, revisions to water quality standards are required to be reviewed by the Department at least once every 3 years, with the results of the review to be submitted to the EPA. The proposed revisions to Chapters 93 and 96 constitute the major portion of the Commonwealth's triennial water quality standards review.

### I. Regulatory Review

Under section 5(a) of the Regulatory Review Act (71 P. S. § 745.5(a)), on August 11, 1998, the Department

submitted a copy of the proposed amendments to the Independent Regulatory Review Commission (IRRC) and to the Chairpersons of the Senate and House Environmental Resources and Energy Committees. In addition to submitting the proposed amendments, the Department has provided IRRC and the Committees with a copy of a detailed regulatory analysis form prepared by the Department. A copy of this material is available to the public upon request.

If IRRC has objections to any portion of the proposed amendments, it will notify the Department within 10 days of the close of the Committees' review period. The notification shall specify the regulatory review criteria which have not been met by that portion. The Regulatory Review Act specifies detailed procedures for the Department, the Governor and the General Assembly to review these objections before final publication of the amendments.

## J. *Public Comments*

*Written Comments*—Interested persons are invited to submit comments, suggestions or objections regarding the proposed amendments to the Environmental Quality Board, P. O. Box 8477, Harrisburg, PA 17105-8477 (express mail: Rachel Carson State Office Building, 15th Floor, 400 Market Street, Harrisburg, PA 17101-2301). Comments submitted by facsimile will not be accepted. Comments, suggestions or objections must be received by the Board by October 28, 1998 (within 60 days of publication in the *Pennsylvania Bulletin*). Interested persons may also submit a summary of their comments to the Board. The summary may not exceed one page in length and must also be received by October 28, 1998 (within 60 days following publication in the *Pennsylvania Bulletin*). The one-page summary will be provided to each member of the Board in the agenda packet distributed prior to the meeting at which the final-form regulations will be considered.

*Electronic Comments*—Comments may be submitted electronically to the Board at RegComments@A1.dep. state.pa.us. A subject heading of the proposal and return name and address must be included in each transmission. Comments submitted electronically must also be received by the Board by October 28, 1998.

In addition to general public comment, public comment is specifically sought on three specific areas of these amendments. First, during the review of the proposed amendments to Chapter 92, WRAC proposed the creation of an additional opportunity for public comment during the NPDES permitting process. Currently, public comment on proposed sewerage projects requiring an NPDES permit is provided during the sewage facilities planning process under the Pennsylvania Sewage Facilities Act, and when the draft NPDES permit is published in the *Pennsylvania Bulletin*. WRAC proposed adding a public notice and comment period upon receipt of the application for an NPDES permit. It was agreed to seek additional input on this recommendation in the Preamble to the proposed rulemaking. Individuals interested in this issue are encouraged to submit comments. Second, in the proposed amendments, potable water supply has been retained as a Statewide water use in § 93.4 so that, except in three specified circumstances, water quality criteria for the protection of potable water supply are applicable to all surface waters. The Board is soliciting comment on whether protection of potable water supply should continue to be a Statewide use, or whether it should be changed so that applicable water quality criteria are only applied at existing or planned potable water supply intakes. It should be noted that if this change is made, public health based fish consumption criteria will continue to be applied Statewide, because of the proposed change to the "Fishing" use category in § 93.3. Third, comment is sought on alternative methods of analysis for color for those situations for which a more accurate method of analysis than the platinum cobalt scale may be appropriate.

## K. *Public Hearings*

The Board will hold three public hearings for the purpose of accepting comments on this regulatory proposal. Each of the hearings will include an afternoon session beginning at 3 p.m. and an evening session beginning at 7 p.m. The date and locations are listed as follows:

October 15, 1998   Department of Environmental Protection
Southwest Regional Office
400 Waterfront Drive
Pittsburgh, PA

October 20, 1998   Department of Environmental Protection
Southcentral Regional Office
Susquehanna River Conference Room
909 Elmerton Avenue
Harrisburg, PA

October 22, 1998   Department of Environmental Protection
Southeast Regional Office
Suite 6010, Lee Park
555 North Lane
Conshohocken, PA

Persons wishing to present testimony at a hearing are requested to contact Kate Coleman at the Environmental Quality Board, P. O. Box 8477, Harrisburg, PA 17105-8477, (717) 787-4526, at least 1 week in advance of the hearing to reserve a time to present testimony. Oral testimony is limited to 10 minutes for each witness. Witnesses are requested to submit three written copies of oral testimony to the hearing chairperson at the hearing. Organizations are limited to designating one witness to present testimony on their behalf at each hearing.

Persons in need of accommodations as provided for in the Americans With Disabilities Act of 1990 should contact Kate Coleman at (717) 787-4526 or through the Pennsylvania AT&T Relay Service at (800) 654-5984 (TDD) to discuss how the Department may accommodate their needs.

JAMES M. SEIF,
*Chairperson*

**Fiscal Note:** 7-338. No fiscal impact; (8) recommends adoption.

## Annex A

## PART I. DEPARTMENT OF ENVIRONMENTAL PROTECTION

### Subpart C. PROTECTION OF NATURAL RESOURCES

### ARTICLE II. WATER RESOURCES

### CHAPTER 92. NATIONAL POLLUTANT DISCHARGE ELIMINATION SYSTEM PERMITTING, MONITORING AND COMPLIANCE

### GENERAL PROVISIONS

§ 92.1. Definitions.

The following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise:

*Administrator*—The Administrator of the [ **United States Environmental Protection Agency** ] **EPA**.

*Applicable effluent standards and limitations*—State, **interstate** and Federal effluent standards and limitations to which a discharge is subject under the State and Federal Acts, including, but not limited to, **water quality-based and technology-based** effluent limitations, standards of performance, toxic effluent standards and prohibitions, **best management practices** and pretreatment standards.

*Applicable water quality standards*—Water quality standards to which a discharge is subject under the State and Federal Acts, **and regulations promulgated thereto** [ **and which have been either:**

**(i)** Approved or permitted to remain in effect by the Administrator under section 303(a) or (c) of the Federal Water Pollution Control Act (33 U.S.C.A. § 1313(a) or (c)).

**(ii)** Promulgated by the Administrator under section 303(b) or (c) of the Federal Water Pollution Control Act (33 U.S.C.A. § 1313(b) or (c)). ]

*Application*—The Department's form for applying for approval to discharge pollutants to surface waters of this Commonwealth under a new NPDES permit, or reissuance of an existing NPDES permit, or the modification, revision or transfer of an existing NPDES permit.

*Average annual discharge limitation*—The highest allowable average of daily discharges over a calendar year, calculated as the sum of all daily discharges measured during a calendar year divided by the number of daily discharges measured during that year.

*Average monthly discharge limitation*—The highest allowable average of daily discharges over a calendar month, calculated as the sum of all daily discharges (a minimum of 4 daily discharge sample results is recommended for toxics; 10 is preferred) measured during a calendar month divided by the number of daily discharges measured during that month.

*Average weekly discharge limitation*—The highest allowable average of daily discharges over a calendar week, calculated as the sum of all daily discharges measured during a calendar week divided by the number of daily discharges measured during that week.

*BAT—Best available technology*—The maximum degree of effluent reduction attainable through the application of the best treatment technology economically achievable within an industrial category or subcategory, or other category of discharger, taking into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques and process changes (including in-plant source reduction measures in addition to end of pipe controls), the cost of achieving the effluent reduction, nonwater quality environmental impacts (including energy requirements), and other factors the Department deems appropriate. The term includes categorical effluent limitation guidelines (ELGs) promulgated by the EPA under section 304(b) of the Federal Act (33 U.S.C.A. § 1314(b)). For sewage treatment plants, BAT is secondary treatment as defined in § 92.2c(b) (relating to minimum sewage treatment requirements). Dischargers of total residual chlorine (TRC), including sewage treatment plants, may establish BAT under this chapter.

*BMP—Best management practices*—Schedules of activities, prohibitions of practices, maintenance procedures and other management practices to prevent or reduce pollution to surface waters of this Commonwealth. The term includes pollution prevention measures; source reduction procedures; water conservation practices; erosion and sedimentation control plans; stormwater management measures; and treatment requirements, operating procedures, and practices to control plant site runoff, spillage, or leaks, sludge or waste disposal, or drainage from raw material storage.

*Bypass*—The intentional diversion of wastewater from a portion of a treatment facility after the headworks.

*CCW—Contact cooling water*—Cooling water that comes into contact with any raw material, intermediate product, finished product, byproduct or waste product, or which otherwise has the potential to become contaminated.

*CSO—Combined sewer overflow*—Any intermittent overflow, or other untreated discharge from a municipal combined sewer system (including domestic, industrial and commercial wastewater, and stormwater) which results from a flow in excess of the dry weather carrying capacity of the system.

*Combined sewer system*—A sewer system which has been designed to serve as both a sanitary sewer and a storm sewer.

*Complete application*—An application which contains an application form properly completed, signed and witnessed, a filing fee, proof of municipal notification, proof of local newspaper publication, standard reports and forms required by the Department to process a permit and other data required by the Department.

*Concentrated animal feeding operations*—Animal feeding operations which meet the criteria in 40 CFR Part 122, Appendix B (relating to criteria for determining a concentrated animal feeding operation), or which the Department designates under the criteria in 40 CFR 122.23(c) (relating to concentrated animal feeding operations).

*Concentrated aquatic animal production facility*—A hatchery, fish farm or other facility which meets the criteria in 40 CFR Part 122, Appendix C (relating to criteria for determining a concentrated aquatic animal production facility), or which the Department designates under the criteria in 40 CFR 122.24(c) (relating to concentrated aquatic animal production facilities).

*Conventional pollutant*—Biochemical oxygen demand, carbonaceous biochemical oxygen demand, nitrites, nitrate nitrogen, phosphorous, suspended solids, pH, fecal coliform, and oil and grease.

*Daily discharge*—The discharge of a pollutant measured during a calendar day or any 24-hour period that reasonably and accurately represents the calendar day for purposes of sampling. For pollutants with limitations expressed in terms of mass, the daily discharge is calculated as the total mass of the pollutant discharged over the day. For pollutants with limitations expressed in other units of measurement, daily discharge is calculated as the average measurement of that pollutant during the day.

[ *Department*—The Department of Environmental Resources of the Commonwealth. ]

*Director*—The Director of the Bureau of Water Quality Management of the Department or his designee. ]

*Discharge*—An addition of any pollutant to [ navigable ] surface waters of this Commonwealth from a point source, including additions of pollutants from surface runoff and stormwater which is collected or channelized; discharges through pipes, sewers or other conveyances which do not lead to a treatment works; and discharges through pipes, sewers or other conveyances.

*Draft permit*—A document prepared by the Department indicating the Department's tentative decision to issue or deny, modify, revoke or reissue a permit.

*Effluent limitation* or *standard*—A restriction established by the [ Commonwealth ] Department or the Administrator on quantities, rates and concentrations of chemical, physical, biological and other constituents which are discharged from point sources into [ navigable ] surface waters, including BMP's and schedules of compliance.

*ELG—Effluent limitations guideline*—A regulation published by the Administrator under section 304(b) of the Federal Act (33 U.S.C.A. § 1314(b)), or by the Department, used to revise or adopt effluent limitations.

[ *EPA*—The United States Environmental Protection Agency. ]

*Existing discharge*—A discharge which is not a new discharge or a new source.

*Facility* or *activity*—Any NPDES point source or other operations, lands or activities which require coverage under the NPDES Program, or are associated with an NPDES discharge.

*Federal Act—The Federal Water Pollution Control Act* [ , act of June 30, 1948 (Ch. 758, 62 Stat 1155) ] (33 U.S.C.A. §§ 1251—1376), also known as the Clean Water Act or CWA.

*         *         *         *         *

*Industrial user*—Those industries identified in the Standard Industrial Classification Manual, [ Bureau ] Office of [ the ] Management and Budget, [ 1967 ] 1987, as amended and supplemented, under the category "Division D-Manufacturing" and other classes of significant waste producers, as by regulation, the Administrator deems appropriate.

*Industrial waste*—A liquid, gaseous, radioactive, solid or other substance, not sewage, resulting from manufacturing or industry, or from an establishment, and mine drainage, refuse, silt, coal mine solids, rock, debris, dirt and clay from coal mines, coal collieries, breakers or other coal processing operations. The term includes all of these substances whether or not generally characterized as waste.

*Instantaneous maximum effluent limitation*—The highest allowable discharge of a concentration or mass of a substance at any one time as measured by a grab sample.

*         *         *         *         *

*LA—Load allocation*—The portion of a surface water's loading capacity that is assigned or allocated to existing and future nonpoint sources and natural quality.

*Large municipal separate storm sewer system*—A municipal separate storm sewer system defined in 40 CFR 122.26(b)(4) (relating to stormwater discharge (application to State NPDES programs)).

*Loading capacity*—The greatest amount of loading expressed in terms of mass per unit time, toxicity or other appropriate measure, that a surface water can receive, while still achieving the water quality protection levels and other requirements in Chapter 96 (relating to water quality standards implementation).

*Log sorting* and *log storage facilities*—Facilities whose discharges result from the holding of unprocessed wood, for example, logs or roundwood with bark or after removal of bark held in self-contained bodies of water (mill ponds or log ponds) or stored on land where water is applied intentionally on the logs (wet decking). (See 40 CFR Part 429, Subpart J (relating to log washing), including the effluent limitations guidelines.

*Major facility*—An NPDES facility or activity classified as such by the Regional Administrator in conjunction with the Department.

*Maximum daily discharge limitation*—The highest allowable daily discharge.

*Medium municipal separate storm sewer system*—A municipal separate storm sewer system as defined in 40 CFR 122.26(b)(7).

*Minor discharge*—A discharge which has a total volume of less than 50,000 gallons on every day of the year, does not affect the waters of another state, and is not identified by the [ Director ] Department, the Regional Administrator, or by the Administrator in regulations issued under section 307(a) of the Federal Act (33 U.S.C.A. § 1317(a)) as a discharge which is not a minor discharge. If there is more than one discharge from a facility and the sum of the volumes of all discharges from the facility

exceeds 50,000 gallons on any day of the year, then no discharge from the facility is a minor discharge.

*Municipal separate storm sewer*—A separate storm sewer (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, manmade channels or storm drains) which is all of the following:

(i) Owned or operated by a state, city, town, borough, county, district, association or other public body (created by or under State law) having jurisdiction over disposal of sewage, industrial wastes, stormwater or other wastes, including special districts under State law such as a sewer district, flood control district or drainage district, or similar entity, or a designated and approved management agency under section 208 of the Federal Act (33 U.S.C.A. § 1288) that discharges to surface waters of this Commonwealth.

(ii) Designed or used for collecting or conveying stormwater.

(iii) Not a combined sewer.

(iv) Not part of a POTW.

*NOI—Notice of intent*—A complete form submitted for NPDES general permit coverage which contains information and certifications required by the terms of the permit and by §§ 92.81—92.83 (relating to general permits). An NOI is not an application.

*NPDES form*—An issued NPDES permit and a [ **national** ] **National** form developed for use in the NPDES, including [ **the Refuse Act application,** ] the [ **NPDES** ] application[ **,** ] and the NPDES reporting form.

*NPDES permit*—A permit or equivalent document or requirements issued by the Administrator, or, [ **where** ] **when** appropriate, by the [ **Director** ] **Department** after enactment of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C.A. §§ 1281 and 1361), to regulate the discharge of pollutants [ **pursuant to** ] **under** section 402 of the Federal Act (33 U.S.C.A. § 1342).

*NPDES primary industry categories*—The primary industry categories in 40 CFR Part 122, Appendix A (relating to NPDES primary industry categories), which is hereby incorporated by reference.

*NPDES reporting form*—The form for reporting monitoring results approved by the Administrator for use in this Commonwealth, **also referred to as a discharge monitoring report (DMR), which includes any supplemental forms provided by the Department.**

\*    \*    \*    \*    \*

*Natural quality*—The water quality conditions that exist or that would reasonably be expected to exist in the absence of human related activity.

[ *Navigable waters*—Surface streams in this Commonwealth, lakes connected thereto, Lake Erie and the Delaware Estuary. ]

*New discharger*—A building, structure, facility, activity or installation from which there is or may be a discharge of pollutants that did not commence the discharge at a particular site prior to August 13, 1979, which is not a new source, and which has never received a final effective NPDES permit for discharges at that site.

*New source*—A building, structure, facility activity or installation from which there is or may be a discharge of pollutants, the construction of which commenced after promulgation of standards of performance under section 306 of the Federal Act (33 U.S.C.A. § 1316) which are applicable to the source, or after proposal of standards of performance in accordance with section 306 of the Federal Act which are applicable to the source.

*Noncontact cooling water*—Cooling water that does not contact any raw material, intermediate product, finished product, byproduct or waste product.

*Nonconventional pollutant*—A pollutant which is not a conventional or toxic pollutant.

[ *NPDES application*—The form for application for an NPDES permit approved for use in this Commonwealth by the Administrator ].

*Operator*—A person responsible for the operation or maintenance, or both, of a facility or activity with a discharge subject to this chapter.

*Owner*—The person holding legal title to a facility or activity with a discharge subject to this chapter.

*POTWs—Publicly owned treatment works*—A device or system used in the treatment (including recycling and reclamation) of municipal sewage or industrial wastes of a liquid nature which is owned by a state or municipality. The term includes sewers, pipes or other conveyances only if they convey wastewater to a POTW providing treatment.

*Person*—Any individual, **public or private** corporation, partnership, association, municipality or political subdivision of the Commonwealth, **institution, authority, firm, trust, estate, receiver, guardian, personal representative, successor, joint venture, joint stock company, fiduciary; department, agency or instrumentality of State, Federal or local government, or an agent or employe thereof; or any other legal entity.**

*Point source*—Any discernible, confined or discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, **landfill leachate collection system**, or vessel or other floating craft, from which pollutants are or may be discharged. **The following are point sources requiring NPDES permits for discharges:**

(i) Industrial waste discharges.

(ii) Sewage discharges.

(iii) Concentrated animal feeding operations.

(iv) Concentrated aquatic animal production facilities.

(v) Discharges from aquaculture projects.

(vi) Discharges of stormwater associated with industrial activity, including discharges from stormwater associated with construction activity.

(vii) Discharges of stormwater from large and medium separate storm sewers.

(viii) Silvicultural point sources.

(ix) Other discharges of pollutants from a discernible, confined or discrete conveyance.

*Pollutant*—[ Dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. This term does not mean "sewage from vessels" within the meaning of section 312 of the Federal Act (33 U.S.C.A. § 1322), or water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the state in which the well is located, and if such state determines that such injection or disposal will not result in the degradation of ground or surface water resources. ] Any contaminant or other alteration of the physical, chemical, biological or radiological integrity of surface water which causes or has the potential to cause pollution as defined in section 1 of the State Act (35 P. S. § 691.1).

*Pollution prevention*—Source reduction and other practices that reduce or eliminate the creation of pollutants through increased efficiency in the use of raw materials, energy, water or other resources, or protection of natural resources by conservation.

*Primary industrial facility*—An industrial facility in a primary industrial category, as defined in 40 CFR 122.2 (relating to definitions).

*Process wastewater*—Water which, during manufacturing or processing, comes into direct contact with or results from the production or use of any raw material, intermediate product, finished product, byproduct or waste product. The term also includes any type of discharge which is covered by an ELG.

[ *Refuse Act*—Section 13 of the River and Harbor Act of March 3, 1899 (33 U.S.C.A. §§ 401—413).

*Refuse Act application*—The application for a permit under the Refuse Act.

*Refuse Act permit*—Any permit issued under the Refuse Act. ]

\*     \*     \*     \*     \*

*Rock crushing and gravel washing facilities*—Facilities which process crushed and broken stone, gravel and riprap (See 40 CFR Part 436, Subpart B (relating to crushed stone subcategory), including the effluent limitations guidelines).

*SSO—Sanitary sewer overflow*—An intermittent overflow of wastewater, or other untreated discharge from a separate sanitary sewer system (which is not a combined sewer system), which results from a flow in excess of the carrying capacity of the system or from some other cause prior to reaching the headworks of the sewage treatment facility.

\*     \*     \*     \*     \*

*Separate storm sewer*—A conveyance or system of conveyances (including pipes, conduits, ditches and channels) primarily used for collecting and conveying stormwater runoff.

*Separate storm sewer overflow*—An event during which stormwater runoff collected in a separate storm sewer system is discharged from points on the separate storm sewer system into surface waters of this Commonwealth.

*Sewage*—A substance that contains any of the waste products or excrementitious or other discharge from the bodies of human beings or animals.

*Silvicultural point source*—A discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of this Commonwealth. The term does not include nonpoint source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance from which there is runoff.

*Single residence sewage treatment plant*—A system of piping, tanks or other facilities serving a single family residence located on a single family residential lot, which collects, disposes and treats solely direct or indirect sewage discharges from the residence into surface waters of this Commonwealth.

\*     \*     \*     \*     \*

*Stormwater*—Stormwater runoff, snow melt runoff and surface runoff and drainage.

*Stormwater discharge associated with construction activity*—The discharge or potential discharge into surface waters of this Commonwealth, municipal separate storm sewers or nonmunicipal separate storm sewers from any conveyance which is used for collecting and conveying stormwater and which is related to construction activities including clearing, grubbing, grading and excavation. These activities require a permit under this chapter whether or not they discharge to waters of this Commonwealth. The term does not include operations that result in the disturbance of less than 5 acres of total land area which are not part of a larger common plan of development or sale.

*Stormwater discharge associated with industrial activity*—The discharge from any conveyance which is used for collecting and conveying stormwater and which is directly related to manufacturing, processing or raw materials storage areas at an industrial area, as defined in 40 CFR 122.26(b)(14) which is incorporated by reference.

*Surface waters*—Perennial and intermittent streams, rivers, lakes, reservoirs, ponds, wetlands, springs, natural seeps and estuaries, excluding water at facilities approved for wastewater treatment such as wastewater treatment impoundments, cooling water ponds and constructed wetlands used as part of a wastewater treatment process.

*TMDL—Total maximum daily load*—The sum of the individual wasteload allocations for point sources, load allocations for nonpoint sources, natural quality and a margin of safety.

*Toxic pollutant*—Those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation, or

assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, [ will ] **may,** on the basis of information available to the Administrator **or Department,** cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions, including malfunctions in reproduction, or physical deformations in [ such ] **these** organisms or their offspring.

*WETT—Whole effluent toxicity testing—A test, survey, study, protocol or assessment which includes the use of aquatic, bacterial, invertebrate or vertebrate species to measure acute or chronic toxicity, and any biological or chemical measure of bioaccumulation, bioconcentration or impact on established aquatic and biological communities. The term includes any established, scientifically defensible method which is sufficiently sensitive to measure toxic effects.*

*WLA—Wasteload allocation—The portion of a surface water's loading capacity that is allocated to existing and future point source discharges.*

*Water quality-based effluent limitation—An effluent limitation derived from application of the requirements, methods, and procedures in Chapters 16, 93, 95 and 96.*

*Water quality standards—The combination of water uses to be protected and the water quality criteria necessary to protect those uses.*

*Wetlands—Areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions, including swamps, marshes, bogs and similar areas.*

*Whole effluent toxicity—The total toxic effect of an effluent measured directly with a toxicity test.*

## PERMITS

**§ 92.2. Incorporation of Federal regulations by reference.**

(a) **Except as specified in subsection (c), the Federal NPDES regulations in subsection (b), including all appendices, future amendments and supplements thereto, are hereby incorporated by reference to the extent that these provisions are applicable and not contrary to Pennsylvania law. In the event of any conflict among Federal and Pennsylvania regulatory provisions, the provision expressly set out in this chapter shall be utilized. Whenever the requirements of this chapter are more stringent than the requirements of the Federal Act or Federal regulations, the requirements of this chapter apply.**

(b) **The following Federal regulatory provisions in 40 CFR are incorporated by reference:**

(1) **122.2 (relating to definitions).**

(2) **122.4 (relating to prohibitions).**

(3) **122.5 (relating to effect of a permit).**

(4) **122.7(b) (relating to confidentiality of information).**

(5) **122.21(g)(1)—(7), (g)(9)—(13), (h)(1), (m)(6) and (p) (relating to application for permit).**

(6) **122.23 (relating to concentrated animal feeding operations).**

(7) **122.24 (relating to concentrated aquatic animal production facilities).**

(8) **122.25 (relating to aquaculture projects).**

(9) **122.26(a)—(b), (c)(1), (d), (e)(1), (3)—(7) and (f)—(g) (relating to stormwater discharges).**

(10) **122.27 (relating to silvicultural activities).**

(11) **122.29 (relating to new sources and new discharges).**

(12) **122.41(a)—(m) (relating to conditions applicable to all permits).**

(13) **122.42 (relating to additional conditions applicable to all permits).**

(14) **122.43 (relating to establishing permit conditions).**

(15) **122.44 (relating to establishing limitations, standards, and other permit conditions).**

(16) **122.45 (relating to calculating NPDES permit conditions).**

(17) **122.48 (relating to requirements for recording and reporting monitoring results).**

(18) **122.50 (relating to disposal of pollutants into wells, into publicly owned treatment works or by land application).**

(19) **122.61—122.64 (relating to transfer, modification, revocation and reissuance, and termination of permits).**

(20) **125.1—125.3 (relating to criteria and standards for imposing technology-based treatment requirements under sections 301(b) and 402 of the act).**

(21) **125.10—125.11 (relating to criteria for issuance of permits to aquaculture projects).**

(22) **125.70—125.73 (relating to criteria for determining alternative effluent limitations under section 316(a) of the act).**

(23) **125.100—125.104 (relating to criteria and standards for best management practices authorized under section 304(e) of the act).**

(c) **Any new or amended Federal regulation enacted after _____ (***Editor's Note:* **The blank refers to the effective date of adoption of this proposal.) which creates a variance to existing substantive or procedural NPDES permitting requirements is not incorporated by reference.**

**§ 92.2a. Treatment requirements.**

(a) **Specific treatment requirements and effluent limitations for each discharge shall be established based on the more stringent of requirements specified in Chapters 93, 95 and 96 (relating to water quality standards; wastewater quality standards and; and water quality standards implementation), the applicable treatment requirements and effluent limitations to which a discharge is subject under this chapter and the Federal Act or the treatment requirements and effluent limitations of this title. Specific treatment requirements and effluent limitations for waste discharges from combined sewer overflows shall be established based on applicable treatment requirements and effluent limitations to which the discharge is subject under the Federal Act.**

(b) When interstate or international agencies under an interstate compact or international agreement establish applicable effluent standards and limitations for dischargers of this Commonwealth which are more stringent than those required by this title, the more stringent stamdards and limitations apply.

(c) If the Department has confirmed the presence or critical habitat of endangered or threatened, Federal or Pennsylvania species listed in "The Pennsylvania Natural Diversity Inventory" (PNDI), discharges to these waters shall be limited to ensure protection of these species and critical habitat.

§ 92.2b. Pollution prevention.

(a) Permittees are encouraged to maximize the use of pollution prevention approaches including: resource reduction through materials substitution, process changes, wastewater conservation, wastewater reuse and wastewater recycling.

(b) The pollution load (in terms of mass) of wastes generated should be reduced by permittees, prior to any required treatment, to the maximum extent practicable by the application of pollution prevention techniques including any combination of the following: in-plant process changes, materials substitution, segregation of wastestreams of differing strengths and constituents, reduction in the volume of water use, in-plant recycling and reuse of water or other constituents in the wastewater, and by improvements in general housekeeping practices within the facility which minimize the need for water-based cleanup. Actions which minimize the contamination of sewage sludge while maximizing its beneficial reuse are encouraged. The most highly effective pollution prevention program may eliminate the need for the discharge of wastewater to surface waters, potentially eliminating the need for a permit required under this chapter. POTWs should encourage pollution prevention practices by dischargers to their systems. A permittee should implement or cause to be implemented a Pollution Prevention Plan (PPP).

§ 92.2c. Minimum sewage treatment requirements.

(a) Sewage, except that discharged from a combined sewer overflow which is in compliance with § 92.21a(f) (relating to additional application requirements for classes of dischargers), shall be given a minimum of secondary treatment.

(b) Secondary treatment for sewage is that treatment which accomplishes the following:

(1) Compliance with the requirements of secondary treatment as defined by the Administrator under section 304 of the Federal Act (33 U.S.C.A. § 1314). The regulations promulgated by the EPA in 40 CFR Part 133 (relating to secondary treatment regulations) including amendments thereto, are incorporated by reference.

(2) Provision of effective disinfection to control disease-producing organisms during the swimming season—May 1 through September 30. Effective disinfection to control disease-producing organisms shall be defined as the product of an effluent which will contain a concentration not greater than 200/100 milliliters of fecal coliform organisms as a geometric mean value nor greater than 1,000/100 milliliters of these organisms in more than 10% of the samples tested.

(3) Provision for the disposal or beneficial use of sludge in accordance with applicable Department regulations.

(4) Reduction to the maximum extent practicable, after direct application or encouragement of pollution prevention approaches including in-process recycling and reuse, the discharge of oils, greases, acids, alkalis and toxic, taste or odor-producing substances inimical to the public interest.

§ 92.2d. Technology-based standards.

Discharges that are regulated by this chapter shall meet the following minimum requirements when applicable:

(1) EPA-promulgated effluent limitation guidelines established under section 304 of the Federal Act (33 U.S.C.A. § 1314).

(2) For those industrial categories for which no effluent limitations have been established under paragraph (1), Department-developed, technology-based limitations established in accordance with 40 CFR 125.3 (relating to technology-based treatment requirement in permits).

(3) For facilities utilizing chlorine, the following applies:

(i) For those facilities utilizing chlorine which discharge to surface waters, an effluent limitation representing the BAT for the discharge of total residual chlorine (TRC). If the EPA adopts a National categorical ELG for TRC for a specific industry or activity under section 301 or 304(b) of the Federal Act (33 U.S.C.A. §§ 1311 and 1314(b)), that ELG constitutes BAT for the industry or activity. If the EPA has not promulgated a National ELG for an industry or activity, the Department may develop a facility-specific BAT effluent limitation. Factors which will be considered in developing a facility-specific BAT effluent limitation include the age of equipment and facilities involved, the engineering aspects of the application of various types of control techniques and alternatives to the use of chlorine or reductions in the volume of chlorine used during the disinfection process, other pollution prevention approaches, the cost of achieving the effluent reduction, nonwater quality environmental impacts (including energy requirements) and other factors the Department deems appropriate. For facilities when the EPA has not promulgated a National ELG for an industry or activity, and the Department has not developed a facility-specific BAT effluent limitation under the factors in this subparagraph, an effluent limitation for TRC of 0.5 mg/l (30-day average) shall constitute BAT.

(ii) Facilities utilizing chlorine which discharge to exceptional value waters or high quality waters where necessary economic or social justification of significant public value and other factors have not been demonstrated under applicable State or Federal law or regulations shall discontinue the use of chlorine or dechlorinate their effluents prior to discharge into the waters.

(4) For oil-bearing wastewaters, the following applies:

(i) Oil-bearing wastewaters, except those from petroleum marketing terminals, discharged into surface waters shall comply with all of the following:

**(A)** At no time cause a film or sheen upon or discoloration of the waters of this Commonwealth or adjoining shoreline.

**(B)** At no time contain more than 15 milligrams of oil per liter as a daily average value nor more than 30 milligrams of oil per liter at any time, or whatever lesser amount the Department may specify for a given discharge or type of discharge as being necessary for the proper protection of the public interest or to meet any requirements based upon the Federal Act.

**(ii)** Pollution prevention approaches, including source reduction, or recycling and environmentally safe reuse of oils, in order to reduce the volume of oil discharged to levels below those allowed by clause (A) are encouraged.

**(iii)** Petroleum marketing terminals shall be provided with facilities to remove oil from waters, including stormwater runoff, before discharge into surface waters. Compliance with this paragraph shall constitute compliance with clause (A) except to the extent that the Federal Act imposes a more stringent requirement. Pollution incident prevention plans as described in § 91.34 (relating to activities utilizing pollutants) are required for all petroleum marketing terminals.

**(iv)** Unless it can be shown that an alternate design is equivalent, oil removal facilities of petroleum marketing terminals shall consist of an American Petroleum Institute (A.P.I.) listed oil separator.

(*Editor's Note*: Section 91.34 is the subject of a separate rulemaking as outlined at 27 Pa.B. 4343 (August 23, 1997). That section incorporates provisions of existing § 101.3.)

### § 92.3. Permit requirement.

**[ No person shall ]** A person may not discharge pollutants from a point source into **[ navigable ]** **surface** waters except as authorized under **[ a ]** an NPDES permit.

### § 92.4. Exclusions from permit requirements.

(a) The following are excluded from the requirement of obtaining an NPDES permit under this chapter:

(1) **[ Agricultural ]** Introduction of pollutants from nonpoint source agricultural activities**[ , except this exclusion shall not apply to ]** and irrigation return flows. As used in this paragraph, "irrigation return flows" means **[ surface water containing ]** pollutants discharged into **[ navigable ]** surface waters from a discernible, confined**[ , ]** and discrete conveyance which results from the controlled application of water by any person to land used primarily for crops, forage growth**[ , ]** or nursery operations**[ , and "surface water" means water that forms exclusively across the surface of the land from the point of application to the point of discharge ]**.

(2) Silviculture activities, except that this exclusion **[ shall ]** **does** not apply to silvicultural point sources. **[ As used in this paragraph, "silvicultural point sources" means any discernible, confined, and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which** are operated in connection with silvicultural activities and from which pollutants are discharged into navigable waters. **]**

(3) Sewage from vessels within the meaning of section 312 of the Federal Act (33 U.S.C.A. § 1322).

(4) Water, gas or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil and gas production and disposed of in a well, if the well is used either to facilitate production or for disposal purposes, is approved by authority of the Department, and if the Department determines that the injection or disposal will not result in the degradation of ground or surface water resources.

(5) Discharges of dredged or fill material into waters of the United States which are regulated under section 404 of the Federal Act (33 U.S.C.A. § 1344).

(6) Indirect discharges:

**(i)** Except as provided in subparagraph (ii), the discharge of sewage, industrial wastes or other pollutants into a POTW or privately owned treatment works which is, or will be when connected, conveying and treating the discharge into the system, and is operated and maintained in accordance with the State Act, rules and regulations promulgated thereto, the permit and any applicable orders.

**(ii)** The Department may require that an indirect discharger of sewage, industrial waste or other pollutants obtain a permit under the State Act to discharge into a POTW or privately owned treatment works where necessary to assure protection of waters of this Commonwealth in situations including, but not limited to, where the indirect discharger has failed to take adequate measures to prevent, reduce or otherwise eliminate the discharge through pollution prevention techniques or to take adequate measures to pretreat its discharge prior to conveying the discharge to the POTW, or otherwise resulting in interference with proper operations of the POTW, upsets at the POTW or pass-throughs of pollutants.

(7) A discharge in compliance with the instructions of the Department in an environmental emergency cleanup situation remediating a one time spill or release of pollutants, or the instructions of an on-scene coordinator under 40 CFR Part 300 or 33 CFR Part 153 (relating to National Oil and Hazardous Substances Pollution Contingency Plan; and control of pollution by oil and hazardous substances, discharge removal), where necessary to abate an imminent threat to the public health or safety.

\*     \*     \*     \*     \*

### § 92.5a. Concentrated animal feeding operations.

(a) Except as provided in subsection (b), owners or operators of concentrated animal feeding operations will be deemed to have an NPDES general permit by rule if the operation meets the following conditions:

(1) The operation has a nutrient management plan under § 83.261 (relating to general) which has been approved in accordance with Chapter 83 (re-

lating to State Conservation Commission) and the operation consists of at least 301 but not more than 1,000 animal equivalent units.

(2) The operation does not have or is not proposing a discharge to surface waters.

(3) The operation is in compliance with applicable provisions of Chapter 83.

(4) The operator implements and maintains a nutrient management plan in accordance with Chapter 83.

(b) Subsection (a) does not apply to concentrated animal feeding operations described in paragraphs (1) and (2). These operations shall apply for an individual NPDES permit.

(1) Those operations which have or are proposing more than 1,000 animal equivalent units as defined in the Nutrient Management Act (3 P. S. §§ 1701—1718).

(2) Those operations which the Department requires to obtain a permit on a case-by-case basis.

§ 92.6. [ NPDES permits issued by the Regional Administrator ] (Reserved).

[ (a) The Department adopts as permits issued under the State Act all NPDES permits issued by the Regional Administrator prior to the effective date of this chapter which are transferred by the Regional Administrator and accepted by the Department for administration and enforcement.

(b) Acceptance of an NPDES permit from the Regional Administrator shall not supersede any permit previously issued under the State Act. All provisions of both permits shall be in force; except, in the event of a conflict between the provisions of a Clean Streams Law permit and an NPDES permit applicable to the same discharge, the more stringent provision shall apply. ]

§ 92.6a. Persons required to apply when a facility is owned by one person, but operated by another.

When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit.

§ 92.7. [ Reporting of new ] New or increased discharges, or change of wastestreams.

Facility expansions, production increases[ , ] or process modifications which result in new or increased discharges of pollutants, which discharges do not violate effluent limitations specified in the NPDES permit, [ must ] shall be reported by submission to the director of notice of [ such ] the new or increased discharges. A new permit application [ must ] shall be submitted and a new permit obtained before commencing a new or increased discharge, or change of the wastestream which would violate effluent limitations in the NPDES permit.

§ 92.8a. Changes in treatment requirements.

(a) Whenever there is a change in the provisions of Chapters 93, 95 and 96 (relating to water quality standards; wastewater treatment requirements; and water quality standards implementation), or this chapter, or whenever the Department adopts a plan or makes a determination which would change existing or impose additional water quality criteria

or treatment requirements, it shall be the duty of permittee of facilities affected thereby, upon notice from the Department, to promptly take steps necessary to plan, obtain a permit or other approval and construct facilities that are required to comply with the new water quality standards or treatment requirements. Permittees should consider pollution prevention practices as a means of achieving compliance with this section.

(b) Within 90 days of the receipt of the notice, or within a lesser period as the Department may specify, the permittee shall submit to the Department either a report establishing that its existing facilities are capable of meeting the new water quality standards or treatment requirements or a schedule setting forth the nature and date of completion of steps that are necessary to plan, obtain a permit or other approval and construct facilities to comply with the new water quality or treatment requirements. The permittee shall comply with the schedule approved by the Department. Pollution prevention practices proposed to comply with this section should be included in both the report and schedule.

(c) Whenever a point of projected withdrawal for a new potable water supply not previously considered is identified by an update to the State Water Plan or a River Basin Commission Plan, or by the application for a water allocation permit from the Department, the Department will notify a discharger of total dissolved solids, nitrite-nitrate nitrogen and fluoride of more stringent effluent limitations needed to protect the point of withdrawal. The discharger shall meet more stringent effluent limitations in accordance with a schedule approved by the Department. The Department will issue orders directing dischargers to achieve compliance, when necessary.

§ 92.9.  Duration of permits.

(a) All NPDES permits shall have a fixed term not to exceed [ five ] 5 years.

(b) The terms and conditions of an expired permit are automatically continued [ pending the issuance of a new permit ] when the following conditions are met:

* * * * *

(2) The [ Director ] Department is unable, through no fault of the permittee, to issue or deny a new permit before the expiration date of the previous permit.

(c) Permits continued under subsection (b) shall remain effective and enforceable against the discharger until such time as the [ Director ] Department takes final action on the pending permit application.

§ 92.11.  Duration of standards for certain new sources.

Any point source the construction of which is commenced after the date of enactment of the Federal Water Pollution Control Act Amendments of 1972 (33 U.S.C.A. §§ 1281 and 1361) and which is so constructed as to meet all applicable [ standards of performance shall ] requirements will not be subject to any more stringent treatment technology standard of performance during a 10-year period beginning on the date of completion of [ such ] the construction[ , ] during the period of depreciation or amortization of [ such ] the facility

for the purpose of [ **section** ] section 167 or [ **Section** ] section 169, or both, of the Internal Revenue Code of 1954 (26 U.S.C.A. §§ 167 and 169)**, or 10 years from the date the source begins to discharge process or other nonconstruction related wastewater,** whichever period ends first**.**[ **; provided, however, that a** ] A more stringent standard may be imposed if [ **such** ] the imposition is allowed under section 510 of the Federal Act (33 U.S.C.A. § 1370). **This section does not apply to water quality based effluent limitations.**

### § 92.13. Reissuance of permits.

(a) [ **Any** ] **A** permittee who wishes to continue to discharge after the expiration date of [ **his** ] **its** NPDES permit [ **must** ] **shall** submit a new [ **NPDES** ] application for reissuance of the permit at least 180 days prior to the expiration of the permit unless permission has been granted for a later date by the [ **Director** ] **Department.** The application fees specified in § 92.22 (relating to application fees) [ **shall** ] apply.

(b) Upon completing review of the new application, the [ **Director** ] **Department** may reissue the permit if, based on up-to-date information on the permittee's waste treatment practices and the nature, contents[ **,** ] and frequency of the permittee's discharge, the [ **Director** ] **Department** determines **that the:**

(1) [ **That the permittee** ] **Permittee** is in compliance with all existing NPDES permit terms, conditions, requirements[ **,** ] **, and schedules of compliance, or that any noncompliance with the existing permit has been resolved by an appropriate compliance action or by the terms and conditions of the permit (including a compliance schedule set forth in the permit), consistent with § 92.55 (relating to schedules of compliance).**

(2) [ **That the discharge** ] **Discharge** is**, or will be** under a compliance schedule issued under **§** 92.55, consistent with the applicable water quality standards, effluent standards and limitations, and other legally applicable requirements, including [ **any** ] revisions or modifications of [ **such** ] **the** standards, limitations and requirements which may have occurred during the term of the existing permit.

### § 92.13a. Effect of modification of permit.

**When a NPDES permit is modified, only those permit conditions which are new or are materially changed in the modified permit are reopened. All other conditions of the permit remain in full force and effect and remain administratively final.**

### § 92.15. Regional Administrator's right to object to the issuance or modification of certain permits.

The EPA Administrator has a right to review or object to issuance of certain permits. The scope of EPA review and the procedures for its exercise are described in a Memorandum of Agreement which was incorporated in the Program Description submitted to the **the** EPA by the [ **Director** ] **Department**. A copy of the Memorandum of Agreement is on file with the [ **Director of the Bureau of Water Quality Management** ] **Department** and with the Administrator of EPA Region III.

### § 92.17. Other chapters applicable.

To the extent that Chapters 91, 93, 95, [ **97, 99 and 101** ] **96, 102 and 105** pertain to a discharge for which an NPDES permit is required, [ **the provisions of** ] Chapters 91, 93, 95, [ **97, 99 and 101** ] **96, 102 and 105** shall govern whenever their application produces a more stringent effluent limitation than would be produced by application of Federal [ **Standards** ] **requirements**. Effluent limitations resulting from the application of **these** [ **Chapters 91, 93, 95, 97, 99 and 101** ] **chapters** shall be expressed in an NPDES permit issued under this chapter.

## APPLICATION FOR PERMITS
### § 92.21. Applications.

(a) Persons wishing to commence discharges of pollutants shall file a complete [ **NPDES** ] application [ **not less than** ] 180 days before the date on which it is desired to commence the discharge of pollutants or within another period of time which the [ **Director** ] **Department** determines is sufficient to insure compliance with [ **the requirements of section 306 of the Federal Act (33 U.S.C.A. § 1316), or with an applicable zoning or siting requirements established under sections 208(b)(2)(C) of the Federal Act (33 U.S.C.A. § 1288(b)(2)(C)) and other** ] **State and Federal law, including** applicable water quality standards and applicable effluent standards and limitations.

(b) [ **A person who filed a complete Refuse Act application and whose application has not been denied is not required to apply for a permit under this chapter unless the discharge described in the application for a Refuse Act permit has changed in nature, volume or frequency. A complete Refuse Act permit application shall be considered to be an application under the NPDES and shall be treated accordingly. If, however, the discharge described in the Refuse Act permit application has changed in nature, volume or frequency, the applicant shall complete, sign and submit the appropriate NPDES application form.** ] At a minimum, the following are required to be submitted by all applicants for an individual permit, except as otherwise specified:

**(1) A permit application fee and other fees as set forth in § 92.22 (relating to application fees).**

**(2) Except for mining activity water quality permits, proof that written notice of an application has been submitted to the municipality in which the activity is or will be located at least 30 days before the Department may take action on the application.**

**(3) For discharges of industrial waste, including process wastewaters, contact cooling waters and noncontact cooling waters, proof that public notice of the application has been published in a newspaper of general circulation in the locality in which the activity is or will be located once a week during a consecutive 4-week period.**

**(4) A description of the activities conducted by the applicant which require an NPDES permit; name, mailing address and location of the facility; up to four standard industrial codes (SIC) which best reflect the principal products or services provided by the facility; the operator's name, address, telephone number, ownership status and entity status; a listing of all Department and EPA environmental quality permits for the facility; a topo-**

graphic or other map extending 1 mile beyond the boundaries of the facility or activity; and a brief description of the nature of the business.

(c) In addition to the information required under subsection (b), the Department may require an applicant to submit other information or data the Department may need to assess the discharges of the facility and any impact on receiving waters, and to determine whether to issue an NPDES permit, or what conditions or effluent limitations (including water quality based effluent limitations) to place in the permit. The additional information may include, but is not limited to:

(1) The results of an effluent assessment (or estimate for new dischargers or new sources), including a list of the mass and concentration of pollutants found (or estimated to be for new discharges or new sources) in the wastewater discharge, under Department protocols.

(2) Description of pollution prevention techniques to be implemented, if any, capable of reducing the generation of pollutants identified in paragraph (1).

(3) The results of a waterbody assessment, under the Department protocols, setting forth the discharges impact (or potential impact) on surface waters of this Commonwealth.

(4) The results of whole effluent toxicity testing, an instream cause/effect survey or other tests or surveys as needed to determine the impact of a discharge on a waterbody conducted under a Department approved protocol.

(5) Additional quantitative data and bioassays to assess the relative toxicity of discharges to aquatic life, and to determine the cause of the toxicity, and information relating to the biological, physical and chemical characteristics of waters and habitat immediately upstream and downstream of the facility conducted under a Department approved protocol.

(6) The results of any pollutant source or waterbody monitoring conducted under this title.

[ (c) Four ] (d) Three copies of complete applications shall be submitted, one of which shall be attested by a notary public, [ justice of the peace, ] alderman or district justice. The Department may require additional copies of the application to be filed.

[ (d) ](e) The Department [ of Environmental Resources ] will publish at least annually a list of addresses to which applications and their accompanying papers shall be submitted.

[ (e) ](f) A person required to file an [ NPDES ] application shall also file additional modules, forms and applications, and supply data as [ are ] specified by the [ Director ] Department. Additional modules, forms [ and ] applications and data shall be considered a part of the [ NPDES ] application.

§ 92.21a. Additional application requirements for classes of dischargers.

(a) Existing industrial discharges. Dischargers of industrial waste from sources other than new sources or new discharges subject to subsection (b), nonprocess wastewater discharges subject to subsection (c) and stormwater discharges associated

with industrial activity subject to subsection (d), shall submit the applicable information required to be submitted under 40 CFR 122.21(g)(1)—(7) and (g)(9)—(13) (relating to application requirements), which is hereby incorporated by reference.

(b) New sources and new discharges. Except for new discharges of industrial facilities which discharge nonprocess wastewater subject to subsection (c) and new discharges of stormwater associated with industrial activity subject to subsection (d), new discharges and new sources applying for NPDES permits shall submit the information required to be submitted, as applicable, under 40 CFR 122.21(k), which is hereby incorporated by reference.

(c) Nonprocess industrial waste discharges. Except for stormwater discharges associated with industrial activity subject to subsection (d), all industrial waste dischargers applying for NPDES permits which discharge only nonprocess wastewater not regulated by an effluent limitation guideline or new source performance standard shall submit all information required to be submitted, as applicable, under 40 CFR 122.21(h), which is hereby incorporated by reference.

(d) Stormwater discharges associated with industrial activity. Applicants for individual NPDES permits for the discharge of stormwater associated with industrial activity shall submit all information required to be submitted, as applicable, under 40 CFR 122.21(g)(7) and 122.26(c)(1) (relating to storm water discharges (application to State NPDES program)), which are hereby incorporated by reference.

(e) New and existing sewage dischargers. The following additional application requirements apply to new and existing sewage dischargers (including POTWs and privately owned treatment works), as applicable except where aquatic communities are essentially excluded, where pollution cannot be remedied by controlling discharges or where water quality data indicates no trend of water quality improvement in the waterbody:

(1) The following sewage dischargers shall provide the results of whole effluent toxicity testing to the Department:

(i) Sewage dischargers with design influent flows equal to or greater than 1 million gallons per day.

(ii) Sewage dischargers with approved pretreatment programs or required to develop a pretreatment program.

(2) In addition to the sewage dischargers in paragraph (1), the Department may require other sewage dischargers to submit the results of toxicity tests with their permit applications, based on consideration of the following factors:

(i) The variability of the pollutants or pollutant parameters in the sewage effluent (based on chemical-specific information, the type of treatment facility and types of industrial contributors).

(ii) The dilution of the effluent in the receiving water (ratio of effluent flow to receiving stream flow).

(iii) Existing controls on point or nonpoint sources, including TMDL calculations for the waterbody segment and the relative contribution of the sewage discharger.

PROPOSED RULEMAKING

**(iv)** Receiving stream characteristics, including possible or known water quality impairment, and whether the sewage discharges to an estuary, one of the Great Lakes or a water which is a high quality water or an exceptional value water under Chapter 93 (relating to water quality).

**(v)** Other considerations including, but not limited to, the history of toxic impact and compliance problems at the sewage discharge facility, which the Department determines could cause or contribute to adverse water quality impacts.

**(3)** For sewage dischargers required under paragraph (1) or (2) to conduct toxicity testing, the EPA's methods or other protocols approved by the Department, which are scientifically defensible and sufficiently sensitive to detect aquatic toxicity and approved by the Department, shall be utilized. The testing shall have been conducted since the last NPDES permit reissuance or major permit modification, whichever occurred later.

**(f)** *Dischargers with approved pretreatment programs.* All sewage dischargers with approved pretreatment programs shall provide a written technical evaluation of the need to revise local limits under 40 CFR 403.5(c)(1) (relating to National pretreatment standards: prohibited discharges) to the Department.

**(g)** *Combined sewer overflows.* CSO dischargers shall submit the following information:

**(1)** The results of an evaluation determining the frequency, extent and cause of the CSO discharge, including identifying the points of inflow into combined systems.

**(2)** An evaluation of the water quality impacts of the CSO discharge on receiving waters.

**(3)** A description of BMPs utilized at the facility to minimize or eliminate the CSO discharge impact on receiving water quality, including:

**(i)** An evaluation of the operational status and functional adequacy of the CSO system and recommended improvements.

**(ii)** A description of the operation and maintenance program which is implemented at the facility.

**(iii)** A description of the high flow management program implemented at the facility.

**(iv)** A description of measures taken to restrict infiltration and inflow into the combined sewer system.

**(v)** A description of measures undertaken to minimize or eliminate discharges of solids and floating materials from the facility.

**(vi)** A description of a long-term plan to minimize and eliminate the CSO discharge.

**(h)** *Large and medium municipal separate storm sewers*—The operator of a discharge from a large or medium municipal separate storm sewer shall submit in its NPDES permit application the information required to be submitted under 40 CFR 122.26(d).

**§ 92.22. Application fees.**

**(a)** [ **An NPDES Sewerage** ] **A sewage** application, except those submitted for single residence sewage treat-

ment plants, shall be accompanied by a check for $500 payable to "Commonwealth of Pennsylvania."

**(b)** [ **NPDES Sewerage** ] **Sewage** applications for single residence sewage treatment plants shall require no application fee.

**(c)** [ **NPDES** ] Industrial [ **Wastes** ] **wastes** applications, except those submitted for mining operations, shall be accompanied by a check for $500 payable to "Commonwealth of Pennsylvania."

**(d)** [ **NPDES** ] Industrial [ **Wastes** ] **wastes** applications submitted for mining operations shall be accompanied by a check for $250 payable to "Commonwealth of Pennsylvania."

**(e)** [ **Application** ] **A notice of intent** for coverage under **a** general NPDES [ **permits** ] **permit** under § 92.83(a) (relating to inclusion of individual dischargers in general NPDES permits) shall be accompanied by a check payable to "Commonwealth of Pennsylvania" in the amount set forth in the public notice for the general permit. The amount [ **shall** ] **may** not exceed $500.

**(f)** The application fee specified in § 91.22 (relating to fees) [ **shall apply** ] **applies** to all other [ **NPDES** ] applications.

**§ 92.23. Identity of signatories to NPDES forms.**

Any NPDES form submitted to the Department [ **must** ] **shall** be signed as follows:

**(1)** In the case of corporations, by a principal executive officer of at least the level of vice president, or [ **his** ] **a** duly authorized representative, if [ **such** ] **the** representative is responsible for the overall operation of the facility from which the discharge described in the NPDES form originates.

\*     \*     \*     \*     \*

**§ 92.25. Incomplete applications or notices of intent.**

The Department [ **shall** ] **will** not complete processing of an application **or notice of intent** which is incomplete or otherwise deficient. **An application for an individual NPDES permit is complete when the Department receives an application form and supplemental information which are completed in accordance with this chapter. An NOI to participate in an NPDES general permit issued by the Department is complete when the Department receives a notice of intent setting forth the information specified by the terms of the general permit.**

**APPROVAL OF APPLICATIONS**

**§ 92.31. Effluent standards or limitations.**

**(a)** [ **No** ] **Except as set forth in subsection (b),** permit [ **shall** ] **will** not be issued for discharge of pollutants unless the proposed discharge is in compliance with [ **all of** ] the following, when applicable:

**(1)** Effluent limitations under sections 301 and 302 of the Federal Act (33 U.S.C.A. §§ [ **1131** ] **1311** and [ **1132** ] **1312).**

\*     \*     \*     \*     \*

**(5)** Any more stringent limitation required to implement any applicable water quality standard[ **; such** ]**.** **The** limitations to include any legally applicable requirements necessary [ **to** ] implement [ **total maximum**

daily loads ] TMDLs established [ pursuant to ] under Chapter 96 (relating to water quality standards implementation), or [ section 303(d) ] of the Federal Act [ (33 U.S.C.A. § 1313) and incorporated in the continuing planning process approved under § 303(c) of the Federal Act (33 U.S.C.A. § 1313) and any regulations and guidelines issued pursuant thereto ] (33 U.S.C.A. § 1313(d)).

\*     \*     \*     \*     \*

(b) Existing dischargers not currently attaining a requirement in subsection (a) may meet the requirements of subsection (a) under a compliance schedule in a reissued or amended permit which is consistent with § 92.55 (relating to schedules of compliance).

### MONITORING BY PERMITTEE

§ 92.41. Monitoring.

(a) The [ Director ] Department may impose reasonable monitoring requirements on any discharge.

(b) Each discharger of pollutants, with the exception of sewage discharges from single family residence sewage treatment plants, may be required to monitor and report all toxic, conventional, nonconventional and other pollutants in its discharge, at least once a year, and on a more frequent basis if requested by the Department, or required by a permit condition. The results of this monitoring shall be submitted to the Department by July 1 of each year, or on a more frequent basis if requested by the Department, or required by a permit condition. If the monitoring results indicate the existence of pollutants which are not limited in the permit, the permittee shall separately identify the pollutants, and their concentration, on the monitoring report, with an explanation of how the permittee will prevent the generation of the pollutant, or otherwise eliminate the pollutant from the discharge within the permit term. If the pollutant cannot be eliminated from the discharge, the permittee shall seek a permit amendment.

[ (b) Any ] (c) A discharge authorized by an NPDES permit which is not a minor discharge[ , the Regional Administrator requests, in writing, be monitored, ] or contains toxic pollutants for which an effluent standard has been established by the Administrator under section 307(a) of the Federal Act (33 U.S.C.A. § 1317(a)) shall be monitored by the permittee for at least the following:

[ (i) ] (1) \*  \*  \*

[ (ii) ] (2) All of the following pollutants:

[ (A) ] (i) Pollutants (either directly or indirectly through the use of accepted correlation [ co-efficients ] coefficients or equivalent measurements) which are subject to abatement under the terms and conditions of the permit.

[ (B) ] (ii) Pollutants which the [ Director ] Department finds, on the basis of information available to [ him ] it, could have [ a significant ] an impact on the quality of the Commonwealth's [ navigable ] waters.

[ (C) ] (iii) \*  \*  \*

[ (D) ] (iv) \*  \*  \*

[ (c) ] (d) Each effluent flow or pollutant required to be monitored [ pursuant to subsection ] under subsections (b) and (c) shall be monitored at intervals sufficiently frequent to yield data which reasonably characterize the nature of the discharge of the monitored effluent flow or pollutant. Variable effluent flows and pollutant levels shall be monitored at more frequent intervals than relatively constant effluent flows and pollutant levels which may be monitored at less frequent intervals.

[ (d) ] (e) The permittee shall maintain records of all information resulting from any monitoring activities required of [ him ] it in [ his ] its NPDES permit as follows:

\*     \*     \*     \*     \*

(2) The permittee shall also be required to retain for a minimum of [ three ] 3 years any records of monitoring activities and results including all original strip chart [ recording ] recordings for continuous monitoring instrumentation and calibration and maintenance records. This period of retention [ shall ] may be extended during the course of any unresolved litigation regarding the discharge of pollutants by the permittee or when requested by the [ Director ] Department or Regional Administrator.

[ (e) ] (f) The permittee shall periodically report, at a frequency of not less than once per year, on the proper NPDES reporting form monitoring results obtained by a permittee pursuant to monitoring requirements. In addition to the NPDES reporting form, the [ Director ] Department may require submission of such other information regarding monitoring results as [ he ] it determines to be necessary.

(g) Requirements to report monitoring results from stormwater discharges associated with industrial activity, except those subject to an effluent limitation guideline or an NPDES General Permit, shall be established on a case-by-case basis with a frequency dependent on the nature and effect of the discharge.

[ (f) ] (h) \*  \*  \*

### PERMIT CONDITIONS

§ 92.51. Standard conditions in all permits.

The [ Director shall insure the standard conditions of each ] issued NPDES permit shall provide for and insure the following:

(1) That all discharges authorized by the NPDES permit shall be consistent with the terms and conditions of the permit; that facility expansions, production increases[ , ] or process modifications which result in new or increased discharges of pollutants [ must ] shall be reported by submission of a new [ NPDES ] application or, if [ such ] the discharge does not violate effluent limitations specified in the NPDES permit, by submission to the [ Director ] Department of notice of [ such ] the new or increased discharges of pollutants, that the discharge of any pollutant more frequently than or at a level in excess of that identified and authorized by the permit shall constitute a violation of the terms and conditions of the permit[ ; ].

\*     \*     \*     \*     \*

(5) That if a toxic effluent standard or prohibition, including any schedule of compliance specified in **[ such ] the** effluent standard or prohibition, is established under section **301(b)(2)(C) and (D), 304(b) or** 307(a) of the Federal Act (33 U.S.C.A. §§ **1311(b)(2)(C) and (D), 1314(b) or** 1317(a)) for a toxic pollutant which is present in the permittee's discharge and the standard or prohibition is more stringent than any limitation upon the pollutant in the NPDES permit, the Department will revise or modify the permit in accordance with the toxic effluent standard or prohibition and so notify the permittee.

**(6) That the discharger may not discharge substances including, but not limited to, floating materials, oil, grease, scum, foam, sheen and substances which produce color, taste, turbidity or settle to form deposits for which no effluent limitations are provided in the permit in concentrations or amounts sufficient to be, or creating a danger of being, inimical to the water uses to be protected or to human, animal, plant or aquatic life.**

§ 92.52a. Site specific permit conditions.

**The Department may establish and include an NPDES permit, any permit condition, as needed on a case-by-case basis, to assure protection of surface waters. These conditions may include a requirement to implement BMPs, toxic reduction activities, effluent limitations based on WETT and other measures which eliminate, or substantially reduce releases of pollutants at their source. Permittees are encouraged to implement, or cause to be implemented, pollution prevention plans to achieve compliance with performance based permit conditions.**

§ 92.53. Additional standard conditions in permits for publicly-owned treatment works which serve industrial users.

(a) Standard conditions in permits for publicly-owned treatment works shall require the permittee to give notice to the **[ Director ] Department** of the following:

\* \* \* \* \*

(2) Except as to categories and classes of point sources or discharges specified by the **[ Director ] Department,** any new introduction of pollutants into treatment works from a source which would be subject to section 301 of the Federal Act (33 U.S.C.A. § 1311) if the source was directly discharging pollutants.

\* \* \* \* \*

§ 92.55. Schedules of compliance.

(a) With respect to **an existing** discharge which is not in compliance with the water quality standards and effluent standards and limitations **[ listed ]** in § 92.31**(a)** (relating to effluent standards **or limitations),** the applicant shall be required in the permit to take specific steps to remedy a violation of the standards and limitations in accordance with a legally applicable schedule of compliance, in the shortest, reasonable period of time, the period not to be inconsistent with the requirements of the Federal Act. **If a deadline specified in section 301 of the Federal Act (33 U.S.C.A. § 1311) has passed, any schedule of compliance specified in the permit shall require compliance with final enforceable effluent limits as soon as practicable, but in no case longer than 3 years, unless a court of competent jurisdiction issues an order allowing a longer time for compliance.**

(b) If the period of time for compliance specified in subsection (a) exceeds **[ 9 months ] 1 year,** a schedule of compliance shall be specified in the permit which will set forth interim requirements and the dates for their achievement **[ ; in no event may more than 9 months elapse between interim dates ].** If the time necessary for completion of the interim requirement such as the construction of a treatment facility is more than **[ 9 months ] 1 year** and is not readily divided into stages for completion, interim dates shall be specified for the submission of reports of progress towards completion of the interim requirement. For each NPDES permit schedule of compliance, interim dates and the final date for compliance shall, to the extent practicable, fall on the last day of the months of March, June, September and December.

(c) Either before or up to 14 days following each interim date and the final date of compliance, the permittee shall provide the **[ Director ] Department** with written notice of the permittee's compliance or noncompliance with the interim or final requirement.

§ 92.57. Effluent limitations.

NPDES permits shall specify average and maximum daily quantitative limitations for the level of pollutants in the authorized discharge in terms of weight except pH, temperature, radiation**[ , ]** and any other pollutants not appropriately expressed by weight. Permits may in addition impose **[ limitation ] limitations** on frequency of discharge, concentrations**[ , ]** or percentage removal, **and may include instantaneous maximum limits, BMPs or any other limitations, as necessary.**

§ 92.59. Documentation for permit conditions.

**[ In any case where ] When** an NPDES permit applies the effluent standards and limitations described in §§ 92.31**[ (a)—(c) ]** (relating to effluent standards **or limitations),** the Department **[ must ] will** prepare documentation demonstrating that the permit will not violate applicable water standards. **[ In any case where ] When** an issued NPDES permit applies any more stringent effluent limitation based upon applicable water quality standards, a waste load allocation **[ must ] shall** be prepared to insure that the discharge authorized by the permit is consistent with applicable water quality standards.

§ 92.61. Public notice of permit application and public hearing.

(a) Public notice of every complete application for an NPDES permit shall be published by the Department in the *Pennsylvania Bulletin.* **[ Such ] The** public notice shall also be posted by the applicant near the entrance to the premises of the applicant and in nearby places. The contents of public notice of applications for NPDES permits shall include at least the following:

\* \* \* \* \*

(3) **[ Brief ] A** brief description of each applicant's activities or operations which result in the discharge described in the **[ NPDES ]** application.

\* \* \* \* \*

(5) A statement of the tentative determination to issue or deny an NPDES permit for the discharge described in the **[ NPDES ]** application. If there is a tentative determination to issue a permit, the determination shall

include proposed effluent limitations for those effluents proposed to be limited, a proposed schedule of compliance including interim dates and requirements for meeting the proposed effluent limitations and a brief description of any proposed special conditions which will have a significant impact upon the discharge described in the **[ NPDES ]** application.

**(6) The location of the nearest downstream potable water supply considered in establishing proposed effluent limitations under this title, or a finding that no potable water supply will be affected by the proposed discharge.**

**[ (6) ] (7)** * * *

**[ (7) ] (8)** * * *

(b) The **[ Director shall ] Department will** organize the tentative determination prepared **[ pursuant to ] under** subsection (a)(5) into a draft NPDES permit.

(c) For every discharge which has a total volume of more than 500,000 gallons on any day of the year the **[ Director shall ] Department will** prepare and following public notice, **[ shall ] will** send to any person, upon request, a fact sheet with respect to the application described in the public notice. The contents of **[ such ] the** fact sheets **[ shall ] will** include at least the following information:

(1) A sketch or detailed description of the location of the discharge described in the **[ NPDES ]** application.

(2) A quantitative description of the discharge described in the **[ NPDES ]** application which includes at least the following:

\*   \*   \*   \*   \*

(d) There shall be a 30-day period following publication of notice during which written comments may be submitted by interested persons before the Department makes its final determination on **[ an NPDES ] a** permit application. All written comments submitted during the 30-day comment period **[ shall ] will** be retained by the **[ Director ] Department** and considered in the formulation of **[ his ] the** final determinations with respect to the **[ NPDES ]** application. The period for comment may be extended at the discretion of the **[ Director ] Department** for one additional 15-day period. The **[ Director shall ] Department will** provide an opportunity for the applicant, any affected state, any affected interstate agency, the Regional Administrator**[ , ] or any interested agency, person[ , ] or group of persons to request or petition for a public hearing with respect to the [ NPDES ]** application. **[ Any such ] The** request or petition for public hearing shall be filed within the 30 day period allowed for filing of written comments and shall indicate the interest of the party filing **[ such ] the** request and the reasons why a hearing is warranted. A hearing **[ shall ] will** be held if there is a significant public interest, including the filing of requests or petitions for **[ such ] the** hearing; in holding **[ such a ] the** hearing. Instances of doubt should be resolved in favor of holding the hearing. Any hearing brought **[ pursuant to ] under** this subsection **[ shall ] will** be held in the geographical area of the proposed discharge or other appropriate area and may, as appropriate, consider related groups of permit applications.

(e) If a public hearing is requested, notice of the hearing **[ shall ] will** be published in the *Pennsylvania Bulletin*, **[ shall ] will** be published in at least one newspaper of general circulation within the geographical area of the discharge and **[ shall ] will** be sent to all persons or government agencies which received a copy of the notice or the fact sheet for the **[ NPDES ]** application. All of the **[ aforementioned ]** notices of a public hearing **[ shall ] will** be published at least 30 days before the hearing. Notice of public hearing **[ shall ] will** include at least the following:

\*   \*   \*   \*   \*

(4) A brief reference to the public notice issued for each **[ NPDES ]** application, including identification number and date of issuance.

\*   \*   \*   \*   \*

§ 92.63. Public access to information.

\*   \*   \*   \*   \*

(b) The **[ Director ] Department** may protect any information, other than effluent data, contained in **[ such ]** NPDES forms, or other records, reports or plans pertaining to the NPDES permit program as confidential upon a showing by any person that **[ such ] the** information **is not a public record for the purposes of section 607 of the State Act (35 P. S. § 691.607). Documents which may be protected as confidential and are not public records are those which** if made public would divulge **an analysis of chemical and physical properties of coal (excepting information regarding the mineral or elemental content which is potentially toxic in the environment), and those which are** confidential commercial information or methods or processes entitled to protection as trade secrets **[ of such person ] under Pennsylvania or Federal law.** If, however, the information being considered for confidential treatment is contained in an NPDES form, the **[ Director shall ] Department will** forward **[ such ] the** information to the Regional Administrator for **[ his ]** concurrence in any determination of confidentiality. If the Regional Administrator does not concur that some or all of the information being considered for confidential treatment merits **[ such ] the** protection and so notifies the **[ Director ] Department** in writing, the **[ Director shall ] Department will** make available to the public that information determined by the Regional Administrator in consultation with the EPA Office of General Counsel not **[ to constitute trade secrets ] entitled to protection** in accordance with 40 CFR Part 2 (relating to public information).

\*   \*   \*   \*   \*

§ 92.65. Notice to other government agencies.

The **[ Director shall ] Department will** do the following:

**[ (a) ] (1)** * * *

**[ (b) ] (2)** At the time of issuance of public notice **[ pursuant to ] under** § 92.61(a) (relating to public notice of permit application and public hearing), transmit to any other states, whose waters may be affected by the issuance of an NPDES permit a copy of fact sheets prepared **[ pursuant to ] under** § 92.61(c). Upon re-

quest, the [ **Director shall** ] **Department will** provide [ **such** ] **the** states with a copy of the [ **NPDES** ] application and a copy of the draft permit prepared [ **pursuant to** ] **under** § 92.61(b). Each affected state shall be afforded an opportunity to submit written recommendations to the [ **Director** ] **Department** and to the Regional Administrator which the [ **Director** ] **Department** may incorporate into the permit if issued. [ **Should** ] **If** the [ **Director fail** ] **Department decides not** to incorporate any written recommendations thus received, [ **he shall** ] **it will** provide to the affected [ **state or** ] states and to the Regional Administrator a written explanation of [ **his** ] **its** reasons for [ **failing** ] **deciding** not to accept any of the written recommendations.

[ **(c)** ] **(3)** At the time of issuance of public notice [ **pursuant to** ] **under** § 92.61(a), transmit to any interstate agency having water quality control authority over waters which may be affected by the issuance of a permit a copy of fact sheets prepared [ **pursuant to** ] **under** § 92.61(c). [ **Such** ] **The** interstate agency shall have the same opportunity to submit recommendations and to receive explanations as set forth in [ **subsection (a)** ] **paragraph (2)**.

[ **(d)** ] **(4)** At the time of issuance of public notice [ **pursuant to** ] **under** § 92.61(a), transmit to the appropriate [ **District Engineer** ] **district engineer** of the Army Corps of Engineers a copy of fact sheets prepared [ **pursuant to** ] **under** § 92.61(c). [ **No** ] **An** NPDES permit [ **shall** ] **will not** be issued if a [ **District Engineer** ] **district engineer** objects to the issuance of [ **such** ] **the** permit **because anchorage and navigation of any of the surface waters would be impaired.**

[ **(e)** ] **(5)** Provide a subscription to the *Pennsylvania Bulletin* and transmit fact sheets prepared [ **pursuant to** ] **under** § 92.61 [ **(b)** ] **(c)** for any other Federal, State or local agency upon request, and provide [ **such** ] **these** agencies an opportunity to respond or comment.

## MISCELLANEOUS

### § 92.71a. Transfer of permit.

An NPDES permit may be automatically transferred to a new permittee if the following conditions are met:

**(1)** The current permittee notifies the Department at least 30 days in advance of the proposed transfer date.

**(2)** The notice includes a written agreement between the existing permittee and the new permittee containing a specific date for transfer of permit responsibilities, coverage and liability between them.

**(3)** The Department does not notify the existing permittee and the proposed new permittee of its intent to modify or revoke and reissue the permit. If this notice is not received, the transfer is effective on the transfer date specified in the agreement required under paragraph (2).

### § 92.72a. Cessation of discharge.

If a permittee intends to cease operations or cease a discharge for which a permit has been issued under this chapter, the permittee shall notify the Department in writing of its intent at least 180 days prior to the cessation of operations or the cessation of the discharge, unless permission has been granted for a later date by the Department.

### § 92.73. Prohibition of certain discharges.

[ **No** ] A permit [ **shall** ] **will not** be issued **under any of the following conditions:**

**(1)** [ **authorizing** ] **Authorizing** the discharge of any radiological, chemical, biological warfare agent [ **of** ] **or** high-level radioactive waste [ **Furthermore, no permit shall be issued** ].

**(2)** [ **authorizing** ] **Authorizing** any discharge which is in conflict with a plan or amendment thereto approved [ **pursuant to** ] **under** section 208(b) of the Federal Act (33 U.S.C.A. § 1288(b)).

**(3)** When the applicant is required to obtain a State water quality certification or other appropriate certification under section 401 of the Federal Act (33 U.S.C.A. § 1341) and that certification has not been obtained or waived.

**(4)** When the Regional Administrator has objected to the issuance of a permit.

**(5)** When the imposition of conditions cannot ensure compliance with the applicable water quality requirements of all affected states.

**(6)** When, in the judgment of the Administrator, a district engineer of the Army Corps of Engineers or the Department, anchorage and navigation in or on any surface waters would be substantially impaired by the discharge.

**(7)** To a new source or a new discharger, if discharge from its construction or operation will cause or contribute to the violation of water quality standards.

**(8)** To a discharger with a sanitary sewer overflow, unless the discharger can demonstrate that it is taking measures to eliminate the overflows as soon as practicable, including, but not limited to, a complete evaluation of the sanitary sewer system, the reduction of infiltration and inflow into the sanitary sewer system, the elimination of illegal hookups to the system, the institution of a ban or prohibition on sewer hookups to the sanitary sewer and any other measures which will eliminate the overflows.

### § 92.75. Transmission of NPDES forms.

The [ **Director shall** ] **Department will** transmit to the Regional Administrator and the [ **national** ] **National** data bank complete copies of all NPDES forms and other information received [ **by the Bureau** ], and in the manner [ **as the Director** ] **agreed upon by the Department** and the Regional Administrator shall agree.

### § 92.77. Requirement of additional data in certain cases.

If, after transmission of information to the Administrator [ **pursuant** ] **under** § 92.75 (relating to transmission

of NPDES forms), the Administrator notifies the [ **Director** ] **Department** that any discharge which has a total volume of less than 50,000 gallons on every day of the year is not a minor discharge, the [ **Director shall** ] **Depart-ment will** require the applicant for [ **such** ] **the** discharge to submit additional NPDES [ **application** ] forms or [ **any** ] other information requested by the Regional Administrator in [ **his** ] **the** notification to the [ **Director** ] **Department.**

### § 92.79. Reports of violations.

The [ **Bureau shall** ] **Department will** prepare a quarterly report listing permittees who have violated final or interim requirements in their NPDES permits, stating the nature of the violation, describing any enforcement action which is proposed or has been taken, and giving a brief description, if appropriate, of any circumstances which explain the violation. A copy of the report shall be forwarded on the last day of the months of February, May, August[ **,** ] and November to the EPA Regional Administrator.

### [ NPDES ] GENERAL PERMITS

### § 92.81. General NPDES permits.

(a) *Coverage and purpose.* The [ **Director** ] **Depart-ment** may issue a general NPDES permit, in lieu of issuing individual NPDES permits, for a clearly and specifically described category of point source discharges, if the point sources meet [ **all of** ] the following [ **para-graphs** ] **conditions**:

\* \* \* \* \*

(5) [ **Do not discharge toxic or hazardous pollu-tants as defined in sections 307 and 311 of the Federal Act (33 U.S.C.A. §§ 1317 and 1321) or any other substance which—because of its quantity; concentration; or physical, chemical or infectious characteristics—may cause or contribute to an in-crease in mortality or morbidity in either an indi-vidual or the total population, or pose a substantial present or future hazard to human health or the environment when discharged into the navigable waters.** ] **Effluent limitations are established in the general permit for any toxic or hazardous sub-stance listed or designated under section 307(a) or 311(b)(2) of the Federal Act (33 U.S.C.A. §§ 1317(a) and 1321(b)(2)) which may be discharged.**

(6) In the opinion of the [ **Director** ] **Department,** are more appropriately controlled under a general permit than under individual permits.

\* \* \* \* \*

(8) Do not discharge to waters classified as "[ **special protection** ] **exceptional value** waters" under Chapter 93 (relating to water quality standards).

(b) *Administration of general permits.* General permits may be issued, amended, suspended, revoked, reis-sued[ **,** ] or terminated under this chapter. Issuance of a general NPDES permit does not exempt a person from compliance with this title. General NPDES permits shall have a fixed term not to exceed 5 years, and shall comply with §§ 92.31, 92.41, 92.51[ **,** ] **and** 92.57[ **and 92.59** ] and other applicable provisions of this title.

(c) *Department specification.* **The Department may specify in the general permit that an eligible**

person who has submitted a timely and complete notice of intent is authorized to discharge in ac-cordance with the terms of the permit under one of the following:

(1) After a waiting period specified in the general permit.

(2) On a date specified in the general permit.

(3) Upon receipt of notification of inclusion by the Department.

(4) Upon receipt of the notice of intent by the Department.

(d) *When notice of intent not required.* Discharges other than those discharges from publicly-owned treatment works, combined sewer overflows, pri-mary industrial facilities and stormwater dis-charges associated with industrial activity, may, at the discretion of the Department, be authorized to discharge under a general permit without submit-ting a notice of intent when the Department finds that an NOI requirement would be inappropriate.

(e) *Department notification.* The Department may notify a discharger that it is covered by a general permit, even if the discharger has not submitted a notice of intent to be covered. A discharger so notified may request an individual permit.

(*Editor's Note:* The regulations currently at §§ 92.81(a)(8) and 92.83(b)(8) were proposed to be amended as outlined in 27 Pa.B. 1459 (March 22, 1997).)

### § 92.82. Public notice and public hearing.

(a) Public notice of every proposed general NPDES permit will be published by the Department in the *Pennsylvania Bulletin.* The contents of the public notice will include at least the following:

\* \* \* \* \*

(5) A brief description of the procedures for the formu-lation of final determinations, and other means by which interested persons may influence or comment on those determinations. [ **The** ] **Except as provided in § 92.81(c)—(e) (relating to general NPDES permits), the** procedures shall comply, at a minimum, with the public notice and hearing requirements set forth in §§ 92.61(c)—(e) (relating to public notice of permit appli-cation and public hearing).

\* \* \* \* \*

(7) The [ **application** ] **notice of intent** fee for cover-age under the general NPDES permit.

(b) Upon issuance of a general permit, the [ **Director** ] **Department** will place a notice in the *Pennsylvania Bulletin* of the availability of the general permit.

### § 92.83. Inclusion of individual dischargers in gen-eral NPDES permits.

(a) [ *Application* ] *Notice of intent for* coverage un-der the general permit.

(1) Eligible dischargers, who wish to be covered by the general permit, shall file [ **an application** ] **a notice of intent** which complies with [ **the requirements of** ] §§ 92.21[ **(c)** ]**(d),** 92.22 and 92.23 (relating to applica-tion for permits). At a minimum, the [ **application** ] **notice of intent** shall identify each point source for which coverage under the general permit is requested; [ **demonstrate** ] **certify** that each point source meets

the eligibility requirements for inclusion in the general permit; **[ demonstrate ] certify** that the discharge from the point sources, individually or cumulatively, will not result in a violation of an applicable water quality standard established under Chapter 93 (relating to water quality standards) and include other information the Department may require. The **[ applications ] NOI** shall be accompanied by a signed and notarized statement that the discharger agrees to accept all conditions and limitations imposed by the general NPDES permit.

(2) If the **[ application for coverage under the general permit ] NOI** is acceptable for one or more point sources, the **[ Director shall ] Department, except as provided in § 92.81(c)—(e) (relating to general permits), will** formally notify the discharger of the coverage for each point source, and shall transmit a copy of the general permit to each discharger covered. Each copy of the general permit issued to a discharger shall bear an individual identification number.

(3) The Department will **[ provide notice ] indicate** in the publication of a general permit in the *Pennsylvania Bulletin* whether it will provide one of the following:

**(i) Notice** in the *Pennsylvania Bulletin* of each **[ application for coverage ] NOI** under an applicable general NPDES permit, and of each approval for coverage under a general NPDES permit.

**(ii) Notice of every approval of coverage only.**

**(iii) No notice of NOIs or approvals of coverage.**

(b) *Denial of coverage.* The **[ Director shall ] Department will** deny any **[ application for coverage under a general permit ] NOI** when one or more of the following conditions exist:

\*     \*     \*     \*     \*

(2) The discharger is not, or will not be, in compliance with any of the conditions of the general permit or has a significant history of noncompliance with a prior **NPDES** permit issued by the Department.

\*     \*     \*     \*     \*

(7) The **[ Director ] Department** determines that **[ such ] the** action is necessary for any other reason to ensure compliance with the Federal Act**[ , ]** the State Act**[ , ]** or this title.

(8) The discharge would be to waters classified as "**[ special protection ] exceptional value waters**" under Chapter 93.

(c) *Requiring an individual permit.* The **[ Director ] Department** may amend, revoke, suspend or terminate previously issued coverage under a general NPDES permit, and require the point source discharger to apply for and obtain an individual NPDES permit for any of the reasons **[ set forth ]** in subsection (b). An interested person may petition the **[ Director ] Department** to take action under this subsection. Upon notification by the **[ Director ] Department** under this subsection that an individual NPDES permit is required for a point source, the discharger shall submit a complete NPDES application, in conformance with **[ the requirements of ]** this chapter, within 90 days of receipt of the notification, unless the discharger is already in possession of a

valid individual NPDES permit. Failure to submit the application within 90 days shall result in automatic termination of coverage of the applicable point sources under the general permit. Timely submission of a complete application shall result in continuation of coverage of the applicable point sources under the general permit, until **[ such time as ]** the **[ Director ] Department** takes final action on the pending individual permit application.

(d) *Action of the **[ Director ] Department.*** Action of the **[ Director ] Department** denying coverage under a general permit under subsection (b), or requiring an individual NPDES permit under subsection (c), is not a final action of the Department until **[ such time as ]** the discharger submits and the Department takes final action on an individual NPDES permit application.

\*     \*     \*     \*     \*

(f) *Coverage under general permit.* A point source excluded from a general permit solely because it already has an individual permit may submit **[ an application for coverage under the general permit ] a notice of intent** under subsection (a). If the **[ application ] notice of intent** is acceptable, the **[ Director ] Department** will revoke the individual permit and notify the source that it is covered under the general permit.

(*Editor's Note:* The regulations currently at §§ 92.81(a)(8) and 92.83(b)(8) were proposed to be amended as outlined at 27 Pa. B. 1459 (March 22, 1997).)

## CIVIL PENALTIES FOR VIOLATIONS OF NPDES PERMITS

### § 92.91. Applicability.

This section and §§ 92.92—92.94 are applicable to civil penalty assessments by the Department under section 605(a) of the State Act (35 P. S. § 691.605(a)).

### § 92.92. Method of seeking civil penalty.

The Department may do either one of the following:

**(1) File a complaint for civil penalties before the EHB.**

**(2) Assess a civil penalty, after hearing under § 92.93 (relating to procedure for civil penalty assessments).**

### § 92.93. Procedure for civil penalty assessments.

(a) The Department, if it assesses a civil penalty for a State Act violation, will serve a copy of the proposed civil penalty assessment on the discharger. Service will be by registered or certified mail, or by personal service. If the mail is tendered at the address in the permit, or at an address where the discharger is located, and delivery is refused, or mail is not collected, the requirements of this section shall be deemed to have been complied with upon the tender.

(b) The discharger who has been served with a proposed assessment in accordance with subsection (a) has 30 days to request that the Department hold an informal hearing on the proposed assessment by serving the Department by registered or certified mail with the request. If no timely request for an informal hearing is submitted, the failure to submit a timely request will operate as a waiver of the opportunity for a hearing, and the proposed assess-

ment will become a final assessment of the Department upon the expiration of the 30 day period unless the Department determines to hold a hearing on the proposed assessment under the procedures in subsection (c).

(c) If a timely request for hearing on the proposed assessment is received by the Department, the Department will assign a representative to hold an informal hearing regarding the assessment. The informal hearing will not be governed by requirements for formal adjudicatory hearings. The Department will establish a hearing date and post notice of the time and place of the hearing at least 5 days prior to the hearing. The person requesting the hearing has the right to attend and participate in the hearing. At the hearing, the Department will consider the relevant information presented and either affirm, raise, lower or vacate the proposed assessment. The Department representative's decision will constitute the Department's final assessment.

(d) The person subject to a final assessment by the Department may contest the penalty assessment by filing a timely appeal with the EHB.

§ 92.94. Disbursement of funds pending resolution of appeal.

(a) If the person subject to a final assessment fails to file a timely appeal to the EHB as provided in the Environmental Hearing Board Act (35 P. S. §§ 7511—7516) the penalty assessed shall become due and payable upon expiration of the time allowed to file an appeal. If the person fails to pay, the amount shall be collected in the manner provided by law. The Department may preclude persons who fail to pay in full from obtaining or renewing any Department permits.

(b) If the final decision in the administrative and judicial review process results in an order increasing the penalty, the person to whom the notice or order was issued shall pay the amount specified in the final decision to the Department within 30 days after the order is mailed to the person. If the person fails to pay the amount specified in the final decision, the amount shall be collected in the manner provided by law. The Department may preclude persons who fail to pay in full from obtaining or renewing any Department permits.

(c) Upon completion of the administrative and judicial review process, any funds collected under §§ 92.91—92.93 (relating to civil penalties for violations of NPDES permits) and this section will be deposited into the Clean Water Fund.

### CHAPTER 93. WATER QUALITY STANDARDS

§ 93.1. Definitions.

The following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise:

[ *Ambient stream concentration*—The range in concentration or level of a water quality parameter which would be expected to occur in the absence of human activities. The value is normally determined from quality measurements of waters that are not affected by waste discharges or other human activities. ]

*Ambient temperature*—The temperature of the water body upstream or outside of the influence of

a heated waste discharge or waste discharge complex. The ambient temperature sampling point should be unaffected by a source of waste heat.

*Application factor*—The ratio of the safe concentration to the 96-hour $LC_{50}$ concentration which is assumed to be constant for related groups of chemicals and is multiplied by an $LC_{50}$ value to produce the estimated safe concentration of a pollutant necessary to protect the balanced indigenous community in the receiving body of water.

*Balanced indigenous aquatic community*—A group of populations occupying a common area which consists of desirable species of fish and shellfish, including the biota of other trophic levels which are necessary as part of the food chain or otherwise ecologically important to the maintenance of these populations. ]

\*   \*   \*   \*   \*

[ *Carcinogenesis*—The onset of cancer. ]

\*   \*   \*   \*   \*

*Clean Water Act*—[ Pub. L. No. 95-217, 91 Stat. 1566—1609 ] The Federal Water Pollution Control Act (33 U.S.C.A. §§ 1251—1376).

[ *Cumulative pollutant*—A pollutant which is measurably increased in concentration within aquatic organisms relative to concentrations in the receiving waters. ]

*Critical use*—The most sensitive designated or existing use the criteria are designed to protect.

\*   \*   \*   \*   \*

*Designated uses*—Those uses specified in §§ 93.4(a) and 93.9a—93.9z for each water body or segment whether or not they are being attained.

[ *Effluent limits*—Restrictions established by the Department on quantities, rates and concentrations of pollutants which are discharged into the waters of this Commonwealth ]

*Epilimion* ] *Epilimnion* \* \* \*

[ *Existing potable water supply*—A source of water supply which is presently being used by humans after conventional treatment for drinking, culinary and other purposes such as inclusion in food products. ]

\*   \*   \*   \*   \*

[ *Existing sensitive industrial water supply*—An existing industrial water supply use which would require installation of additional water treatment by the industrial user if the total dissolved solids concentration in-stream exceeds 500 mg/l as a monthly average and 750 mg/l at one time. ]

\*   \*   \*   \*   \*

[ *$LC_{50}$ value*—The concentration of a pollutant in test waters that is lethal to 50 of the test organisms during continuous exposure for a specified period of time. ]

\*   \*   \*   \*   \*

[ *Maximum allowable daily load (MDL)*—The maximum amount of a pollutant from point and nonpoint sources which the receiving waters can

assimilate at the accepted design stream flow without endangering the achievement of the water quality standards. ]

\* \* \* \* \*

*Natural quality*—The water quality conditions that exist or that would reasonably be expected to exist in the absence of human related activity.

[ *No demonstrable adverse effect on an ecological community*—A condition which would exist only if appropriate statistical analysis reveals that the relative abundance of each major grouping of organisms—that is, family, genus and species taxonomic levels—and the species diversity for major communities at upstream and downstream sampling stations is within the 95% confidence limits and that there is no shift in species from a mixed sensitive/facultative/tolerant composition structure to one favoring a facultative/tolerant composition structure.

*Noncumulative pollutant*—A pollutant which is not measurably increased in concentration within aquatic organisms relative to concentrations in the receiving waters. ]

*Nonthreshold effect*—An adverse impact, including [ **carcinogenesis** ] **carcinogenic effects**, for which no exposure greater than zero assures protection to the exposed individual.

\* \* \* \* \*

[ *$Q_{7-10}$*—The actual or estimated lowest 7 consecutive-day average flow that occurs once in 10 years for a stream with unregulated flow, or the estimated minimum flow for a stream with regulated flow.

*Representative important species*—Species of aquatic life whose protection and propagation will assure the sustained presence of a balanced indigenous community. The species are representative in the sense that maintenance of water quality criteria will assure both the natural completion of the species' life cycles and the overall protection and sustained propagation of the balanced indigenous community. ]

\* \* \* \* \*

[ *Safe concentration value*—An estimated pollutant concentration as may be determined by the Department from relevant aquatic field studies, substantial available scientific literature or bioassay tests tailored to the ambient quality of the receiving waters which will allow the survival of representative important species that have been chronically exposed to the concentration in the receiving waters.

*State water plan*—The reports, studies, inventories and plans prepared by the Department to guide the conservation, development and administration of the Commonwealth's water and related land resources as authorized by section 1904-A of The Administrative Code of 1929 (71 P. S. § 510-4). ]

\* \* \* \* \*

s

[ *Test water*—A receiving water directly upstream from a waste discharge which is relatively unaffected by human activities, or a reconstituted water

which approximates the ambient chemical characteristics of these receiving waters. ]

\* \* \* \* \*

*Thirty-day average*—The arithmetic average of the samples collected during a consecutive 30-day period.

\* \* \* \* \*

[ *Water-quality-based effluent limitations*—An effluent limitation based on the need to attain or maintain specific water quality criteria in order to assure protection of a designated use. ]

*Water quality criteria*—[ Levels of parameters or stream conditions that need to be maintained or attained to prevent or eliminate pollution. ] Numeric concentrations, levels or surface water conditions that need to be maintained or attained to protect existing and designated uses.

\* \* \* \* \*

§ 93.2. Scope.

(a) This chapter sets forth water quality standards for [ the ] surface waters of [ the ] this Commonwealth, including wetlands. These standards are based upon water uses which are to be protected and will be considered by the Department in its regulation of discharges.

(b) [ Where ] When an interstate or international [ agencies ] agency under an interstate compact or international agreement [ establish ] establishes water quality standards regulations applicable to [ the ] surface waters of [ the ] this Commonwealth, including wetlands, more stringent than those in this title, the more stringent apply.

§ 93.3. Protected water uses.

Water uses which shall be protected, and upon which the development of water quality criteria shall be based, are set forth, accompanied by their identifying symbols, in [ the following ] Table 1:

TABLE 1

| Symbol | Protected Use |
| --- | --- |
|  | \* \* \* \* \* |
|  | *Recreation* **and fish consumption** |
|  | \* \* \* \* \* |
| F | *Fishing*—Use of the water for the legal taking of fish **for recreation or consumption**. |
|  | \* \* \* \* \* |

(*Editor's Note*: Section 93.3 is also proposed to be amended in a proposed rulemaking at 27 Pa. B. 1459 (March 22, 1997).)

§ 93.4. Statewide water uses.

(a) *Statewide water uses.* [ The ] **Except when otherwise specified in law or regulation,** the uses set forth in Table 2 [ were considered in determining the water quality criteria applicable to the particular waters listed in § 93.9 (relating to designated water uses and water quality criteria), except where otherwise indicated in § 93.9. ] are applicable to all surface waters. These uses shall be protected in accordance with Chapters 95 and 96 (relating to wastewater treatment requirements; and water quality standards implementation) and other applicable State and Federal laws and regulations.

TABLE 2

| Symbol | Use |
|---|---|
| * | *Aquatic Life* |
| [ WWF ] | [ Warm Water Fishes ] |
| * | * * * * |
| | *Recreation and fish consumption* |
| B | Boating |
| F | Fishing |
| WC | Water Contact Sports |
| E | Esthetics |

**\* Specific aquatic life uses are listed in §§ 93.9a—93.9z.**

(b) *Less restrictive uses.* Less restrictive uses than those currently designated for particular waters listed in [ § 93.9 ] §§ 93.9a—93.9z may be adopted when it is demonstrated that the designated use is more restrictive than the existing use, **the use cannot be attained by implementing effluent limits required under sections 301(b) and 306 of the Federal Clean Water Act (33 U.S.C.A. §§ 1311(b) and 1316) or implementing cost-effective and reasonable best management practices for nonpoint source control,** and one or more of the following conditions exist:

[ **(1)** The designated use is not attainable because of natural background conditions.

**(2)** The designated use is not attainable because of irretrievable man-induced conditions.

**(3)** Application of effluent limitations for existing sources more stringent than those required under section 301 of the Water Pollution Control Act (33 U.S.C.A. § 1311), to attain the designated use, would result in substantial and widespread adverse economic and social impact. ]

**(1)** Naturally occurring pollutant concentrations (natural quality) prevent the attainment of the use.

**(2)** Natural, ephemeral, intermittent or low flow conditions or water levels prevent the attainment of the use, unless these conditions may be compensated for by the discharge of sufficient volume of effluent discharges without violating State water conservation requirements to enable uses to be met.

**(3)** Human caused conditions or sources of pollution prevent the attainment of the use and cannot be remedied or would cause more environmental damage to correct than to leave in place.

**(4)** Dams, diversions or other types of hydrologic modifications preclude the attainment of the use, and it is not feasible to restore the water body to its original condition or to operate the modification in a way that would result in the attainment of the use.

**(5)** Physical conditions related to the natural features of the water body, such as the lack of a proper substrate, cover, flow, depth, pools, riffles and the like, unrelated to water quality, preclude attainment of aquatic life uses.

**(6)** Controls more stringent than those required by sections 301(b) and 306 of the Federal Clean Water Act would result in substantial and widespread economic and social impact.

(*Editor's Note*: Sections 93.4(c) and (d)(1) and (2) are proposed to be amended and moved to a new § 93.4a in proposed rulemaking published at 27 Pa. B. 1439 (March 22, 1998).)

\* \* \* \* \*

§ 93.5. [ Application of water quality criteria to discharge of pollutants ] (Reserved).

[ (a) *Application of effluent limitations.* The water quality criteria prescribed in this chapter for the various designated uses of the waters of this Commonwealth apply to receiving waters and are not to be necessarily deemed to constitute the effluent limit for a particular discharge, but rather one of the major factors to be considered in developing specific limitations on the discharge of pollutants. Where water quality criteria become the controlling factor in developing specific effluent limitations, the procedures in § 95.3 (relating to waste load allocations) will be employed.

(b) *Design conditions.*

(1) Except if otherwise specified in this chapter, the water quality criteria in this chapter shall be achieved at stream flows equal to or exceeding $Q_{7-10}$. For streams where the $Q_{7-10}$ flow is estimated to be zero, water quality criteria shall be achieved at the first downstream point where the stream is capable of supporting designated water uses, as defined in § 93.4 (relating to Statewide water uses).

(2) The Department may impose more restrictive design stream flow conditions where, in its judgment, the conditions are necessary for the protection of designated water uses.

(3) In establishing effluent limitations based on water quality criteria in this chapter, the Department may consider design conditions including, but not limited to, temperature, pH and hardness. The combination of design conditions shall provide a minimum 99% level of protection.

(c) *Application of ambient stream concentrations.* Where adopted water quality criteria as set forth in § 93.9 (relating to designated water uses and water quality criteria) are more stringent than ambient stream concentrations of specific water quality indicators, the ambient stream concentrations shall be deemed to be the applicable criteria used to establish specific effluent limits.

(d) *Application of osmotic pressure criterion for protection of aquatic life.* To protect aquatic life and irrigation where it occurs, the amount and composition of total dissolved solids in discharges into the surface waters of this Commonwealth shall be controlled so that the osmotic pressure of the receiving waters does not exceed either the criteria listed in paragraphs (1) or (2):

(1) Fifty milliosmoles per kilogram at any time.

(2) A less stringent osmotic pressure criterion established and based upon data obtained from bioassay or aquatic field studies conducted in accordance with the methodologies specified in subparagraphs (i) or (ii) respectively. In either case, the discharger shall submit a plan proposing the studies to be conducted; progress reports as the Department may require; and a report of the completed results of the testing including data collected and calculations made in recording, evaluating and interpreting the data. The alternate methodologies are as follows:

(i) *Bioassays.* Data shall be obtained from continuous flow bioassay tests conducted in a water

environment which is equal to or closely approximates that of the natural quality of the receiving waters. A safe osmotic pressure for a test solution which simulates projected instream conditions will be determined by establishment of a no-effect level-maximum acceptable toxicant concentration or by the determination of an experimentally derived application factor which would be applied to a 96-hour $LC_{50}$ bioassay test result utilizing one or more representative important species of benthic macroinvertebrates and fishes obtained from commercially available strains or wild populations from unpolluted streams or impoundments. Remaining bioassay testing protocol shall be conducted in accordance with continuous flow methodologies outlined in EPA Ecological Research Series Publication, *EPA-660/3-75-009, Methods of Acute Toxicity Tests with Fish, Macroinvertebrates, and Amphibians (April, 1975);* EPA Environmental Monitoring Series Publication, *EPA-600/4-78-012, Methods for Measuring the Acute Toxicity of Effluents to Aquatic Organisms (July, 1978); Standard Methods for the Examination of Water and Wastewater (15th Edition, 1980); Standard Method of Test for ASTM D 1345-59 (Reapproved 1970 and published in the 1975 Annual Book of ASTM Standards)—Part 31—Water; or Biological Methods for the Assessment of Water Quality, ASTM Special Technical Publication 528,* 1973. The use of other methodologies is subject to prior written approval by the Department.

(ii) *Aquatic field studies.* The studies may be used when the stream above the source of total dissolved solids supports a balanced, indigenous aquatic community. Instream sampling stations shall be located directly upstream and downstream of the source of total dissolved solids and free of harm from other abatable point and nonpoint sources of pollution. Biological parameters including, but not limited to, benthic macroinvertebrates and fishes, shall be collected qualitatively or quantitatively, or both, on a quarterly basis for a minimum of 1 year. Sample replication should be adequate to determine precision of the data collected and to conduct appropriate statistical tests. Remaining biological field methods shall be conducted in accordance with *Standard Methods for the Examination of Water and Wastewater (15th Edition, 1980); EPA-Biological Field and Laboratory Methods for Measuring the Quality of Surface Waters and Effluents, EPA-670/4-73-001, July, 1973, Cornelius I. Weber, ed; Techniques of Water Resources Investigations of the United States Geological Survey, Chapter A4, Methods for Collection and Analysis of Aquatic Biological and Microbiological Samples by K. V. Slack, et al., 1973; EPA-Model State Water Monitoring Program, edited by Water Monitoring Task Force, R. L. Crim, Chairman, EPA-440/9-74-002, June, 1975.* It shall be demonstrated that the existing point source discharge of total dissolved solids will not result in a demonstrable adverse effect on the ecological community structure when upstream and downstream biological data are compared.

(e) *Application of potable water supply use criteria.*

(1) Water quality criteria for total dissolved solids $(TDS_1)$, nitrite-nitrate nitrogen (N), phenolics $(Phen_1)$ and fluoride $(F_1)$ established for the protection of Statewide potable water use shall be applied so instream criteria are met at the point of withdrawal for existing potable water supply systems, and at the point of projected withdrawal for new potable water supplies identified by the State Water Plan or a river basin commission plan as necessary to satisfy the demands of an existing or new potable water supply within the next 20 years. Criteria necessary to protect other designated uses shall be met at the point of wastewater discharge.

(2) The Department will include in every public notice of a draft NPDES permit published under § 92.61 (relating to public notice of permit application and public hearing) the location of the nearest downstream potable water supply considered in establishing proposed effluent limitations under this section, or a finding that no potable water supply will be affected by the proposed discharge.

(3) Wastewater discharges to waters designated for special protection in § 93.9 will continue to be regulated under § 95.1 (relating to general requirements).

(4) Whenever a point of projected withdrawal for a new potable water supply not previously considered is identified by an update to the State Water Plan or a river basin commission plan, or by the application for a water allocation permit from the Department, the Department will notify a discharger of total dissolved solids, nitrite-nitrate nitrogen, phenolics and fluoride of more stringent effluent limitations needed to protect the point of withdrawal. The discharger shall meet more stringent effluent limitations in accordance with a schedule approved by the Department. The Department will issue orders directing dischargers to achieve compliance, when necessary.

(f) *Application of total residual chlorine (TRC) criteria.*

(1) Except as provided in paragraph (2), facilities utilizing chlorine which discharge to waters of this Commonwealth shall meet the more stringent of the following:

(i) An effluent limitation representing the Best Available Technology (BAT) for the discharge of TRC. If the EPA adopts a National categorical effluent limit guideline (ELG) for TRC for a specific industry or activity under sections 301 and 304(b) of the Water Pollution Control Act (33 U.S.C.A. §§ 1311 and 1314(b)), that ELG shall constitute BAT for the industry or activity. If the EPA has not promulgated a National ELG for an industry or activity, the Department may develop a facility-specific BAT effluent limitation. Factors which will be considered in developing a facility-specific BAT effluent limitation include the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques and process changes (including source reduction measures in addition to end-of-pipe controls), the cost of achieving the effluent reduction, nonwater quality environmental impact (including energy requirements), and other factors the Department deems appropriate. For facilities where the EPA has not promulgated a National ELG for an industry or activity, and the Department has not developed a facility-specific BAT effluent limitation pursuant to the factors in this subparagraph, an effluent limitation for TRC of 0.5 mg/l (30-day average) shall constitute BAT.

(ii) A water-quality based effluent limitation for a facility developed in accordance with subsections (a) and (b), as applicable, which attains the water quality criteria for TRC specified in § 93.7(c), Table 3 (relating to specific water quality criteria).

(2) Facilities utilizing chlorine which discharge to Exceptional Value Waters, as defined in § 93.3 (relating to protected water uses), or High Quality Waters, as defined in § 93.3, where necessary economic or social justification of significant public value and other factors have not been demonstrated under § 95.1(b), shall dechlorinate their effluents prior to discharge into the waters.

(3) For facilities subject to paragraph (1)(ii), the Department may allow site-specific criteria under § 93.8 (relating to development of site-specific water quality criteria for the protection of aquatic life).

(4) Facilities which have discharges containing fecal coliform organisms shall effectively disinfect their discharges under § 95.7 (relating to effective disinfection). ]

§ 93.6. General water quality criteria.

(a) Water may not contain substances attributable to point or nonpoint source [ waste ] discharges in concentration or amounts sufficient to be inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life.

*   *   *   *   *

§ 93.7. Specific water quality criteria.

(a) [ Waters of this Commonwealth for which specific criteria have been established are listed in § 93.9 (relating to designated water uses and water quality criteria).

(b) References to specific criteria in § 93.9 shall be keyed to the list of specific criteria in subsection (c) and to the groups of criteria in subsection (d).

(c) ] (a) [ The following ] Table 3 displays [ the ] specific water quality criteria and associated critical uses. [ Unless otherwise specified, the specific criteria concentration limits are for the total rather than the dissolved, form of a substance. ] The criteria associated with the Statewide water uses listed in Table 2 are applicable to all surface waters, unless a specific exception is indicated in §§ 93.9a —93.9z. Other specific water quality criteria are applicable to surface waters as specified in §§ 93.9a—93.9z. All applicable criteria shall be applied in accordance with Chapters 95 and 96 (relating to wastewater treatment requirements; and water quality standards implementation) and other applicable State and Federal laws and regulations.

**TABLE 3**

| Parameter | Symbol | Criteria | Critical Use* |
|---|---|---|---|
| [ Aluminum ] | [ Al ] | [ Maximum 0.1 of the 96-hour LC50 for representative important species as determined through substantial available literature data or bioassay tests tailored to the ambient quality of the receiving waters. ] | [ 1 ] |
| Alkalinity | $Alk_1$ | Minimum 20 mg/l as $CaCO_3$ [ , except where natural conditions are less. Where discharges are to waters with 20 mg/l or less alkalinity, the discharge should not further reduce the alkalinity of the receiving waters. ] | [ 1 ] CWF, WWF, TSF, MF |
|  | [ $Alk_2$ ] | [ Minimum 20 mg/l as $CaCO_3$. ] | [ 1 ] |
|  | [ $Alk_3$ ] | [ Between 20 and 100 mg/l. ] | [ DRBC ] |
|  | [ $Alk_4$ ] | [ Between 20 and 120 mg/l. ] | [ DRBC ] |
| Ammonia Nitrogen | Am | The maximum total ammonia nitrogen concentration at all times shall be the numerical value given by: un-ionized ammonia nitrogen ($NH_3$-N) $\times$ ($log^{-1}[pK_T$-pH$] + 1$), where: <br> *   *   *   *   * <br> [ For purposes of calculating effluent limitations based on this value the accepted design stream flow shall be the actual or estimated lowest 30-consecutive-day average flow that occurs once in 10 years. ] | [ 1 ] CWF, WWF, TSF, MF |
| Bacteria | $Bac_1$ | (Fecal coliforms/100 ml)—During the swimming season (May 1 through September 30), the maximum fecal coliform level shall be a geometric mean of 200 per 100 milliliters (ml) based on a minimum of five consecutive samples each sample collected on different days during a 30-day period; for the remainder of the year, the maximum fecal coliform level shall be a geometric mean of 2,000 per 100 milliliters (ml) based on a minimum of five consecutive samples collected on different days during a 30-day period. | [ 3 ] WC |

| Parameter | Symbol | Criteria | Critical Use* |
|---|---|---|---|
| | Bac$_2$ | (Coliforms/100 ml)—Maximum of 5,000/100 ml as a monthly average value, no more than this number in more than 20 of the samples collected during a month, nor more than 20,000/100 ml in more than 5% of the samples. | [ 2 ] PWS |
| | [ Bac$_3$ ] | [ (Coliforms/100 ml)—Not more than 5,000/100 ml as a monthly geometric mean. ] | [ 2 ] |
| | [ Bac$_4$ ] | [ (Fecal Coliforms/100 ml)—Maximum geometric mean of 770/100 ml; samples shall be taken at a frequency and location to permit valid interpretation. ] | [ DRBC ] |
| | [ Bac$_5$ ] | [ The fecal coliform density in five consecutive samples may not exceed a geometric mean of 200/100 ml. ] | [ DRBC ] |
| Chloride | [ Ch$_1$ ] | [ Maximum 150 mg/l. ] | [ 4 ] |
| | Ch[ $_2$ ] | Maximum 250 mg/l. | [ 2 ] PWS |
| | [ Ch$_3$ ] | [ Maximum 30-day average 180 mg/l. ] | [ DRBC ] |
| | [ Ch$_4$ ] | [ Maximum 15-day average 50 mg/l. ] | [ DRBC ] |
| Color | [ Col$_1$ ] | [ Maximum 50 units on the platinum-cobalt scale; no other colors perceptible to the human eye. ] | [ 3 ] |
| | Col[ $_2$ ] | Maximum 75 units on the platinum-cobalt scale; no other colors perceptible to the human eye. | [ 2 ] PWS |
| Dissolved Oxygen | DO$_1$ | Minimum daily average 6.0 mg/l; minimum 5.0 mg/l. For lakes, ponds and impoundments only, minimum 5.0 mg/l at any point. | [ 1 ] CWF, HQ-WWF, HQ-TSF |
| | DO$_2$ | Minimum daily average 5.0 mg/l; minimum 4.0 mg/l. For the epilimnion of lakes, ponds and impoundments, minimum daily average of 5.0 mg/l, minimum 4.0 mg/l. | [ 1 ] WWF |
| | [ DO$_3$ ] | [ Minimum daily average not less than 5.0 mg/l; during periods April 1—June 15 and September 16—December 31, not less than 6.5 mg/l as a seasonal average. ] | [ DRBC ] |
| | [ DO$_4$ ] | [ Minimum daily average not less than 3.5 mg/l; during periods April 1—June 15 and September 16—December 31, not less than 6.5 mg/l as a seasonal average. ] | [ DRBC ] |
| | DO[ $_5$ ]$_3$ | For the period February 15 to July 31 of any year, minimum daily average of 6.0 mg/l, minimum 5.0 mg/l. For the remainder of the year, minimum daily average of 5.0 mg/l, minimum 4.0 mg/l. | [ 1 ] TSF |
| | DO[ $_6$ ]$_4$ | Minimum 7.0 mg/l. | [ 1 ] HQ-CWF |
| Fluoride | F[ $_1$ ] | Daily average 2.0 mg/l. | [ 2 ] PWS |
| | [ F$_2$ | Four-day average 0.01 of the 96-hour LC$_{50}$; one-hour average 0.05 of the 96-hour LC$_{50}$ for representative important species as determined through substantial available literature data or bioassay tests tailored to the ambient quality of the receiving water, or both. ] | 1 |
| [ Hardness ] | [ Hd$_1$ ] | [ Maximum monthly mean 150 mg/l. ] | [ DRBC ] |
| | [ Hd$_2$ ] | [ Maximum monthly mean 95 mg/l. ] | [ DRBC ] |
| Iron | Fe$_1$ | [ Daily ] 30-day average 1.5 mg/l as total [ iron; maximum 0.3 mg/l as dissolved iron ] Recoverable. | [ 1,2 ] CWF, WWF, TSF, MF |
| | Fe$_2$ | Maximum 0.3 mg/l as dissolved | PWS |
| Manganese | Mn | Maximum 1.0 mg/l, as total recoverable. | [ 2 ] PWS |
| [ Methylene Blue Active Substance ] | [ MBAS$_1$ ] | [ Not more than 0.5 mg/l. ] | [ DRBC ] |
| | [ MBAS$_2$ ] | [ Not more than 1.0 mg/l. ] | [ DRBC ] |
| Nitrite plus Nitrate | N | Maximum 10 mg/l as nitrogen. | [ 2 ] PWS |

| Parameter | Symbol | Criteria | Critical Use* |
|---|---|---|---|
| Osmotic Pressure | OP | Maximum 50 milliosmoles per kilogram [ or criteria developed using § 93.5(d) (relating to the application of water quality criteria to discharge of pollutants). ] | [ 1 ] CWF, WWF, TSF, MF |
| pH | pH | From 6.0 to 9.0 inclusive. | [ 1 ] CWF, WWF, TSF, MF |
|  | [ pH$_2$ ] | [ Not less than 6.5 and not more than 8.5. ] | [ DRBC ] |
|  | [ pH$_3$ ] | [ From 7.0 to 9.0 inclusive. ] | [ 1 ] |
|  | [ pH$_4$ ] | [ Not less than 6.0 and not more than 8.5. ] | [ DRBC ] |
| [ Phenolics (except Section 307(a)(1) (33 U.S.C.A. § 1317(a)(1)), Priority Pollutants) ] | [ Phen$_1$ ] | [ Maximum 0.005 mg/l. ] | [ 2 ] |
|  | [ Phen$_2$ ] | [ Maximum 0.02 mg/l. ] | [ DRBC ] |
|  | [ Phen$_3$ ] | [ Four-day average 0.02 mg/l; 1-hour average 0.1 mg/l. ] | [ 1 ] |
| [ Radioactivity | Rad ] | [ Alpha emitters, maximum 3 pc/l; beta emitters, maximum 1,000 pc/l. ] | [ DRBC ] |
| Sulfate | Sul | Maximum 250 mg/l. | [ 2 ] PWS |
| [ Temperature ] | [ Temp$_1$ ] | [ Maximum temperatures in the receiving water body resulting from heated waste sources regulated under Chapter 97 (relating to industrial wastes), and other sources where the Department determines that temperature limits are necessary to protect designated uses, are as follows. Additionally, these wastes may not result in a change by more than 2°F during a 1-hour period. Exceptions to these thermal maxima may be granted on a case-specific basis under § 97.82(a)(2) (relating to allowable discharges). ] | [ 1 ] |

| [ Period ] | [ Temperature °F ] |
|---|---|
| [ January 1-31 | 38 |
| February 1-29 | 38 |
| March 1-31 | 42 |
| April 1-15 | 48 |
| April 16-30 | 52 |
| May 1-15 | 54 |
| May 16-31 | 58 |
| June 1-15 | 60 |
| June 16-30 | 64 |
| July 1-31 | 66 |
| August 1-31 | 66 |
| September 1-15 | 64 |
| September 16-30 | 60 |
| October 1-15 | 54 |
| October 16-31 | 50 |
| November 1-15 | 46 |
| November 16-30 | 42 |
| December 1-31 | 40 ] |

| [ Parameter ] | [ Symbol ] | [ Criteria ] | [ Critical Use* ] |
|---|---|---|---|
| [ Temperature ] | [ Temp$_2$ ] | [ Maximum temperatures in the receiving water body resulting from heated waste sources regulated under Chapter 97, and other sources where the Department determines that temperature limits are necessary to protect designated uses, are as follows. Additionally, these wastes may not result in a change by more than 2°F during a 1-hour period. Exceptions to these thermal maxima may be granted on a case-specific basis under § 97.82(a)(2). ] | [ 1 ] |

| [ Period ] | [ Temperature °F ] |
|---|---|
| [ January 1-31 | 40 |
| February 1-29 | 40 |
| March 1-31 | 46 |
| April 1-15 | 52 |
| April 16-30 | 58 |
| May 1-15 | 64 |
| May 16-31 | 72 |
| June 1-15 | 80 |
| June 16-30 | 84 |
| July 1-31 | 87 |
| August 1-31 | 87 |
| September 1-15 | 84 |
| September 16-30 | 78 |
| October 1-15 | 72 |
| October 16-31 | 66 |
| November 1-15 | 58 |
| November 16-30 | 50 |
| December 1-31 | 42 ] |

| [ Parameter ] | [ Symbol ] | [ Criteria ] | [ Critical Uses* ] |
|---|---|---|---|
| [ Tempera-ture ] | [ Temp$_3$ ] | [ Maximum temperatures in the receiving water body resulting from heated waste sources regulated under Chapter 97 and other sources where the Department determines that temperature limits are necessary to protect designated uses, are as follows. Additionally, these wastes may not result in a change by more than 2°F during a 1-hour period. Exceptions to these thermal maxima may be granted on a case-specific basis under § 97.82(a)(2). ] | [ 1 ] |

| [ Period ] | [ Temperature °F ] |
|---|---|
| [ January 1-31 | 40 |
| February 1-29 | 40 |
| March 1-31 | 46 |
| April 1-15 | 52 |
| April 16-30 | 58 |
| May 1-15 | 64 |
| May 16-31 | 68 |
| June 1-15 | 70 |
| June 16-30 | 72 |
| July 1-31 | 74 |
| August 1-15 | 80 |
| August 16-30 | 87 |
| September 1-15 | 84 |
| September 16-30 | 78 |
| October 1-15 | 72 |
| October 16-31 | 66 |
| November 1-15 | 58 |
| November 16-30 | 50 |
| December 1-31 | 42 ] |

| [ Parameter ] | [ Symbol ] | [ Criteria ] | [ Critical Uses* ] |
|---|---|---|---|
| Temperature | | Maximum temperatures in the receiving water body resulting from heated waste sources regulated under Chapters 92, 96 and other sources where temperature limits are necessary to protect designated and existing uses. | See below |

| | | Symbol: | |
| Critical Use: | | Temp$_2$ | |
| Period | Temp$_1$ CWF | WWF Temperature °F | Temp$_3$ TSF |
|---|---|---|---|
| January 1-31 | 38 | 40 | 40 |
| February 1-29 | 38 | 40 | 40 |
| March 1-31 | 42 | 46 | 46 |
| April 1-15 | 48 | 52 | 52 |
| April 16-30 | 52 | 58 | 58 |

| *Symbol:* *Critical Use:* *Period* | *Temp₁ CWF* | *Temp₂* *WWF* *Temperature °F* | *Temp₃* *TSF* |
|---|---|---|---|
| May 1-15 | 54 | 64 | 64 |
| May 16-31 | 58 | 72 | 68 |
| June 1-15 | 60 | 80 | 70 |
| June 16-30 | 64 | 84 | 72 |
| July 1-31 | 66 | 87 | 74 |
| August 1-15 | 66 | 87 | 80 |
| August 16-30 | 66 | 87 | 87 |
| September 1-15 | 64 | 84 | 84 |
| September 16-30 | 60 | 78 | 78 |
| October 1-15 | 54 | 72 | 72 |
| October 16-31 | 50 | 66 | 66 |
| November 1-15 | 46 | 58 | 58 |
| November 16-30 | 42 | 50 | 50 |
| December 1-31 | 40 | 42 | 42 |

| [ *Parameter* ] | [ *Symbol* ] | [ *Criteria* ] | [ *Critical Use** ] |
|---|---|---|---|
|  | [ $Temp_4$ ] | [ No rise when ambient temperature is 87°F or above; not more than a 5°F rise above ambient temperature until stream temperature reaches 87°F; not to be changed by more than 2°F during any 1-hour period. ] | [ DRBC ] |
|  | [ $Temp_5$ ] | [ Not more than 5°F above the average daily temperature during the 1961—66 period, which is shown below, or a maximum of 86°F, whichever is less. ] | [ DRBC ] |

[ Average Daily Temperature ]
[ 1961—1966 ]
[ (Temperatures may be interpolated) ]

| [ Date ] | [ Delaware Estuary, Head of Tide to River Mile 108.4 (about 1 mile below Pennypack Creek) °F ] | [ Delaware Estuary, River Mile 108.4 (about 1 mile below Pennypack Creek) to Big Timber Creek °F ] | Delaware Estuary From Big Timber Creek to Pennsylvania-Delaware State Line °F ] |
|---|---|---|---|
| [ January 1 | 37 | 41 | 42 |
| February 1 | 35 | 35 | 36 |
| March 1 | 38 | 38 | 40 |
| April 1 | 46 | 46 | 47 |
| May 1 | 58 | 58 | 58 |
| June 1 | 71 | 71 | 72 |
| July 1 | 79 | 79 | 80 |
| August 1 | 81 | 81 | 81 |
| September 1 | 78 | 79 | 78 |
| September 15 | 76 | 77 | 78 |
| October 1 | 70 | 70 | 70 |
| November 1 | 59 | 61 | 60 |
| December 1 | 46 | 50 | 50 |
| December 15 | 40 | 45 | 45 ] |

| *Parameter* | *Symbol* | *Criteria* | *Critical Uses** |
|---|---|---|---|
|  | [ $Temp_6$ ] | [ Not more than 5°F rise above the ambient temperatures until stream temperatures reach 50°F; nor more than 2°F rise above ambient temperature when temperatures are between 50°F and 58°F; nor may temperatures exceed 58°F, whichever is less, except in designated heat dissipation areas. ] | DRBC |

| Parameter | Symbol | Criteria | Critical Uses* |
|---|---|---|---|
| | [ Temp$_7$ ] | [ As a guideline, the maximum length of heat dissipation areas may not be longer than 3,500 feet measured from the point where the waste discharge enters the stream. The width of heat dissipation areas may not exceed two-thirds the surface width measured from shore to shore at any stage of tide or the width encompassing one-fourth the cross-sectional area of the stream, whichever is less. Within any one heat dissipation area only one shore shall be used in determining the limits of the area. Where waste discharges are close to each other, additional limitations may be prescribed to protect water uses. Controlling temperatures shall be measured outside the heat dissipation area. The rate of temperature change in the heat dissipation area may not cause mortality of the fish. ] | [ DRBC ] |
| | [ Temp$_8$ ] | [ As a guideline, the maximum length of heat dissipation areas may not be longer than 3,500 feet or 20 times the average stream width, whichever is less, measured from the point where the waste discharge enters the stream. Heat dissipation areas may not exceed one-half the surface stream width or the width encompassing one-half the cross-sectional area of the stream, whichever is less. Within any one heat dissipation area only one shore may be used in determining the limits of the area. Where waste discharges are close to each other, additional limitations may be prescribed to protect stream uses. Controlling temperatures shall be measured outside the heat dissipation zone. The rate of temperature change in designated heat dissipation areas may not cause mortality of the fish. ] | [ DRBC ] |
| | [ Temp$_9$ ] | [ As a guideline, the maximum length of heat dissipation areas may not be longer than 1,000 feet or 20 times the average width of the stream, whichever is less, measured from the point where the waste discharge enters the stream. Heat dissipation areas may not exceed one-half the surface stream width or the width encompassing one-half the entire cross-sectional area of the stream, whichever is less. Within any one heat dissipation area only one shore shall be used in determining the limits of the area. Where waste discharges are close to each other, additional limitations may be prescribed to protect water uses. Controlling temperatures shall be measured outside the heat dissipation zone. The rate of temperature change in designated heat dissipation areas may not cause mortality of the fish. ] | [ DRBC ] |
| [ Threshold Odor Number ] | [ TON ] | [ Maximum 24 at 60°C. ] | [ 3 ] |
| Total Dissolved Solids | TDS$_1$ | 500 mg/l as a monthly average value; maximum 750 mg/l. | [ 2 ] PWS |
| | [ TDS$_2$ | Maximum 1,500 mg/l. ] | [ 1 ] |
| | [ TDS$_3$ | Not to exceed 133% of ambient stream concentration or 500 mg/l, whichever is less. ] | [ DRBC ] |
| | [ TDS$_4$ | Not to exceed 133% of ambient stream concentration. | [ DRBC ] |
| Total Residual Chlorine | TRC | Four-day average 0.011 mg/l; 1-hour average 0.019 mg/l. | [ 1 ] CWF, WWF, TSF, MF |
| [ Turbidity ] | [ Tur$_1$ ] | [ Not more than 30 NTU during the period May 30—September 15, nor more than a monthly mean of 40 NTU or a maximum of 150 NTU during the remainder of the year. ] | [ DRBC ] |
| | [ Tur$_2$ ] | Maximum monthly mean 40 NTU, maximum value not more than 150 NTU. ] | [ DRBC ] |
| | [ Tur$_3$ ] | [ Not more than 100 NTU. ] | [ 1 ] |
| | [ Tur$_4$ ] | [ For the period May 15—September 15 of any year, not more than 40 NTU; for the period September 16—May 14 of any year, not more than 100 NTU. ] | [ 1 ] |

PROPOSED RULEMAKING 4475

| Parameter | Symbol | Criteria | Critical Uses* |
|---|---|---|---|
| | [ $Tur_5$ ] | [ Maximum monthly mean of 10 NTU, maximum 150 NTU. ] | [ DRBC ] |
| | [ $Tur_6$ ] | [ Maximum monthly mean of 20 NTU, maximum 150 NTU. ] | [ DRBC ] |
| | [ $Tur_7$ ] | [ Maximum monthly mean of 30 NTU, maximum 150 NTU. ] | [ DRBC ] |

*Critical use: The most sensitive designated **or existing** water use the criteria are designed to protect[**, identified by the following:** ]

**1 = AquaticLife**

**2 = Water Supply**

**3 = Recreation (including esthetics)**

**4 = Special Protection**

**DRBC = Criteria adopted by agreement with the Delaware River Basin Commission and that apply only to selected portions of the Delaware River Basin in this Commonwealth.** ]

[ **(d)  Unless otherwise specified in subsection (e), §§ 93.5(d) and (e) and 93.9, Statewide specific criteria in the following Table 4 apply to the surface waters of this Commonwealth.** ]

TABLE 4

| [ Symbol ] | [ Specific Water Quality Criteria ] |
|---|---|
| [ Al | Aluminum |
| $Alk_1$ | Alkalinity |
| Am | Ammonia Nitrogen |
| $Bac_1$ | Bacteria |
| $F_1$ & $F_2$ | Fluoride |
| Fe | Iron |
| Mn | Manganese |
| N | Nitrite plus Nitrate |
| OP | Osmotic Pressure |
| $pH_1$ | Ph |
| $Phen_1$ & $Phen_3$ | Phenolics |
| $TDS_1$ | Total Dissolved Solids |
| TRC | Total Residual Chlorine ] |

[ **(e)  Table 5 contains groups of specific water quality criteria based upon water uses to be protected. When the symbols listed in Table 5 appear in the** *Water Uses Protected* **column in § 93.9, they have the meaning listed in the Table 5. Exceptions to these standardized groupings will be indicated on a stream-by-stream or segment-by-segment basis by the words "Add" or "Delete" followed by the appropriate symbols described elsewhere in this chapter.** ]

TABLE 5

| [ Symbol ] | [ Water Uses Included ] | [ Specific Criteria ] |
|---|---|---|
| [ WWF | Statewide list | Statewide list plus $DO_2$ and $Temp_2$ |
| CWF | Statewide list plus Cold Water Fish | Statewide list plus $DO_1$ and $Temp_1$ |
| TSF | Statewide list plus Trout Stocking | Statewide list plus $DO_5$ and $Temp_3$ |
| HQ-WWF | Statewide list plus High Quality Waters | Statewide list plus $DO_1$ and $Temp_2$ |
| HQ-CWF | Statewide list plus High Quality Waters and Cold Water Fish | Statewide list plus $DO_6$ and $Temp_1$ |
| HQ-TSF | Statewide list plus High Quality Waters and Trout Stocking | Statewide list plus $DO_1$ and $Temp_3$ |
| EV | Statewide list plus Exceptional Value Waters | Existing quality ] |

[ **(f) ] (b)**  The list of specific water quality criteria does not include all possible substances that could cause pollution. For substances not listed, the general criterion that these substances may not be inimical or injurious to the designated water uses applies. [ **The best scientific information available will be used to adjudge the suitability of a given waste discharge where these substances are involved.** ] The Department may develop a criterion for any substance not listed in Table 3 that is determined to be inimical or injurious to existing or designated water uses using the best available scientific information, as determined by the Department.

**(c)**  If the Department determines that natural quality of a surface water segment is of lower quality than the applicable criteria listed in Table 3, the natural quality shall constitute the criteria for that segment. All draft natural quality determinations will be published in the *Pennsylvania Bulletin* and subject to a minimum 30-day comment period. The Department will maintain a publicly available list of surface waters and parameters where this subsection applies, and from time to time submit appropriate amendments to §§ 93.9a—93.9z.

**§ 93.8. Development of site-specific water quality criteria for the protection of aquatic life.**

(a) The Department will consider a request for site-specific criteria for protection of aquatic life, human health or wildlife when a person demonstrates that there exist site-specific biological or chemical conditions of receiving waters or exposure factors which differ from conditions upon which the water quality criteria were based. Site-specific criteria may be developed for use only in place of current Statewide or regional (such as the Great Lakes Systems) criteria. The request for site-specific criteria shall include the results of scientific studies for the purpose of:

(1) Defining the areal boundaries for application of the site-specific criteria which will include the potentially affected wastewater dischargers identified by the Department, through various means, including, but not limited to, **[ water quality modeling, the wasteload allocation process ]** the total maximum daily load (TMDL) process described in Chapter 96 (relating to water quality standards implementation) or biological assessments.

\*     \*     \*     \*     \*

(c) **[ This section applies to the criteria in regulations adopted by the EQB, including § 93.5(f) (relating to application of total residual chlorine criteria); § 93.7, Table 3 (relating to specific water quality criteria) or in the statement of policy implementing § 93.8a (relating to toxic substances) set forth at § 16.51 (relating to table) and § 16.61 (relating to water quality criteria for the Great Lakes System); or otherwise forming the basis for effluent limitations established under § 93.7(f). These provisions include criteria developed by the EPA under section 304(a) of the Water Pollution Control Act (33 U.S.C.A. § 1314(a)), and adopted in their original or modified form, and criteria developed by the Department.**

(d) **]** \*\*\*

**[ (e) ] (d)** \*\*\*

**[ (f) ] (e)** \*\*\*

**[ (g) ] (f)** \*\*\*

**§ 93.8a. Toxic substances.**

\*     \*     \*     \*     \*

(e) **[ Design conditions for toxics shall be determined under § 93.5(b) (relating to application of water quality criteria to discharge of pollutants), except that for ]** Water quality criteria for toxics shall be applied in accordance with Chapter 96 (relating to water quality standards implementation) and other applicable State and Federal laws and regulations. For carcinogens, the design **[ stream flow ] conditions** shall **[ be that which results ]** result in a lifetime—70 years—average exposure corresponding to the risk management level specified in subsection (d).

\*     \*     \*     \*     \*

(h) **[ The Department may require effluent toxicity testing as a basis for limiting the addition of toxic substances to waters of this Commonwealth, and may establish water quality based effluent limitations based on the results of effluent toxicity testing.**

**(i) ] (h)** \*\*\*

**[ (j) ] (i)** \*\*\*

**[ (k) ] (l)**

\*     \*     \*     \*     \*

**§ 93.9. Designated water uses and water quality criteria.**

(a) **[ Except as provided in § 93.5(d) and (e) (relating to the application of water quality criteria to discharge of pollutants), the ]** The tables in §§ 93.9a—93.9z display designated water uses and water quality criteria **in addition to the water uses and criteria apecified in Tables 2 and 3. Designated uses shall be protected in accordance with Chapters 95 and 96 (relating to wastewater treatment requirements; and water quality standards implementation) and other applicable State and Federal laws and regulations. The tables also indicate specific exceptions to Tables 2 and 3 on a stream by stream or segment by segment basis by the words "add" or "delete" followed by the appropriate symbols described elsewhere in this chapter.** The county column in §§ 93.9a—93.9z indicates the county in which the mouth of the stream is located. Abbreviations used in the "Zone" column are as follows:

\*     \*     \*     \*     \*

(b) Where appropriate, "exceptions to specific criteria" provide reference to DRBC (Delaware River Basin Commission) water quality regulations, ORSANCO (Ohio River Valley Water Sanitation Commission) pollution control standards and the GLWQA (Great Lakes Water Quality Agreement) which specify the criteria that apply. The applicable criteria can be obtained from the following:

**Delaware River Basin Commission**
**P. O. Box 7360**
**West Trenton, New Jersey 08628**
**(609) 883-9500**

PROPOSED RULEMAKING                                                  4477

Ohio River Valley Water Sanitation Commission
5735 Kellogg Ave.
Cincinnati, Ohio 45228
(513) 231-7719

GLWQA: International Joint Commission
Great Lakes Regional Office
100 Ouellette Ave., 8th Floor
Windsor Ontario, Canada N9A 6T3
(519) 257-6700

[ **(b)** ] **(c)** \* \* \*

[ **(c)** ] **(d)** \* \* \*

\*    \*    \*    \*    \*

## § 93.9a.  Drainage List A.

### Delaware River Basin in Pennsylvania

#### *Delaware River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | | \*    \*    \*    \* | | |
| 2—West Branch Delaware River | Main Stem, PA-NY State Border to Confluence with East Branch | Wayne | CWF, MF | [ *Delete* $Bac_1$, $pH_1$, $Temp_1$ and $TDS_1$ *Add* $Bac_5$, $pH_4$, $Temp_6$, $Temp_9$, $TDS_3$, $Tur_5$, TON, Rad and $MBAS_1$ ] See DRBC Regulations—Water Quality Zone 1A |
| | | \*    \*    \*    \* | | |
| 1—Delaware River | Main Stem, Confluence of East and West Branches to PA 652 Bridge (Narrowsburg, NY) | Wayne | CWF, MF | [ *Delete* $Bac_1$, $pH_1$, $Temp_1$ and $TDS_1$ *Add* $Bac_5$, $pH_4$, $Temp_6$, Temp, $TDS_3$, $Tur_5$, TON, $MBAS_1$ and Rad ] See DRBC Regulations—Water Quality Zone 1A |
| | | \*    \*    \*    \* | | |
| 1—Delaware River | Main Stem, PA 652 Bridge to Lackawaxen River | Pike | WWF, MF | [ *Delete* $Bac_1$, $pH_1$ and $TDS_1$ *Add* $Bac_5$, $pH_4$, $Temp_4$, $Temp_9$, TON, $TDS_3$, $Tur_5$, $MBAS_1$ and Rad ] See DRBC Regulations—Water Quality Zone 1B |

\*    \*    \*    \*    \*

## § 93.9c.  Drainage List C.

### Delaware River Basin in Pennsylvania

#### *Delaware River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Delaware River | Main Stem, Lackawaxen River to Tocks Island | Pike | WWF, MF | [ *Delete* $Bac_1$, $pH_1$ and $TDS_1$ *Add* $Bac_5$, $pH_4$, $Temp_4$, $Temp_9$, TON, $TDS_3$, $Tur_5$ upstream of RM 254.75 and $Tur_6$, downstream of RM 254.75, $MBAS_1$ and Rad ] See DRBC Regulations—Water Quality Zone 1B/1C |

\*    \*    \*    \*    \*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Delaware River | Main Stem, Tocks Island to Lehigh River | Northampton | WWF, MF | [ *Delete* Bac$_1$, pH$_1$ and TDS$_1$. *Add* Bac$_5$, pH$_4$, Temp$_4$, Temp$_8$, TON, TDS$_3$, Tur$_6$, MBAS$_1$ and Rad ] See DRBC Regulations—Water Quality Zone 1D |

\*     \*     \*     \*     \*

## § 93.9e. Drainage List E.

### Delaware River Basin in Pennsylvania

#### *Delaware River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Delaware River | Main Stem, Lehigh River to Head of Tide | Bucks | WWF[ ; ] MF | [ *Delete* Bac$_1$, pH$_1$ and TDS$_1$ *Add* Bac$_5$, MBAS$_1$, pH$_4$, Rad, TDS$_3$, Temp$_4$ Temp$_8$, TON and Tur$_7$ ] See DRBC Regulations—Water Quality Zone 1E |

\*     \*     \*     \*     \*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Delaware Estuary | Tidal Portions of Basin, Head of Tide to Burlington-Bristol Bridge | Bucks | WWF, MF | [ *Delete* Alk$_1$, Bac$_1$, DO$_2$, pH$_1$, Temp$_2$, TDS$_1$ and Am *Add* Alk$_3$, Bac$_5$, Enterococcus—maximum geometric average 33 per 100 ml, Ch$_4$, DO$_3$, Hd$_2$, MBAS$_1$, pH$_2$, Rad, TDS$_3$, Temp$_5$, Temp$_7$, TON and Tur$_1$ ] See DRBC Regulations—Water Quality Zone 2 |

\*     \*     \*     \*     \*

2—Neshaminy Creek

**The following criteria are specific to waters in the Neshaminy Creek Basin where indicated, based on special studies.**

| Parameter | Symbol | Criteria | Critical Use |
|---|---|---|---|
| Turbidity | Tur$_3$ Tur$_4$ | Not more than 100 NTU. For the period May 15—September 15 of any year, not more than 40 NTU; for the period September 16—May 14 of any year, not more than 100 NTU. | PWS, WWF, MF PWS, CWF, WWF, MF |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 3—West Branch Neshaminy Creek | Basin, Source to Confluence with North Branch | Bucks | WWF, MF | *Add* [ Col$_2$, ] Tur$_4$ |
| 3—North Branch Neshaminy Creek | Basin, Source to Tailwaters of Lake Galena | Bucks | WWF | *Add* [ Col$_2$, ] Tur$_4$ |
| 3—North Branch Neshaminy Creek | Basin, Lake Galena | Bucks | WWF | *Add* [ Col$_2$, ] Tur$_4$ |
| 3—North Branch Neshaminy Creek | Basin, Lake Galena Dam to Confluence with West Branch | Bucks | TSF, MF | *Add* [ Col$_2$, ] Tur$_4$ |
| 2—Neshaminy Creek | Main Stem, Confluence of West and North Branches to PA 614 Dam | Bucks | TSF, MF | *Add* [ Col$_2$, ] Tur$_4$ |
| 3—Unnamed Tributaries to Neshaminy Creek | Basins, Confluence of West and North Branches to proposed PA 614 Dam | Bucks | TSF, MF | *Add* [ Col$_2$, ] Tur$_4$ |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 3—Cooks Run | Basin | Bucks | WWF, MF | *Add* [ Col$_2$, ] Tur$_4$ |
| 3—Mill Creek | Basin | Bucks | TSF, MF | *Add* [ Col$_2$, ] Tur$_4$ |
| 3—Country Club Creek | Basin | Bucks | WWF, MF | *Add* [ Col$_2$, ] Tur$_4$ |
| 2—Neshaminy Creek | Non-Tidal Portion of Main Stem, proposed PA 614 Dam to Mouth | Bucks | WWF, MF | *Add* [ Col$_2$ and ] Tur$_3$ |
| 3—Unnamed Tributaries to Neshaminy Creek | Non-Tidal Portions of Basins, proposed PA 614 Dam to Mouth | Bucks | WWF, MF | *Add* [ Col$_2$ and ] Tur$_3$ |
| 3—Little Neshaminy Creek | Basin | Bucks | WWF, MF | *Add* [ Col$_2$ and ] Tur$_3$ |
| 3—Mill Creek | Basin, Source to Watson Creek | Bucks | CWF, MF | *Add* [ Col$_2$ and ] Tur$_4$ |
| 4—Watson Creek | Basin | Bucks | CWF, MF | *Add* [ Col$_2$ and ] Tur$_4$ |
| 3—Mill Creek | Basin, Watson Creek to Mouth | Bucks | WWF, MF | *Add* [ Col$_2$ and ] Tur$_3$ |
| 3—Core Creek | Basin, Source PA 620 Dam | Bucks | CWF, MF | *Add* [ Col$_2$ and ] Tur$_4$ |
| 3—Core Creek | Basin, PA 620 Dam to Mouth | Bucks | WWF, MF | *Add* [ Col$_2$ and ] Tur$_3$ |
| 3—Mill Creek | Basin | Bucks | WWF, MF | *Add* [ Col$_2$ and ] Tur$_3$ |
| 1—Delaware Estuary | Tidal Portions of Basin, Burlington-Bristol Bridge to RM 108.4 | Philadelphia | WWF, MF | [ *Delete* Alk$_1$, Bac$_1$, DO$_2$, pH$_1$, Temp$_2$, TDS$_1$ and Am. *Add* Alk$_3$, Bac$_5$, Enterococcus maximum geometric average 33 per 100 ml, CH$_4$, DO$_3$, Hd$_2$, MBAS$_1$, pH$_2$, Rad, TDS$_3$, Temp$_5$, Temp$_7$, Tur$_2$ and TON ] See DRBC Basin Regulations—Water Quality Zone 2 |

*   *   *   *   *

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Delaware Estuary | Tidal Portions of Basin, RM 108.4 to Big Timber Creek (NJ) | Philadelphia | WWF (Maintenance Only); MF (Passage Only); *Delete* WC | [ *Delete* Alk$_1$ Bac$_1$, DO$_2$, pH$_1$, Temp$_2$, TDS$_1$ and Am *Add* Alk$_4$, Bac$_4$, Enterococcus—maximum geometric average 88 per ml, Ch$_3$ at RM 98, Sodium—maximum 30-day average 100 mg/l at RM 98, DO$_4$, Hd$_1$, MBAS$_2$, pH$_2$, TDS$_3$, Temp$_5$, Temp$_9$, TON, Tur$_2$ and Rad ] See DRBC Basin Regulations—Water Quality Zone 3 |

*   *   *   *   *

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Delaware Estuary | Tidal Portions of Basin, Big Timber Creek (NJ) to Philadelphia-Delaware County Border | Philadelphia-Delaware | WWF (Maintenance Only); MF (Passage Only); N *Delete* WC, PWS, LWS and IRS | [ *Delete* Alk$_1$, Bac$_1$, DO$_2$, F, N, pH$_1$, Phen$_1$, Temp$_2$, TDS$_1$ and Am *Add* Alk$_4$, Bac$_4$, Enterococcus—maximum geometric average 88 per 100 ml, DO$_4$, MBAS$_2$, pH$_2$, Phen$_2$, Rad, TDS$_4$, Temp$_5$, Temp$_7$, TON and Tur$_2$ ] See DRBC Basin Regulations—Water Quality Zone 4 |

*   *   *   *   *

4480 PROPOSED RULEMAKING

**§ 93.9g.  Drainage List G.**

### Delaware River Basin in Pennsylvania

#### *Delaware River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Delaware Estuary | Tidal Portions of Basin, Philadelphia-Delaware County Border to PA-DE State Border | Delaware | WWF (Maintenance Only); MF (Passage Only); *Delete* PWS, LWS, IRS. *Delete* WC above RM 81.8 | [ *Delete* Alk$_1$, Bac$_1$, DO$_2$, F, N, pH$_1$, Phen$_1$, Temp$_2$, TDS$_1$ and Am *Add* Alk$_4$ above RM 81.8: Bac$_4$, Enterococcus—maximum geometric average 88 per 100 ml; below RM 81.8: Bac$_5$, and Enterococcus—maximum geometric average 33 per 100 ml, DO$_4$, MBAS$_2$, pH$_2$, Phen$_2$, TDS$_4$, Temp$_5$, Temp$_7$, TON, Tur$_2$ and Rad ] See DRBC Basin Regulations—Water Quality Zone 4 |
| | * * * * * | | | |
| 3—Brandywine Creek | Main Stem, Confluence of East and West Branches to PA-DE State Border | Delaware | WWF, MF | [ *Add* TON ] None |
| | * * * * * | | | |

**§ 93.9i.  Drainage List I.**

### Susquehanna River Basin in Pennsylvania

#### *Susquehanna River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | * * * * * | | | |
| 1—Susquehanna River | Main Stem, PA-NY State Border near Milltown to Lackawanna River | Luzerne | WWF | [ *Add* TON and Mn ] None |
| | * * * * * | | | |

**§ 93.9l.  Drainage List L.**

### Susquehanna River Basin in Pennsylvania

#### *West Branch Susquehanna River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | * * * * * | | | |
| 3—Bald Eagle Creek | Main Stem, Nittany Creek to Mouth | Centre | WWF | [ *Add* Col$_2$ ] None |
| | * * * * * | | | |
| 3—Chatham Run | Basin, Chatham Water Co. Intake to Mouth | Clinton | CWF | [ *Add* Col$_2$ ] None |
| | * * * * * | | | |

## § 93.9m.  Drainage List M.

### Susquehanna River Basin in Pennsylvania
#### *Susquehanna River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Susquehanna River | Main Stem, West Branch Susquehanna River to Juniata River | Perry | WWF | [ *Add* Mn ] None |

*     *     *     *     *

## § 93.9n.  Drainage List N.

### Susquehanna River Basin in Pennsylvania
#### *Juniata River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | | *     *     *     *     * | | |
| 4—Halter Creek | Basin | Blair | WWF | [ *Add* Col$_2$ ] None |
| 3—Frankstown Branch Juniata River | Main Stem, Halter Creek to Piney Creek | Blair | WWF | [ *Add* Col$_2$ ] None |
| | | *     *     *     *     * | | |
| 3—Frankstown Branch Juniata River | Main Stem, Piney Creek to US 22 Bridge | Huntingdon | TSF | [ *Add* Col$_2$ ] None |
| | | *     *     *     *     * | | |
| 3—Frankstown Branch Juniata River | Main Stem, US 22 Bridge to Confluence with Little Juniata River | Huntingdon | WWF | [ *Add* Col$_2$ ] None |
| | | *     *     *     *     * | | |
| 3—Little Juniata River | Main Stem, South Bald Eagle Creek to Spruce Creek | Huntingdon | TSF | [ *Add* Col$_2$ ] None |
| | | *     *     *     *     * | | |
| 3—Little Juniata River | Main Stem, Spruce Creek to Confluence with Frankstown Branch | Huntingdon | CWF | [ *Add* Col$_2$ ] None |

*     *     *     *     *

## § 93.9o.  Drainage List O.

### Susquehanna River Basin in Pennsylvania
#### *Susquehanna River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Susquehanna River | Main Stem, Juniata River to PA-MD State Border | York Lancaster | WWF | [ *Add* Mn ] None |
| | | *     *     *     *     * | | |
| 2—Yellow Breeches Creek | Main Stem, LR 21012 to Mouth | Cumberland York-Dauphin | CWF | *Delete* DO$_1$ *Add* DO[ $_6$ ]$_4$ |
| | | *     *     *     *     * | | |
| 2—Codorus Creek | Main Stem, Oil Creek to Mouth | York | WWF | *Add* Col[ $_1$ ]or: maximum 50 units on the Platinum-Cobalt Scale; no other colors perceptible to the human eye. |

4482 **PROPOSED RULEMAKING**

| Stream | Zone | | | County | | | Water Uses Protected | Exceptions To Specific Criteria |
|--------|------|--|--|--------|--|--|---------------------|--------------------------------|
| | | * | * | * | * | * | | |

### § 93.9p.  Drainage List P.

**Ohio River Basin in Pennsylvania**

*Allegheny River*

| Stream | Zone | | | County | | | Water Uses Protected | Exceptions To Specific Criteria |
|--------|------|--|--|--------|--|--|---------------------|--------------------------------|
| 1—Ohio River | | | | | | | | |
| 2—Allegheny River | Main Stem, Source to PA-NY State Border | | | McKean | | | CWF | [ *Add* $Ch_1$, $MBAS_1$ and *TON* ] None |
| | | * | * | * | * | * | | |
| 3—Knapp Creek | Main Stem | | | McKean | | | CWF | [ *Add* $Ch_2$ ] None |
| | | * | * | * | * | * | | |
| 3—Indian Creek | Main Stem, PA-NY State Border to Mouth | | | McKean | | | CWF | [ *Add* $Ch_2$ ] None |
| | | * | * | * | * | * | | |
| 3—Tunungwant Creek | Main Stem, Confluence of East and West Branches to PA-NY State Border | | | McKean | | | WWF | [ *Add* $Ch_2$ ] None |
| | | * | * | * | * | * | | |
| 3—Oswayo Creek | Main Stem, Source to Honeoye Creek | | | McKean | | | CWF | [ *Add* $Ch_1$ ] None |
| | | * | * | * | * | * | | |
| 4—Honeoye Creek | Main Stem, PA-NY State Border to Mouth | | | Potter | | | CWF | [ *Add* $Ch_1$ ] None |
| | | * | * | * | * | * | | |
| 3—Oswayo Creek | Main Stem, Honeoye Creek to PA-NY State Border | | | McKean | | | WWF | [ *Add* $Ch_1$ ] None |
| | | * | * | * | * | * | | |
| 3—Tunungwant Creek | Main Stem, Confluence of East and West Branches to PA-NY State Border | | | McKean | | | WWF, *Delete WC* | [ *Add* $Ch_2$ ] None |
| | | * | * | * | * | * | | |

### § 93.9q.  Drainage List Q.

**Ohio River Basin in Pennsylvania**

*Allegheny River*

| Stream | Zone | | | County | | | Water Uses Protected | Exceptions To Specific Criteria |
|--------|------|--|--|--------|--|--|---------------------|--------------------------------|
| | | * | * | * | * | * | | |
| 2—Allegheny River | Main Stem, PA-NY State Border to Clarion River | | | Clarion | | | WWF | [ *Add* $Ch_1$, $MBAS_1$ and *TON* ] None |
| | | * | * | * | * | * | | |
| 3—Brokenstraw Creek | Main Stem, PA-NY State Border to Mouth | | | Warren | | | CWF | [ *Add* $Ch_1$ ] None |
| | | * | * | * | * | * | | |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 3—Oil Creek | Main Stem, Source to Cherrytree Run | Venango | CWF | [ *Add* TON ] None |
| 4—Unnamed Tributaries to Oil Creek | Basins, Source to Cherrytree Run | Crawford-Venango | CWF | [ *Add* TON ] None |
| 4—West Shreve Run | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—East Shreve Run | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—Mosey Run | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—Bloomfield Run | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—East Branch Oil Creek | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—Marsh Run | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—Thompson Creek | Basin | Crawford | CWF | [ *Add* TON ] None |
| 5—Shirley Run | Basin | Crawford | HQ-CWF | [ *Add TON* ] None |
| 4—Thompson Creek | Basin, Shirley Run to Mouth | Crawford | CWF | [ *Add TON* ] None |
| 4—Church Run | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—Pine Creek | Main Stem | Crawford | CWF | [ *Add* TON ] None |
| 5—Unnamed Tributaries to Pine Creek | Basins | Warren-Crawford | CWF | [ *Add* TON ] None |
| 5—Campbell Creek | Basin | Warren | CWF | [ *Add* TON ] None |
| 5—Dunham Run | Basin | Warren | CWF | [ *Add* TON ] None |
| 5—Caldwell Creek | Basin | Crawford | HQ-CWF | [ *Add* TON ] None |
| 5—Henderson Run | Basin | Crawford | CWF | [ *Add* TON ] None |
| 4—Benninghof Run | Basin | Venango | CWF | [ *Add* TON ] None |
| 4—Cherrytree Run | Basin | Venango | CWF | [ *Add* TON ] None |
| 3—Oil Creek | Main Stem, Cherrytree Run to Mouth | Venango | WWF | [ *Add* TON ] None |
| 4—Unnamed Tributaries to Oil Creek | Basins, Cherrytree Run to Mouth | Venango | CWF | [ *Add* TON ] None |
| 4—Cherry Run | Basin, Source to Rouseville Corporate Boundary | Venango | HQ-CWF | [ *Add* TON ] None |
| 4—Cherry Run | Basin, Rouseville Corporate Boundary to Mouth | Venango | CWF | [ *Add* TON ] None |
| 4—Cornplanter Run | Basin | Venango | CWF | [ *Add* TON ] None |

\*     \*     \*     \*     \*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 3—French Creek | Main Stem, PA-NY State Border to Mouth | Venango | WWF | [ *Add* MBAS₁ and TON ] None |

\*     \*     \*     \*     \*

## § 93.9r.  Drainage List R.

### Ohio River Basin in Pennsylvania

#### *Clarion River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Ohio River | | | | |
| 2—Allegheny River | | | | |
| 3—Clarion River | | | | |
| 4—East Branch Clarion River | Basin, Source to Confluence with West Branch | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—West Branch Clarion River | Main Stem, Source to Confluence with East Branch | Elk | CWF | [ *Add* TON ] None |
| 5—Unnamed Tributaries to West Branch Clarion River | Basins, Source to Confluence with East Branch | McKean-Elk | CWF | [ *Add* TON ] None |
| 5—Windfall Run | Basin | McKean | CWF | [ *Add* TON ] None |
| 5—Sicily Run | Basin | McKean | CWF | [ *Add* TON ] None |
| 5—Buck Run | Basin | McKean | CWF | [ *Add* TON ] None |
| 5—Rocky Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Nearing Run | Basin | Elk | CWF | [ *Add* TON ] None |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 5—Wilson Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Oil Creek | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Wolf Run | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 5—Meffert Creek | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Silver Creek | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 3—Clarion River | Main Stem, Confluence of East and West Branches to Mouth | Clarion | CWF | [ *Add* TON ] None |
| 4—Unnamed Tributaries to Clarion River | Basins, Confluence of East and West Branches to Mouth | Elk-Forest-Jefferson-Clarion | CWF | [ *Add* TON ] None |
| 4—Johnson Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Powers Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Riley Run | Basin | Elk | WWF | [ *Add* TON ] None |
| 4—Little Mill Creek | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—Mason Creek | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Elk Creek | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Island Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Big Mill Creek | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—Connerville Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Dog Hollow Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Gillis Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Little Toby Creek | Main Stem | Elk | CWF | [ *Add* TON ] None |
| 5—Unnamed Tributaries to Little Toby Creek | Basins | Elk-Jefferson | CWF | [ *Add* TON ] None |
| 5—Limestone Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Kyler Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—McCauley Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Sawmill Run | Main Stem | Elk | CWF | [ *Add* TON ] None |
| 6—Unnamed Tributaries to Sawmill Run | Basins | Elk | CWF | [ *Add* TON ] None |
| 6—Lost Run | Basin, Source to Fox Township Municipal Authority Dam | Elk | HQ-CWF | [ *Add* TON ] None |
| 6—Lost Run | Basin, Fox Township Municipal Authority Dam to Mouth | Elk | CWF | [ *Add* TON ] None |
| 5—Brandy Camp Creek | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Johnson Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Bear Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Oyster Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Mead Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Boggy Run | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 5—Whetstone Branch | Basin, Source to Brockway Municipal Authority No. 1 Dam | Elk | HQ-CWF | [ *Add* TON ] None |
| 5—Whetstone Branch | Basin, Brockway Municipal Authority No. 1 Dam to Mouth | Elk | CWF | [ *Add* TON ] None |
| 5—Walburn Run | Basin | Jefferson | CWF | [ *Add* TON ] None |
| 5—Rattlesnake Creek | Basin, Source to Brockway Municipal Authority Dam | Jefferson | HQ-CWF | [ *Add* TON ] None |
| 5—Rattlesnake Creek | Basin, Brockway Municipal Authority Dam to Mouth | Jefferson | CWF | [ *Add* TON ] None |
| 5—Baghdad Run | Basin | Jefferson | CWF | [ *Add* TON ] None |
| 5—Jenkins Run | Basin | Jefferson | CWF | [ *Add* TON ] None |
| 5—Little Vineyard Run | Basin | Jefferson | CWF | [ *Add* TON ] None |
| 5—Vineyard Run | Basin | Jefferson | CWF | [ *Add* TON ] None |
| 5—Coward Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Laurel Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 5—Bearmouth Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Bear Creek | Basin | Elk | HQ-CWF | [ *Add* TON ] None |

**PROPOSED RULEMAKING** 4485

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 4—Mahood Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Beech Bottom Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Lake City Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Cole Run | Main Stem | Elk | CWF | [ *Add* TON ] None |
| 5—Unnamed Tributaries to Cole Run | Basins | Elk | CWF | [ *Add* TON ] None |
| 5—Crow Run | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—Irwin Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Spring Creek | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—Maxwell Run | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—Elliott Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Daugherty Run | Basin | Jefferson | CWF | [ *Add* TON ] None |
| 4—Raught Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Painter Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Church Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Callen Run | Basin | Jefferson | HQ-CWF | [ *Add* TON ] None |
| 4—Cline Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Wyncoop Run | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—Leeper Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Pine Run | Basin | Elk | CWF | [ *Add* TON ] None |
| 4—Mill Stone Creek | Basin | Elk | HQ-CWF | [ *Add* TON ] None |
| 4—Shippen Run | Basin | Forest | CWF | [ *Add* TON ] None |
| 4—Clear Creek | Basin | Jefferson | HQ-CWF | [ *Add* TON ] None |
| 4—Tadler Run | Basin | Jefferson | CWF | [ *Add* TON ] None |
| 4—Cherry Run | Basin | Forest | HQ-CWF | [ *Add* TON ] None |
| 4—Maple Creek | Basin | Forest | HQ-CWF | [ *Add* TON ] None |
| 4—Coleman Run | Basin | Forest | HQ-CWF | [ *Add* TON ] None |
| 4—Troutman Run | Basin | Forest | HQ-CWF | [ *Add* TON ] None |
| 4—Henry Run | Basin | Forest | CWF | [ *Add* TON ] None |
| 4—Toms Run | Basin | Forest | CWF | [ *Add* TON ] None |
| 4—Cather Run | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |
| 4—Maxwell Run | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |
| 4—Blyson Run | Basin | Clarion | EV | None |
| 4—Mill Creek | Main Stem, Source to Little Mill Creek | Clarion | HQ-CWF | [ *Add* TON ] None |
| 5—Unnamed Tributaries to Mill Creek | Basins, Source to Little Mill Creek | Clarion-Jefferson | HQ-CWF | [ *Add* TON ] None |
| 4—Mill Creek | | | | |
| 5—Parks Run | Basin | Jefferson | HQ-CWF | [ *Add* TON ] None |
| 5—Martin Run | Basin | Jefferson | HQ-CWF | [ *Add* TON ] None |
| 5—Rankin Run | Basin | Jefferson | HQ-CWF | [ *Add* TON ] None |
| 5—Updike Run | Basin | Jefferson | HQ-CWF | [ *Add* TON ] None |
| 5—McCanna Run (Pendleton Run) | Basin | Clarion | EV | None |
| 5—Little Mill Creek | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Mill Creek | Main Stem, Little Mill Creek to Mouth | Clarion | CWF | [ *Add* TON ] None |
| 5—Unnamed Tributaries to Mill Creek | Basins, Little Mill Creek to Mouth | Clarion | HQ-CWF | [ *Add* TON ] None |
| 5—Douglass Run | Basin | Clarion | CWF | [ *Add* TON ] None |
| 5—Woods Run | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |
| 5—Stroup Run | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |
| 5—Trap Run | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |
| 5—Whites Run | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Reeds Run | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Toby Creek | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Trout Run | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Courtleys Run | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Piney Creek | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Deer Creek | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Canoe Creek | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 4—Beaver Creek | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |
| 4—Licking Creek | Basin | Clarion | CWF | [ *Add* TON ] None |
| 4—Turkey Creek | Basin | Clarion | HQ-CWF | [ *Add* TON ] None |

### § 93.9u. Drainage List U.

#### Ohio River Basin in Pennsylvania

##### *Allegheny River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Ohio River | | | | |
| 2—Allegheny River | Main Stem, Kiskiminetas River to Confluence with Monongahela River | Allegheny | WWF[ ; ], *Add* N | [ *Add* TON ] None |
| | * * * * * | | | |
| 3—Unnamed Tributaries to Allegheny River | Basins, Plum Creek to Confluence with Monongahela River | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Powers Run | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Indian Creek | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Quigley Creek | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Sandy Creek | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Squaw Run | Basin | Allegheny | HQ-WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Shades Run | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Guyasuta Run | Basin, Source to PA 28 | Allegheny | HQ-WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Guyasuta Run | Basin, PA 28 to Mouth | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Pine Creek | Basin, Source to North Park Lake Dam | Allegheny | CWF | None |
| 3—Pine Creek | Basin, North Park Lake Dam to Mouth | Allegheny | TSF | [ *Delete* TDS₁ *Add* TDS₂ ] None |
| 3—Girtys Run | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |

### § 93.9v. Drainage List V.

#### Ohio River Basin in Pennsylvania

##### *Monongahela River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Ohio River | | | | |
| | * * * * * | | | |
| 2—Monongahela River | Main Stem, PA-WV State Border to Confluence with Allegheny River | Allegheny | WWF; *Add* N | [ *Add* TON ] None |
| | * * * * * | | | |
| 3—Unnamed Tributaries to Monongahela River | Basins, Youghiogheny River to Mouth | Allegheny | WWF; *Delete* PWS | [ *Delete* TDS and Mn; *Add* TDS₂ ] None |
| 3—Crooked Run | Basin | Allegheny | WWF; *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |
| 3—Thompson Run | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS₁ and Mn; *Add* TDS₂ ] None |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 3—Turtle Creek | Main Stem, Source to Brush Creek | Allegheny | TSF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Unnamed Tributaries to Turtle Creek | Basins, Source to Brush Creek | Westmoreland-Allegheny | TSF[ ; ]. *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Steels Run | Basin | Westmoreland | HQ-CWF, *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Haymakers Run | Basin | Westmoreland | HQ-CWF, *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Abers Creek | Basin | Allegheny | TSF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Lyons Run | Basin | Westmoreland | TSF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Simpson Run | Basin | Allegheny | TSF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Brush Creek | Basin | Allegheny | TSF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 3—Turtle Creek | Main Stem, Brush Creek to Mouth | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Unnamed Tributaries to Turtle Creek | Basins, Brush Creek to Mouth | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 4—Thompson Run | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 3—Homestead Run | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 3—Ninemile Run | Basin | Allegheny | TSF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 3—West Run | Basin | Allegheny | WWF[ ; ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |
| 3—Streets Run | Basin | Allegheny | WWF[ : ], *Delete* PWS | [ *Delete* TDS$_1$ and Mn; *Add* TDS$_2$ ] None |

**§ 93.9w.  Drainage List W.**

### Ohio River Basin in Pennsylvania

#### *Ohio River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Ohio River | Main Stem, Confluence of Allegheny and Monongahela Rivers to PA-OH State Border | Beaver | WWF[ ; ], *Add* N | [ *Shown Below* ] See Orsanco, Pollution Control Standards |

[ **Exceptions to Specific Criteria for Ohio River Main Stem**

*Delete* CN and F; *Add*:

**Barium—Total barium shall not exceed 1.0 mg/l.**

**Cadmium—Total cadmium shall not exceed 0.01 mg/l.**

**Chloride—Chloride shall not exceed 250 mg/l.**

4488 PROPOSED RULEMAKING

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|--------|------|--------|----------------------|--------------------------------|
| | Cyanide—Total cyanide shall not exceed 0.025 mg/l; free cyanide shall not exceed 0.005 mg/l. | | | |
| | Fluoride—Total fluoride shall not exceed 1.0 mg/l. | | | |
| | Nitrite—Nitrite shall not exceed 1.0 mg/l as N. | | | |
| | Selenium—Total selenium shall not exceed 0.01 mg/l. | | | |
| | Silver—Total silver shall not exceed 0.05 mg/l. | | | |
| | Radionuclides—Gross total alpha activity (including radium-226 but excluding radon and uranium) shall not exceed 15 picocurie per liter (pCi/l) and combined radium-226 and radium-228 shall not exceed 5 pCi/l; provided that specific determinations of radium-226 and radium-228 are not required if gross particle activity does not exceed 5 pCi/l. Concentration of total gross beta particle activity shall not exceed 50 pCi/l; the concentration of tritium shall not exceed 20,000 pCi/l; the concentration of total Strontium-90 shall not exceed 8 pCi/l. | | | |
| | Mercury—Total organism body burden of any aquatic species shall not exceed 0.5 micrograms/gram as total mercury. Total mercury concentration (unfiltered) in any water sample shall not exceed 0.2 micrograms/liter. | | | |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | PCB—Total PCB shall not exceed 1 nanogram per liter; however, when the level in water is less than the practical laboratory quantification level, a fish flesh body burden level in excess of 2 ppm shall be cause for concern and further investigation. ] | | | |
| | * * * * * | | | |
| 3—Mahoning River | Main Stem, PA-OH State Border to Confluence with Shenango River | Lawrence | WWF | [ *Shown Below* ] None |
| | [ Exceptions to Specific Criteria for Mahoning River Main Stem | | | |
| | *Delete* the entire list except Am. | | | |
| | *Add*: | | | |
| | As, Ch$_2$, Cr, DO$_2$, F, Pb, Mn, N, S, Temp$_4$, TDS$_1$, | | | |
| | pH—Not less than 6.0 and not more than 8.5 | | | |
| | Total Iron—Not more than 1.0 mg/l | | | |
| | Threshold Odor Number—Not to exceed 24 at 60°C as a daily average | | | |
| | Total Cyanide—Not to exceed 0.025 mg/l | | | |
| | Free Cyanide—Not to exceed 0.005 mg/l | | | |
| | Phenolics—Not to exceed 0.010 mg/l | | | |
| | Cadmium—Not to exceed 0.01 mg/l | | | |
| | Total Chromium—Not to exceed 0.1 mg/l | | | |
| | PCB—Not to exceed 1 nanogram per liter. | | | |
| | Copper—Not to exceed 0.02 mg/l (total). | | | |
| | Nickel—Not to exceed 0.1 mg/l (total) | | | |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | **Zinc—Not to exceed 0.2 mg/l (total)** ] | | | |
| | * * * * * | | | |
| 3—Shenango River | Main Stem (all sections in PA), Pymatuning Reservoir | Crawford | WWF | [ *Add* TON ] None |
| | * * * * * | | | |
| 3—Shenango River | Main Stem, Pymatuning Reservoir Dam to Shenango Reservoir Dam | Mercer | WWF | [ *Add* TON ] None |
| | * * * * * | | | |
| 3—Shenango River | Main Stem, Shenango Reservoir Dam to Point 1.0 River Mile Downstream | Mercer | TSF | [ *Add* TON ] None |
| 4—Unnamed Tributaries to Shenango River | Basins, Shenango Reservoir Dam to Point 1.0 River Mile Downstream | Mercer | CWF | None |
| 3—Shenango River | Main Stem (all sections in PA), 1.0 River Mile Downstream of Shenango Reservoir Dam to Confluence with Mahoning River | Lawrence | WWF | [ *Add* TON ] None |
| | * * * * * | | | |
| 2—Beaver River | Main Stem, Confluence of Mahoning and Shenango Rivers to Mouth | Beaver | WWF, *Add* N | [ *Add* TON ] None |
| | * * * * * | | | |

## § 93.9x. Drainage List X.

### Lake Erie

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| 1—Lake Erie | All sections of lake in PA except Outer Erie Harbor and Presque Isle Bay | Erie | CWF | *Delete* Fe, pH$_1$ DO$_1$ and Bac$_1$ [ *Add* the "specific criteria for Lake Erie" as listed below. ] See GLWQA |
| | [ **Specific Criteria for Lake Erie** | | | |
| | **Determination of compliance with specific criteria shall be based on statistically valid sampling data. For the lake-wide dissolved solids limit, the Great Lakes Regional Office of the IJC will determine compliance.** | | | |
| | **pH—Values should not be outside range of 6.5 to 9.0** | | | |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|--------|------|--------|---------------------|--------------------------------|
|        | **Dissolved Oxygen—In the upper waters of the lakes, the dissolved oxygen level should be not less than 6.0 milligrams per liter at any time; in hypolimnetic waters, it should be not less than necessary for the support of fishlife, particularly cold water species.** | | | |
|        | **Iron (Fe)—Levels should not exceed 0.3 milligrams per liter or natural levels, whichever is greater.** | | | |
|        | **Temperature—Temp$_1$** | | | |
|        | **Dissolved Solids—In addition to TDS$_1$ the level of total dissolved should not exceed 200 milligrams per liter as an annual average based on representative lakewide sampling.** | | | |
|        | **Bacteria—The geometric mean of not less than five samples taken over not more than a thirty-day period should not exceed 1,000/100 milliliters total coliforms, nor 200/100 milliliters fecal coliforms. Waters used for body contact recreation activities should be substantially free from bacteria, fungi, or viruses that may produce enteric disorders or eye, ear, nose, throat and skin infections or other human diseases and infections.** | | | |
|        | **Taste and Odor—Phenols and other objectionable taste and odor producing substances should be substantially absent.** | | | |

4492 PROPOSED RULEMAKING

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|--------|------|--------|---------------------|-------------------------------|
| | **Phosphorus (P)—Concentrations should be limited to the extent necessary to prevent nuisance growths of algae, weeds, and slimes that are or may become injurious to any beneficial water use.** | | | |
| | **Radioactivity—Radioactivity should be kept at the lowest practicable level and in any event should be controlled to the extent necessary to prevent harmful effects on health.** | | | |
| | **Aldrin/Dieldrin—Not to exceed 1 nanogram per liter in water; not to exceed 0.3 mg/Kg in the edible portion of fish.** | | | |
| | **Chlordane—Not to exceed 60 nanograms per liter.** | | | |
| | **DDT and Metabolites— Not to exceed 3 nanograms per liter in water; not to exceed 1 mg/Kg in the edible portion of fish.** | | | |
| | **Endrin—Not to exceed 2 nanograms per liter in water; not to exceed 0.3 mg/Kg in the edible portion of fish.** | | | |
| | **Heptachlor—Not to exceed 1 nanogram/liter in water; not to exceed 0.3 mg/Kg in the edible portion of fish.** | | | |
| | **Lindane—Not to exceed 10 nanograms per liter in water; not to exceed 0.3 mg/Kg in the edible portion of fish.** | | | |
| | **Methoxychlor—Not to exceed 40 nanograms per liter.** | | | |
| | **Toxaphene—Not to exceed 8 nanograms per liter.** | | | |

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | **Phthalate Esters; Dibutyl Phthalate—Not to exceed 4 micrograms per liter. Di-(2-ethylhexyl phthalate)—Not to exceed 0.6 micrograms per liter. Other phthalate esters—Not to exceed 0.2 micrograms per liter.** | | | |
| | **PCB's—Not to exceed 1 nanogram per liter; not to exceed 0.1 mg/Kg in whole fish.** | | | |
| | **Cadmium—Not to exceed 0.01 of the 96-hour LC50 for representative important species.** | | | |
| | **Mercury—Not to exceed 0.2 micrograms per liter in an unfiltered water sample.** | | | |
| | **Selenium—Not to exceed 10 micrograms per liter. ]** | | | |
| 1—Lake Erie (Outer Erie Harbor and Presque Isle Bay) | Portion of lake bordered by Presque Isle on west, longitude 80°01′50″ on east, and latitude 42°10′18″ on north, except harbor area and central channel dredged and maintained by United States Army Corps of Engineers. | Erie | WWF | ***Delete*** pH[ $_1$ ] ***Add*** pH[ $_3$ ] Between $_7$ and $_9$ [ , TON, and MBAS$_1$ ] |
| 1—Lake Erie (Outer Erie Harbor and Presque Isle Bay) | Harbor area and central channel dredged and maintained by United States Army Corps of Engineers | Erie | WWF, *Delete* WC | ***Delete*** pH[ $_1$ ], and Bac$_1$ ***Add*** pH[ $_3$ ] Between $_7$ and $_9$, Bac$_2$ [ TON and MBAS$_1$ ] |

*        *        *        *        *

## § 93.9y.  Drainage List Y.

[ **Susquehanna River** ] **Lake Ontario** Basin in Pennsylvania
[ **(Lake Ontario** ]

***Genesee River***

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|

*        *        *        *        *

§ 93.9z. Drainage List Z.

### Potomac River Basin in Pennsylvania
#### *Potomac River*

| Stream | Zone | County | Water Uses Protected | Exceptions To Specific Criteria |
|---|---|---|---|---|
| | | *   *   *   *   * | | |
| 3—East Branch Antietam Creek | Main Stem, Vineyard Run to Confluence with West Branch | Franklin | CWF | [ **Add Col₂** ] None |
| 4—Unnamed Tributaries to East Branch Antietam Creek | Basins (all sections in PA) Vineyard Run to Confluence with West Branch | Franklin | CWF | [ **Add Col₂** ] None |
| 4—Deer Lick Run | Basin | Franklin | CWF | None |
| 4—Biesecker Run | Basin | Franklin | CWF | [ **Add Col₂** ] None |
| 4—Red Run | Main Stem | Franklin | CWF | [ **Add Col₂** ] None |
| 5—Unnamed Tributaries to Red Run | Basins (all sections in PA) | Franklin | CWF | [ **Add Col₂** ] None |
| 5—Devils Run | Basin | Franklin | CWF | [ **Add Col₂** ] None |
| 5—Mackey Run | Basin | Franklin | CWF | [ **Add Col₂** ] None |
| 5—Falls Creek | Basin (all sections in PA) | Franklin | WWF | [ **Add Col₂** ] None |
| 3—West Branch Antietam Creek | Basin, Source to Confluence with East Branch | Franklin | CWF | None |
| 2—Antietam Creek | Basin, Confluence of East and West Branches to PA-MD State Border | Franklin | WWF | [ **Add Col₂** ] None |
| 2—Antietam Creek (MD) 3—Unnamed Tributaries to Antietam Creek | Basins (all sections in PA), PA-MD State Border to Mouth | Franklin | WWF | [ **Add Col₂** ] None |
| | | *   *   *   *   * | | |

---

## CHAPTER 95. WASTEWATER TREATMENT REQUIREMENTS

§ 95.1. [ **General requirements** ] **Special protection.**

(a) [ **Specific treatment requirements and effluent limitations for each waste discharge shall be established based on the more stringent of subsections (b) and (c), the water quality criteria specified in Chapter 93 (relating to water quality standards), the applicable treatment requirements and effluent limitations to which a discharge is subject under 33 U.S.C.A. § 1251 or the treatment requirements and effluent limitations of this title provided that specific treatment requirements and effluent limitations for waste discharges from overflows as defined in § 94.1 (relating to definitions) shall be established based on applicable treatment requirements and effluent limitations to which such discharge is subject under 33 U.S.C.A. § 1251 et seq.** ]

(b) ] ***

\*   \*   \*   \*   \*

[ **(c)** ] **(b)** ***

[ **(d)** ] **(c)** ***

\*   \*   \*   \*   \*

(*Editor's Note*: There is an outstanding proposed amendment to § 95.1 at 27 Pa.B. 1459 (March 22, 1997).)

§§ 95.2—95.9. (Reserved).

(*Editor's Note*: The Department is proposing to delete §§ 95.2—95.9 as they currently appear in the *Pennsylva-*

*nia Code* at pages 95-3—95-11 (serial pps. (234591)—(234593) and (228303)—(228309).)

§§ 95.2—95.9. (Reserved).

(*Editor's Note*: The following chapter is proposed to be added. It has been printed in regular type to enhance readability.)

### CHAPTER 96. WATER QUALITY STANDARDS IMPLEMENTATION

Sec.
96.1.   Definitions.
96.2.   Purpose.
96.3.   Water quality protection levels.
96.4.   TMDLs.
96.5.   Nutrient discharges.
96.6.   Heated wastewater discharges.
96.7.   Public participation.

§ 96.1. **Definitions.**

The following words and terms, when used in this chapter, have the following meanings, unless the context clearly indicates otherwise:

*Allowable discharge concentration*—The average discharge concentration from a point source discharge over a specified duration.

*Concentration*—The amount of a substance, expressed in mass units, in a unit volume of water or wastewater.

*Conservative substance*—A pollutant whose concentration in the water column does not change, except by dilution.

*Continuous point source discharge*—A point source whose discharge rate is not determined primarily by precipitation or surface water runoff.

*Cumulative loading*—The sum of pollutant loadings from individual pollutant sources.

*Design discharge flow*—The average daily flow from an existing or proposed point source discharge that is included in a discharger's NPDES permit, or that may be reasonably expected over a 10-year period.

*Dilution ratio*—Surface water flow divided by pollutant source flow.

*Harmonic mean flow*—The flow that is determined by taking the reciprocal of the arithmetic mean of reciprocals of daily flow values.

*Impaired surface water*—A surface water that does not support its existing or designated surface water uses.

*LA—Load allocation*—The poriton of a surface water's loading capacity that is assigned or allocated to existing and future nonpoint sources or natural quality and is expressed in narrative or numeric terms.

*Lake, pond or impoundment*—A surface water with a hydraulic residence time of 14 days or more based on average annual surface and groundwater discharge. Residence time shall be determined at normal pool volume. In the absence of actual records, an average annual daily discharge rate of 1.5 cfs per square mile shall be used unless a scientifically defensible alternative is demonstrated to the Department's satisfaction.

*Loading capacity*—The greatest amount of loading that a surface water can receive without violating water quality standards.

*Margin of safety*—The portion of a surface water's loading capacity that is set aside to account for uncertainty about the relationship between pollutant loadings and resulting surface water quality, including any uncertainty or imprecision in mathematical models used to determine these relationships. For nonconservative substances, any imprecision or uncertainty concerning the mechanisms by which the substance decays or is transformed shall be considered.

*Mass load*—The pollutant loading expressed in units of mass per unit time.

*NPDES* or *National Pollutant Discharge Elimination System permit*—A permit issued under Chapter 92 (relating to National Pollutant Discharge Elimination System) for the discharge or potential discharge of pollutants from a point source to surface waters.

*Natural quality*—The water quality conditions that exist or that would reasonably be expected to exist in the absence of human related activity.

*Nonconservative substance*—A pollutant whose concentration in the water column changes as a result of volatilization, photolysis, hydrolysis, biodegradation, transformation or other processes, except dilution.

*Nonpoint source best management practice*—An activity, procedure, practice or combination thereof determined to be effective and practical to maintain and improve surface water quality and its associated aquatic environment by preventing to the maximum extent practicable nonpoint source pollutant loadings to surface waters.

*Nonpoint source discharge*—A pollutant discharge which is not a point source discharge.

*Nonpoint source remediation plan*—A nonpoint source management plan which describes needed actions to achieve water quality protection levels.

*Precipitation induced point source discharge*—A point source discharge whose discharge rate is determined primarily by precipitation or surface water runoff.

*Point source discharge*—A pollutant source regulated under the NPDES permit system as defined in § 92.1 (relating to definitions).

*Pollutant*—A contaminant or other alteration of the physical, chemical, biological or radiological integrity of surface water which causes or has the potential to cause pollution as defined in section 1 of The Clean Streams Law (35 P. S. § 691.1).

*Potable water supply*—A water source that is used by humans after conventional treatment for drinking, culinary and other purposes such as inclusion in food products.

$Q_{7-10}$ *flow*—The actual or estimated lowest 7 consecutive-day average flow that occurs once in 10 years for a stream with unregulated flow, or the estimated minimum flow for a stream with regulated flow.

$Q_{30-10}$ *flow*—The actual or estimated lowest 30 consecutive-day average flow that occurs once in 10 years for a stream with unregulated flow, or the estimated 30-day average minimum flow for a stream with regulated flow.

*Significant pollutant source*—A point or nonpoint source discharge whose pollutant loading contributes a substantial portion of the total pollutant loading to a surface water. In determining whether a pollutant source is significant, the Department will consider the following factors:

(i) The number of pollutant sources discharging to or otherwise impacting a surface water.

(ii) The relative contribution of each pollutant source to the total pollutant load in the surface water.

(iii) Whether the pollutant source must be controlled to meet the water quality protection levels in § 96.3 (relating to water quality protection levels) in the surface water.

*Steady state modeling*—The use of a pollutant fate and transport model that utilizes constant values of input variables to predict constant values of receiving water quality concentrations.

*Surface waters*—Perennial and intermittent streams, rivers, lakes, reservoirs, ponds, wetlands, springs, natural seeps and estuaries, excluding water at facilities approved for wastewater treatment such as wastewater treatment impoundments, cooling water ponds and constructed wetlands used as part of a wastewater treatment process.

*TMDL—Total maximum daily load*—The sum of individual waste load allocations for point sources, load allocations for nonpoint sources, natural quality and a margin of safety.

*WLA—Wasteload allocation*—The portion of a surface water's loading capacity that is allocated to existing and future point source discharges.

*Water quality criteria duration*—The averaging period associated with a water quality criterion.

*Water quality protection levels*—The levels of water quality necessary to protect existing and designated uses in a surface water.

*Water quality standards*—The combination of water uses to be protected and the water quality criteria necessary to protect those uses.

*Wetlands*—Areas that are inundated or saturated by surface or groundwater at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions, including swamps, marshes, bogs and similar areas.

### § 96.2.  Purpose.

The purpose of this chapter is to establish the process for achieving and maintaining water quality standards.

### § 96.3.  Water quality protection levels.

(a)  Existing and designated surface water uses shall be protected.

(b)  Antidegradation requirements, in Chapters 93, 95 and 105 (relating to water quality standards; wastewater treatment requirements; and dam safety and waterway management) shall apply to surface waters classified as high quality and exceptional value in Chapter 93.

(c)  To protect existing and designated surface water uses, the water quality criteria in Chapter 93, including the criteria in §§ 93.6, 93.7 and 93.8a(b) (relating to general water quality criteria; specific water quality criteria; and toxic substances) shall be achieved in all surface waters at least 99% of the time, unless otherwise specified in this chapter.

(d)  Water quality criteria for total dissolved solids, nitrite-nitrate nitrogen and fluoride established for the protection of potable water supply shall be met at least 99% of the time at the point of all existing or planned surface water supply withdrawals, except in high quality and exceptional value waters, where they shall be met at least 99% of the time everywhere and applied in accordance with § 95.1 (relating to special protection).

(e)  When a water quality criterion described in Chapter 93, including the criteria in §§ 93.6, 93.7 and 93.8a(b), cannot be attained at least 99% of the time due to natural quality, as determined by the Department under § 93.7(c) based on observations at one or more reference stations, or an evaluation of the physical surroundings of the surface water, the natural quality that is achieved at least 99% of the time shall be the applicable protection level.

(f)  When the minimum flow of a stream segment is determined or estimated to be zero, applicable water quality criteria shall be achieved at least 99% of the time at the first downstream point where the stream is capable of supporting existing or designated uses.

(g)  Functions and values of wetlands shall be protected under Chapter 105 (relating to dam safety and waterway management).

### § 96.4.  TMDLs.

(a)  The Department will identify surface waters or portions thereof that require the development of TMDLs, prioritize these surface waters for TMDL development and then develop TMDLs for these waters.

(b)  In addition to subsection (a), the Department will determine a TMDL using applicable procedures described in this chapter when the following apply:

(1)  As a result of a watershed assessment or other evaluation, including an evaluation of an application for a new or modified point source discharge, the Department determines that water quality protection levels specified in § 96.3 (relating to water quality protection levels) are or would be violated after the imposition of applicable technology based limitations required under section 301(b), 306, 307 or other sections of the Federal Clean Water Act (33 U.S.C.A. §§ 1311(b), 1316 and 1317) to the point source.

(2)  One or more point sources are or would be the primary cause of violation of the applicable water quality protection level.

(c)  The sum of WLAs and LAs may not be greater than the loading capacity of the surface water, after allowances are made for natural quality, seasonal variations and a margin of safety.

(d)  WLAs developed in accordance with this chapter shall serve as the basis for the determination of water quality-based effluent limitations for pollutant sources regulated under Chapter 92 (relating to National Pollutant Discharge Elimination System permitting, monitoring and compliance).

(e)  In developing TMDLs, WLAs and LAs the Department:

(1)  Will consider relevant design factors, including, but not limited to: water quality criteria duration; flow duration and frequency; natural seasonal variability in water temperature; and the natural variability of pH and hardness.

(2)  Will treat all pollutants as conservative unless it finds based on scientifically valid information that the substance is not conservative, and adequate information is available to characterize the substances fate or transformation, or both.

(3)  Will include a margin of safety.

(4)  May consider any increases in pollutant loadings that may be reasonably expected over a 10-year period.

(f)  The allocation procedure is as follows:

(1)  WLAs and LAs assigned or allocated to individual pollutant sources shall be the more stringent of the following:

(i)  The pollutant loading authorized to be discharged under applicable technology-based requirements.

(ii)  When applicable, the pollutant loading determined under §§ 96.5 and 96.6 (relating to nutrient discharges; and heated wastewater discharges).

(iii)  The pollutant loading that can be discharged by the source in the absence of all other sources, except natural quality, that will achieve water quality protection levels specified in § 96.3.

(2)  WLAs and LAs for significant pollutant sources shall be made more stringent if the cumulative loading determined after the application of paragraph (1) exceeds the TMDL.

(g)  The Department may approve effluent trading provided that the following conditions are met:

(1)  All pollutant sources comply with applicable technology-based requirements.

(2) Water quality protection levels specified in § 96.3 are achieved in all portions of the surface water under consideration.

(3) The Department has published a description of the effluent trading procedure in the *Pennsylvania Bulletin*, and solicited comments thereon.

(h) Steady state modeling at the design flow conditions listed in Table 1 shall be used to develop TMDLs, WLAs and LAs when it is determined that continuous point sources are the primary cause of a violation of the water quality protection levels specified in § 96.3, unless an alternative method is approved by the Department under subsection (g). The LA portion of the TMDL may be a total allotment for nonpoint source pollutant loadings and natural quality, and need not be assigned to individual nonpoint sources.

*Table 1*

| *Water Quality Criteria* | *Steady State Design Flow* |
|---|---|
| Fish and aquatic life, except ammonia-nitrogen | $Q_{7-10}$ |
| Ammonia-nitrogen | $Q_{30-10}$ |
| Threshold human health | $Q_{7-10}$ |
| Nonthreshold human health (carcinogens) | Harmonic mean flow |

(i) The Department will revise WLAs and LAs because of new or increased pollutant loadings. WLAs shall be revised at or before the expiration date of the current point source discharge permit term.

(j) When mathematical modeling techniques are used to determine TMDLs, WLAs and LAs, the techniques should be generally accepted in the scientific community.

(k) The Department may require NPDES dischargers and other persons subject to regulation under The Clean Streams Law (35 P. S. §§ 691.1—691.1001) to conduct appropriate monitoring of pollutant sources and waters and report the results and data, in order to obtain data needed to develop TMDLs, WLAs and LAs, and to determine their effectiveness.

(l) A person challenging a TMDL, WLA or LA prepared by the Department under this section shall have the burden of proof to demonstrate that the TMDL, WLA or LA does not meet the requirements of this chapter.

§ 96.5. **Nutrient discharges.**

(a) Whenever technically and financially feasible, and environmentally sound, land disposal of wastewater shall be used on a continuous or seasonal basis to prevent or minimize to the maximum extent practicable the discharge of nutrients to surface waters, including tributaries thereof, that are determined to be either threatened or impaired by nutrient enrichment.

(b) Where necessary to control eutrophication in a lake, pond or other impoundment, the Department will develop a TMDL and associated WLAs and LAs based on average annual loading estimates.

(c) When it is determined that the discharge of phosphorus, alone or in combination with the discharge of other pollutants, contributes or threatens to impair existing or designated uses in a free flowing surface water, phosphorus discharges from point source discharges shall be limited to an average monthly concentration of 2 mg/l. More stringent controls on point source discharges may be imposed, or may be otherwise adjusted as a result of a TMDL which has been developed.

§ 96.6. **Heated wastewater discharges.**

(a) WLAs established for the discharge of heated wastewater shall comply with applicable State and Federal requirements.

(b) Heated wastewater discharges may not cause a change of surface water temperature of more than 2°F during any 1 hour period.

(c) In addition to subsection (b), the allowable heat content of heated wastewater discharges shall be limited to one of the following:

(1) A calculated amount that will raise the temperature of the receiving surface water to no more than the applicable criteria specified in § 93.7 (relating to public participation).

(2) An amount based on an evaluation conducted in accordance with section 316(a) of the Federal Clean Water Act (33 U.S.C.A. § 1326(a)).

§ 96.7. **Public participation.**

(a) The Department will publish a notice in the *Pennsylvania Bulletin* of the availability of draft and final lists of surface waters requiring TMDLs under § 96.4(a) (relating to TMDLs). The notice of the draft list shall set forth a minimum 30-day public comment period.

(b) The Department will publish a notice in the *Pennsylvania Bulletin* of the availability of any draft and final TMDL prepared under this chapter. Draft TMDL notices shall be subject to a minimum 30-day comment period. The Department may hold a public hearing on a draft TMDL if there is significant public interest. When the TMDL is prepared under § 96.4(b), the notice may be included in the notice of permit application prepared under § 92.61(a) (relating to public notice of permit application and public hearing).

**CHAPTER 97. INDUSTRIAL WASTE**

§ 97.1. **(Reserved).**

§ 97.2. **(Reserved).**

§ 97.14. **(Reserved).**

§ 97.15. **(Reserved).**

§ 97.63. **(Reserved).**

§§ 97.81—97.83. **(Reserved).**

§§ 97.91—97.95. **(Reserved).**

(*Editor's Note*: The Department is proposing to delete §§ 97.1, 97.2, 97.14, 97.15, 97.63, 97.81—97.83 and 97.91—97.95 which currently appear at *Pennsylvania Code* pages 97-3—97-6, 97-10—97-12, and 97-14—97-31 (serial pps. (233515)—(233518), (233522)—(233524), (233526)—(233528) and (233529)—(233543)).

[Pa.B. Doc. No. 98-1436. Filed for public inspection August 28, 1998, 9:00 a.m.]