UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE SIERRA CLUB, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 2:19-cv-01284-WSS |
| NRG POWER MIDWEST LP, | ) |
| Defendant. | ) |

**DEFENDANT GENON POWER MIDWEST LP'S REPLY BRIEF
IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

GenOn Power Midwest LP ("GenOn"), by its undersigned counsel, submits this Reply Brief in Support of its Motion for Judgment on the Pleadings.

**I.     The Permit Condition Must Be Interpreted Consistent with 25 Pa. Code § 96.6(b)**

Plaintiff filed this lawsuit alleging violations of a one-sentence, general permit condition with no associated monitoring requirement(s) that provides: "The discharge at Outfall 003 shall not cause a change in stream temperature of more than 2°F during any one hour." Compl. Exhibit A at 34 ("Permit Condition"). The inescapable fact is that the Permit Condition is taken nearly verbatim from the Pennsylvania regulation codified at 25 Pa. Code § 96.6(b), which provides that "[h]eated wastewater discharges may not cause a change of surface water temperature[1] of more than 2°F during any one hour period." Despite this, Plaintiff contends that minor differences in language used in the Permit Condition allow Plaintiff to interpret the Permit Condition in a way that is at odds with 25 Pa. Code § 96.6(b) and regulatory interpretations by the Pennsylvania

---

[1] The difference in language between "stream temperature" (Permit Condition) and "surface water temperature" (25 Pa. Code § 96.6(b)) is a distinction without a difference. As addressed in GenOn's opening Brief, the applicable regulations define "surface water" to include "streams," among other surface water bodies. Plaintiff is trying to make a mountain out of a mole hill.

Environmental Quality Board ("EQB")[2] and Pennsylvania Department of Environmental Protection ("PADEP").  These are the state agencies responsible for adopting and enforcing the applicable regulation.  Plaintiff's arguments lack a rational basis and widely miss the mark.

While GenOn acknowledges that courts outside the Third Circuit have held that NPDES permits are to be interpreted like a contract, *see* Pl.'s Br. at 10, these cases are distinguishable from this lawsuit, where an underlying regulation is the basis for the Permit Condition.  The Fourth, Sixth, and Ninth Circuit cases relied upon by Plaintiff all determined whether a NPDES permit prohibited certain types of discharges that were not explicitly addressed or limited in the permits. *Tenn. Clean Water Network v. TVA*, 905 F.3d 436 (6th Cir. 2018)(holding that a NPDES permit did not regulate discharges from a coal ash pond); *Piney Run Pres. Ass'n v. County Com'rs of Carroll Co.*, 268 F.3d 255 (4th Cir. 2001)(holding that the county wastewater treatment plant's thermal discharges were shielded from Clean Water Act liability because even though they were not limited in the permit, the thermal discharges were listed in the permit application); *Northwest Envtl. Advocates v. Portland*, 56 F.3d 978 (9th Cir. 1995)(holding that a NPDES permit covered combined sewer overflows even though the overflows were not separately listed in the permit).  Unlike the cases relied upon by Plaintiff, GenOn does not contest the Permit Condition or that it relates to Cheswick's thermal discharges.  Plaintiff's attempt to interpret and apply the Permit Condition in a vacuum, however, without reference to 25 Pa. Code § 96.6(b) and the regulatory agencies' interpretations of the same, is without merit.

---

[2] The EQB is "a 20-member independent board that adopts all of the Department of Environmental Protection's regulations." PADEP, *What is the EQB?*, available at
https://www.dep.pa.gov/PublicParticipation/EnvironmentalQuality/Pages/WhatIsEQB.aspx (last visited Feb. 21, 2020).

II.     **Mixing Must Be Considered When Applying the Permit Condition and 25 Pa. Code § 96.6(b)**

Plaintiff argues that "GenOn asks this Court to apply a mixing zone that simply does not exist." *See* Pl.'s Br. at p. 5. Yet, Plaintiff is misconstruing what GenOn has requested in its Motion. GenOn is not asking the Court to apply a mixing zone or to make a ruling on the point of compliance for the Permit Condition. GenOn is asking the Court to determine that Plaintiff's Complaint lacks a plausible claim of a permit violation, which is Plaintiff's burden. An NPDES permit condition can only be violated at the point of compliance. Plaintiff's complete lack of any averments related to the point of compliance, therefore, is fatal to its claims. Indeed, any citizen suit action involving a permit violation requires allegations that support an actual and continuing violation. *Nat. Res. Def. Council, Inc. v. Texaco Ref. and Mktg., Inc.*, 2 F.3d 493, 501 (3d Cir. 1993) (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 66 (1987)). Without this, a citizen suit claim fails. *Id.* Here, in discussing the point of compliance set forth in the Temperature Guidance, Plaintiff questions in its brief "At what point?" and then answers its own question with the response that "No one knows." Pl.'s Br. at p. 7. If Plaintiff doesn't know the point of compliance (and further contends that no one knows the point of compliance), then how can it bring a citizen suit action alleging a permit violation? The answer is that it cannot.[3] The evaluation of the plausibility of Plaintiff's claims should end with this concession from Plaintiff.

Notwithstanding Plaintiff's concession that it lacks knowledge regarding the point of compliance, Plaintiff makes much of the fact that Pennsylvania does not have a regulation or statewide policy governing "mixing zones" and the NPDES Permit does not include a "mixing

---

[3] This fundamental flaw in Plaintiff's citizen suit action rings even more true for a Permit Condition that has no associated monitoring requirement.

zone." However, Plaintiff fails to acknowledge that mixing zone concepts, such as dilution, criteria compliance time, and mixing factors are pillars of PADEP's NPDES permitting evaluation. To determine whether to apply water quality-based effluent limitations in a NPDES permit, a delegated permitting authority, like PADEP, must conduct an analysis of whether the discharge poses a "reasonable potential" to cause or contribute to a water quality standard excursion. 40 C.F.R. § 122.44(d)(1); 25 Pa. Code § 92a.44. Under the EPA regulations that the EQB has adopted in Pennsylvania, a "reasonable potential" analysis can consider "dilution of the effluent in the receiving water." 40 C.F.R. § 122.44(d)(1)(ii); 25 Pa. Code § 92a.44. Furthermore, Chapter 5 of the EPA *Water Quality Standards Handbook*[4] expressly states that a water quality model can use "zones of actual or physical mixing in which the discharge and receiving water naturally mix regardless of whether a mixing zone, in the regulatory sense, has been authorized." Pl.'s Br., Exhibit A at 3.

PADEP evaluates "reasonable potential" using its PENTOXSD water quality model and by performing other calculations. PADEP has developed a *Technical Reference Guide* (Version 2.0; May 22, 2004) ("Technical Reference Guide")("Exhibit 5") for its PENTOXSD water quality analysis model that is replete with references to mixing. The first sentence of this Technical Reference Guide describes the PENTOXSD model as a "mass-balance water quality analysis model that includes consideration for ***mixing***, first order decay and other factors to determine recommended water quality-based effluent limits." Exhibit 5 at 1 (emphasis added). The Technical Reference Guide includes a section on "Criteria Compliance Times" that states as follows:

> ***PENTOXSD does not assume that all discharges completely mix with the stream.*** Therefore, it is necessary to define the mixing

---

[4] The *Water Quality Standards Handbook* is attached as Exhibit A to Plaintiff's Brief and relied on by Plaintiff to argue that "mixing" and "mixing zones" play no role in determining compliance with the Permit Condition.

4

> characteristics of the discharge. In doing so, the point of compliance with the water quality criteria must be established. This is accomplished by assigning different criteria compliance times (CCTs) for each criterion. These compliance times establish the locations where compliance with the water quality criteria is expected to occur.

*Id.* at 3 (emphasis added). The Technical Reference Guide also includes references and a description of how PADEP calculates "complete mix times." *Id.* at 4. The CCTs and "complete mix times" are then used to calculate the "partial mixing factors," described as the "fractional portion of the stream that mixes with the discharge at the CCT." *Id.* Contrary to Plaintiff's arguments, "mixing" concepts are firmly embedded into the calculation methodologies and models PADEP uses to calculate WQBELs in the NPDES Process.

In fact, PADEP used a "partial mix factor" when evaluating Cheswick's thermal discharge. Instead of using its PENTOXSD model, PADEP uses its "Thermal Spreadsheet" to evaluate Cheswick's thermal discharge. The Thermal Spreadsheet, essentially a pared down version of the PENTOXSD model, is included as Attachment C on page 46 of the NPDES Permit Fact Sheet. The far right-hand column includes values of 0.20 for "PMF" or "partial mix factor." GenOn's Br., Exhibit 1 at 46. At low flow conditions in the Allegheny River, PADEP calculated a "complete mix time" as 1000+ minutes from the time of discharge. *Id.* at 62. Therefore, not only did PADEP employ mixing zone concepts in its analysis of Cheswick's thermal discharge, it calculated a "complete mix time" of more than 16 hours.

PADEP's use of "mixing zone" concepts in calculating appropriate NPDES Permit limits, and its specific use of such concepts for Cheswick's thermal discharge, demonstrates that mixing plays a critical role in determining compliance with the Permit Condition. Plaintiff's Complaint, however, fails to include any acknowledgment of the role that mixing plays in determining compliance with the Permit Condition and Pennsylvania's water quality criteria generally. In fact,

5

Plaintiff acknowledges that its Complaint entirely discounts any mixing and how such mixing affects the point of compliance for the Permit Condition.  *See* Pl.'s Br. at 7.

**III.    Plaintiff's Interpretation of the Permit Condition Is Inconsistent with State Policy**

    **A.  The Permit Condition is a "Rate of Change" Requirement**

Plaintiff acknowledges that the Permit Condition must be consistent with "state policy," citing the Temperature Guidance.  Pl.'s Br. at 11.  By interpreting the Permit Condition to prohibit "absolute temperature increases" between randomly selected upstream and downstream locations, Plaintiff fails to account for the fact that Pennsylvania regulatory agencies have unambiguously stated that the Permit Condition and 25 Pa. Code § 96.6(b) are "rate of change" requirements.  Although Plaintiff ignores this in its brief, the EQB, not GenOn, is responsible for explaining that 25 Pa. Code § 96.6(b) is a "rate of change" requirement.  *See* GenOn's Br., Exhibit 3 at 4445.  Because the Permit Condition is expressly based on an underlying Pennsylvania regulation, the EQB's rulemaking statements are highly relevant.  *See Columbia Gas Transmission, LLC v. 1.01 Acres, More or Less in Penn Twp.*, 768 F.3d 300, 313 (3d Cir. 2014) (holding that even if a regulation is ambiguous, a regulatory agency's interpretation of its own rule should control).

Furthermore, throughout the Temperature Guidance, PADEP describes the Permit Condition and 25 Pa. Code § 96.6(b) as a 2°F "per hour" requirement.  GenOn's Br., Exhibit 4 at 3-4 and 15-16.  "Per hour" plainly means "rate of change," not an absolute limit.

    **B.  Plaintiff Misinterprets the Applicable Pennsylvania Guidance**

Plaintiff argues that "PADEP assumes an "instantaneous complete mix" of heated wastewater discharges."  Pl.'s Br. at 7.  Relying on the Temperature Guidance, Plaintiff erroneously states that, for purposes of applying the Permit Condition, PADEP assumes "that the

6

effluent mixes completely with the stream <u>the moment</u> it is discharged." Pl.'s Br. at 8 (emphasis added).  Plaintiff's "instantaneous complete mix" argument is flawed.

The Temperature Guidance plainly states that "***[h]istorically***, instantaneous complete mix of the discharge with the receiving stream has been assumed in water quality analyses designed to produce thermal effluent limits." Exhibit 4 at 4 (emphasis added).  The Temperature Guidance goes on to state that "[t]he assumption that mixing is immediate and complete may be unreasonable in impoundments and large rivers, especially rivers that are broad and shallow at design flow." *Id.* at 7; *see also id.* at 4 (describing additional scenarios where the historical "instantaneous complete mix" assumption is incorrect).  The Allegheny River near Cheswick's discharge at Outfall 003 is over 500 feet wide and is immediately upstream of the Bill Young Lock and Dam. *See, e.g.*, Pl.'s Compl., Exhibits C-F.  Plaintiff's brief conveniently omits the important distinctions PADEP has drawn in the Temperature Guidance.

**IV.   <u>Plaintiff's Data Cannot Prove an Alleged Violation of the Permit</u>**

Plaintiff's "temperature sampling data" demonstrate that the Permit Condition cannot be interpreted as an "absolute temperature standard."  Plaintiff argues that based on "average ambient temperatures" and "average downstream temperatures," the information and "data" attached to its Complaint show violations of the Permit Condition, when construed as an "absolute limit" on temperature.  In doing so, Plaintiff highlights the fallacy of its own interpretation of the Permit Condition.  By averaging the "temperature data," Plaintiff fails to account for significant temperature variations between closely located waypoints.  *See* Pl.'s Compl., Exhibits C-F. Furthermore, these significant temperature variations do not appear to be correlated to the distance from Outfall 003 and/or the time at which they were collected. *See id.*  As illustrated by Plaintiff's own analysis, instantaneous temperature grab samples collected at random locations "upstream"

and "downstream" of Cheswick's discharge at Outfall 003 cannot be used to assess compliance with the Permit Condition.

By alleging that the Permit Condition limits absolute temperature increases, Plaintiff is treating the Permit Condition as an effluent limit, which it is not. *See* Pl.'s Br. at 10 ("Otherwise, the permit would have no effect on limiting the effluent from Outfall 003.")  Again, the NPDES Permit has a heat rejection rate that governs the discharge of heated water.  The 2011 sampling data referenced by Plaintiff in its Brief was collected by GenOn and submitted to PADEP in support of its applicable heat rejection rate, which was imposed based on a Clean Water Act § 316(a) variance renewed by PADEP.[5]  This sampling data had no relation to the Permit Condition. Plaintiff is trying to take sampling data that was collected and used for an entirely different purpose in an effort to show an alleged violation of a completely separate Permit Condition.  This currently is not a battle over "sampling methodology" as Plaintiff contends.  This is a challenge to the allegations of the Complaint, which plainly do not support a permit violation.  Without a plausible claim of a permit violation, Plaintiff has no citizen suit.

Even if the "temperature data" were valid and recorded over the appropriate time period after "complete-mix," Plaintiff's attempt to argue that the "temperature data" show that Cheswick's discharge caused an increase[6] of more than 2°F per hour in the Allegheny River downstream of Outfall 003 fares no better.  Assuming for the sake of argument that data collected

---

[5] When it issued the NPDES Permit, PADEP renewed Cheswick's long-standing Clean Water Act section 316(a) variance from Pennsylvania's temperature water quality criteria at 25 Pa. Code § 93.7, concluding from Cheswick's Thermal Study that "[t]here have been no documented effects to aquatic life in the Allegheny River caused by the thermal discharge at Cheswick." GenOn's Br. at 3 (citations omitted).

[6] In footnotes 23, 25, and 26 of its Response Brief, Plaintiff appears to rely on what it describes as "temperature decreases" to support its arguments.  The allegations in Plaintiff's Complaint, however, rely solely on what Plaintiff alleges are "increase[s] in the temperature of the surface of the Allegheny River."  *See, e.g.,* Compl. ¶ 32; *see also id.* ¶¶ 81, 83, 94 (alleging violations based on changes of "more" than 2°F and "heated wastewater discharges"). Plaintiff cannot expand the scope of its Complaint to cover what it believes are "temperature decreases."

at "approximately the same location" at different times could be used to assess compliance with the Permit Condition, none of the data Plaintiff references on pages 18 and 19 of its Response Brief were collected for one hour (or more appropriately, at several representative increments throughout the course of 60 minutes).  Rather, the purported measured temperature increases relied on by Plaintiff are based on 44, 78, and 79 minute differences.  Thus, Plaintiff cannot show the requisite rate of change (i.e., "per hour") necessary for assessing compliance with the Permit Condition.

**V.**     **Conclusion**

For all the foregoing reasons and the reasons stated in GenOn's Motion and Brief in Support, Plaintiff's Complaint should be dismissed with prejudice and judgment entered in favor of GenOn.

Dated: February 21, 2020            */s/ Mark D. Shepard*
Mark D. Shepard, Esq.
Alana E. Fortna, Esq.
Babst, Calland, Clements and Zomnir, P.C.
Two Gateway Center, 6th Floor
603 Stanwix Street
Pittsburgh, Pennsylvania 15222
(412) 394-5400

*Counsel for Defendant, GenOn Power Midwest LP*

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing as, this 21st day of February, 2020, I served the foregoing Defendant GenOn Power Midwest LP's Reply Brief in Support of Motion for Judgment on the Pleadings via the Court's ECF electronic filing system on the following counsel of record:

Benjamin M. Barczewski
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Ave. N.W.
Washington, D.C. 20001
bb1073@georgetown.edu

Michael Becher
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
mbecher@appalmad.org

/s/ Mark D. Shepard