# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE SIERRA CLUB,<br><br>     *Plaintiff,*<br><br>vs.<br><br>GENON POWER MIDWEST LP,<br><br>     *Defendant.* | Civil Action No. 2:19-cv-1284<br>Hon. William S. Stickman IV |

## PLAINTIFF'S POST-ARGUMENT BRIEF

Pursuant to the Court's invitation, Sierra Club respectfully submits the following post-argument brief. This brief addresses three points that arose in the argument before the Court on July 20, 2021. First, as explained in the next section the case is not moot. Cheswick is not closed now and will not be for at least several months. Even if the plant does close, relief is not precluded until there is a guarantee that the plant cannot resume operations. And even if Cheswick closed and could not resume operations, the case is still not moot. Because Sierra Club has proven ongoing violations, the claim for civil penalties will not be moot.

Second, Sierra Club has satisfied the constitutional requirements for standing. The lessened recreational values of Sierra Club's members in the affected portion of the Allegheny River are sufficient to meet those requirements. Courts throughout this Circuit and the country have held as much.

Finally, there is no factual dispute that prevents the Court from granting summary judgment for Sierra Club. Permits and guidance submitted as evidence stand on their own. The testimony of GenOn's expert Brian Lees is not admissible as evidence of a legal conclusion or as a basis upon which to assess agency practice. For these reasons, Plaintiff respectfully requests that the Court grant its Motion for Partial Summary Judgment on Jurisdiction and Liability.

## ARGUMENT

**I.      This Case Is Not Moot.**

At the July 20th argument the Court noted that there were reports of the plant permanently closing "within a couple of months." Transcript of July 20, 2021 Oral Argument ("Argument Tr."), at 4. Counsel for the Defendant argued that the public announcement that Cheswick is slated to be closed effectively mooted the case, both for claims of injunctive relief and for civil penalties. *Id.* at 4–6. As explained below a public announcement of future retirement is not sufficient to render a case moot. Even if injunctive relief does become moot at some point in the future, claims for civil penalties will not.

A.    Injunctive Relief is Not Moot as Long as Cheswick Remains in Operation

Article III of the U.S. Constitution limits the judicial authority of the federal courts to "cases" or "controversies" that are actual and ongoing. U.S Const. Art. III, § 2, Cl. 1; *Khodara Env't, Inc. ex rel. Eagle Env't, L.P. v. Beckman*, 237 F.3d 186, 192–93 (3d Cir. 2001). If the defendant (or any party) claims that some development has mooted the case, it bears the heavy burden of persuading the court that there is no longer a live controversy. *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305–06 (3d Cir. 2020) (internal quotations omitted). Indeed, for a claim to be moot, it must be "*impossible* for a court to grant any effectual relief." *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012) (internal quotation marks omitted) (citations omitted); *see also, Nat. Res. Def. Council, Inc. v Texaco Refin. and Mktg., Inc.,* 2 F.3d 493, 502 (3d Cir. 1993). A claim is still considered "live" when a real and substantial controversy exists between the parties, however small, that can be resolved by specific relief granted by the court." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Further, for mootness to apply it must be "absolutely

clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth v. Laidlaw Env't Servs.,* 528 U.S. 167, 189 (2000); *see also Hartnett,* 963 F.3d at 306.

To date, the Defendant has submitted nothing to the Court to serve as a basis for finding mootness. The only potential evidence before the Court is a public announcement which appears on GenOn's website and was reported by news media. Plans for future retirement, however, cannot satisfy GenOn's heavy burden to make "absolutely clear" that no violations will continue. First and foremost, the plant has not yet shut down. Thus, today, the Court retains the ability to order injunctive relief. Moreover, the Defendant's plans for the plant, as evidenced by its public announcements, have changed. Originally, on June 9, 2021, GenOn announced that the Cheswick plant would be permanently retired by September 15, 2021. *See* Pl.'s Ex. W (GenOn Press Release, June 9, 2021); *see also* Pl.'s X (Pittsburgh Post Gazette, June 10, 2021.) More recently, the retirement has been put off until April of 2022. Pl.'s Ex. Y (GenOn Press Release, July 15, 2021); Pl.'s Ex. Z (Pittsburgh Post Gazette, July 23, 2021). The Defendant has already changed its retirement plans once. So long as it retains the ability to change course, none of the claims in this action are moot.

B. Even if Cheswick Ceases Operation During the Pendency of this Action there is no Guarantee that It would Not Resume Operations.

Even if Cheswick does shut down, it would be a voluntary decision. Courts are particularly reticent to find a case moot when it is the defendant's choice to stop the conduct causing the relevant violation. *See United States v. Concentrated Phosphate Exp. Ass'n* 393 U.S. 199, 203 (1968) ("here we have only appellees' own statement that it would be uneconomical for them to engage in any further joint operations. Such a statement, standing alone cannot satisfy the heavy burden of persuasion of which we have held rests upon those in appellee's shoes."); *Burns v. Pa. Dep't of Corr.,* 544 F.3d 279, 284 (3d Cir. 2008) (refusing to find mootness based on the

3

Commonwealth's letter that it would refrain from the offending conduct in the future); *United States v. Virgin Islands*, 363 F.3d 276, 775–76 (3d Cir. 2004) (refusing to find mootness based on the termination of a contested contract, statements and statements by the Governor of the Virgin Islands that the termination was not due to litigation and that it would not reinstate the challenged contract); *Cooey v.Strickland*, 588 F.3d 924, 927 (6th Cir. 2009). ("determining mootness based on a litigant's statement that it has no reason to resume the challenged activity, no matter how earnest is not part of the mootness analysis.")

GenOn is likely to rely on cases like *Hartnett* and *Diamond v. Pennsylvania State Education Association*, 399 F. Supp. 3d 361 (W.D. Pa. 2019), or others that were decided after the Supreme Court's *Janus* decision, but these cases are not applicable to the facts of this case. *See, e.g.*, *Id. Diamond* and *Hartnett* dealt with a rare factual situation in which the Supreme Court made clear that the defendant's conduct was illegal. In those cases, a Supreme Court opinion made it "absolutely clear" that the conduct could not legally continue. In addition, in those cases, the defendant recognized the illegality of the challenged conduct because of the Supreme Court opinion finding the conduct unconstitutional. *Hartnett* 963 F.3d at 307; *Diamond* 399 F. Supp. 3d at 385–86 ("this controversy was mooted by the intervening *Janus* decision, which held that fair-share fees are unconstitutional, and Union Defendants' undisputed compliance therewith"). These cases, and others in the Third Circuit where the voluntary cessation doctrine was found to be inapplicable did not involve voluntary cessation in the ordinary sense, but rather conduct made clearly illegal as a result of a binding Supreme Court opinion. *See also Malhan v. Atty. Gen. of N.J.*, 848 Fed. Appx. 517, 520–21 (3d Cir. 2021) ("The voluntary cessation doctrine does not apply here because the Government Defendants are not responsible for the cessation.")

The situation in this case stands in stark contrast to the facts in *Hartnett* and other cases decided in the wake of the *Janus* decision. First and foremost, there is no declaration of illegality by the Third Circuit or the Supreme Court. While Plaintiff maintains that GenOn's conduct is in plain violation of its permit, there is to this point no judicial pronouncement of unlawful conduct. Moreover, there is nothing to demonstrate that the Defendant has even acknowledged that its conduct is illegal. It is overwhelmingly likely that GenOn is continuing the challenged conduct at this time. Sierra Club's expert found hundreds of exceedances of the 2° F temperature condition in the weeks just before his report was due. Op. Br. at 2; Pl.'s Ex. B at 9–10 (showing exceedances at multiple points in the river and at multiple depths from August to October 2020); *see also*, Pl.'s Ex. B at 13 (averring that the Defendant violated its permit frequently and repeatedly through the assessed time period.).[1] GenOn has consistently contested Plaintiff's allegations on legal grounds and has refused to accept that recorded 2°F temperature fluctuations in the Allegheny River constitute violations of its permit. Thus, far from making it "absolutely clear" that the challenged conduct will not continue, GenOn has made it obvious it will violate its permit so long as the plant is operating.

Because GenOn has not accepted or even acknowledged the illegality of its action, there must be some bar to it resuming its conduct for this case to be moot. A voluntary shutdown would not suffice. As described in the prior section, GenOn has already demonstrated that retirement plans can change. As the courts have long recognized a simple pledge that challenged conduct will stop is insufficient to demonstrate the heavy burden of mootness. *Virgin Islands*, 363 F.3d at 775–76 ("Because we agree with the United States that the voluntary termination of

---

[1] Sierra Club is confident that they could show more recent violations if the Court permitted extended discovery and a supplemental expert report. Sierra Club is happy to conduct such an analysis at the Court's request. As explained in the next section, however, post-complaint violations are already sufficient to satisfy a plaintiff's duty to show "ongoing violations."

this particular contract did not clearly indicated that GVI would not reinter this contract or enter a similar one in the future, we hold that the District Court did not err in determining the issue was not moot."); *Concentrated Phosphate*, 393 U.S. at 203 ("here we have only appellees' own statement that it would be uneconomical for them to engage in any further joint operations. Such a statement, standing alone, cannot suffice to satisfy the heavy burden of persuasion which we have held rests upon those in appellees' shoes.").

C. Because Plaintiff Can Demonstrate Ongoing Violations Civil Penalties Create a Live Case or Controversy.

Even if GenOn could show that injunctive relief was moot, it cannot moot Sierra Club's claim for civil penalties. In a landmark series of cases decided in the Fourth Circuit and the United States Supreme Court, the Fourth Circuit wrestled with the jurisdictional requirements of the Clean Water Act, the statutory meaning of the phrase "in violation," and the doctrine of mootness. *See Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.,* 11 F. Supp. 1542 (1985) ("*Gwaltney I*"), *affirmed*, 791 F.2d 304 (4th Cir. 1986) ("*Gwaltney II*"), *vacated and remanded*, 484 U.S. 49 (1987) ("*Gwaltney III*"), *on remand*, 844 F.2d 170 (4th Cir. 1988) ("*Gwaltney IV*"), *judgment reinstated*, 688 F. Supp. 1078 (E.D. Va. 1988) ("*Gwaltney V*"), *affirmed in part, reversed in part and remanded*, 890 F.2d 690 (4th Cir. 1989) ("*Gwaltney VI*"). Therein, the Supreme Court decided that based on the language in 33 U.S.C. § 1365(a) granting jurisdiction to citizen-plaintiffs against polluters "alleged to be in violation" that such plaintiffs could not bring suit for "wholly past" violations. *Gwaltney III*, 484 U.S. at 58–59. The Court recognized, however, the jurisdictional requirement was based on good faith "allegations" of continuing violation, and if such "good faith allegations" of continuing violations could be demonstrated jurisdiction would attach. *Id.* at 64–65. While the Court noted the applicability of the mootness doctrine to citizen-suit cases, it explained that the "[m]ootness doctrine . . . protects defendants

6

from the maintenance of suit under the Clean Water Act based solely on violations *wholly*

*unconnected to any present or future wrongdoing*. *Id.* at 66 (emphasis added).

On remand, the Fourth Circuit Court of Appeals determined citizen-plaintiffs could show

good faith allegations of continuing violations:

> (1) by proving violations that continue on or after the date the complaint is filed,
> *or* (2) by adducing evidence from which a reasonable trier of fact could find a
> continuing likelihood of a recurrence in intermittent or sporadic violations.
> Intermittent or sporadic violations do not cease to be ongoing until the date when
> there is no real likelihood of repetition.

*Gwaltney IV,* 84 F.2d at 171–72 (emphasis added). Other circuit courts of appeal, including the

Third Circuit, have adopted this standard. *Texaco*, 2 F.3d at 501–02. Courts have jurisdiction

over a live case or controversy if citizen-plaintiffs demonstrate one or more post-complaint

violations until "there is no real likelihood of repetition." *Id.*

As recognized by the Supreme Court in *Gwaltney* mootness may apply, but only in

situations where maintenance of the suit is based on violations "unconnected to any present or

future wrongdoing." *Gwaltney III*, 484 U.S. at 66. In a final *Gwaltney* decision rendered by the

Fourth Circuit, the court grappled with the question of whether post-complaint compliance

would moot the case. By the time the court rendered its decision, the defendant had been in

"near-perfect compliance" for a period of more than five years. *Gwaltney VI*, 890 F.2d at 694.

Despite the longstanding compliance and the district court's refusal to grant an injunction, the

Fourth Circuit held that the case was not moot. The continued litigation over "penalties imposed

for past violations which are linked with ongoing violations presents a live case or controversy."

*Id.* at 696–97. The Third Circuit, likewise, has adopted this reasoning, reaching the conclusion

that not only do civil penalties preserve a live case and controversy but that "once a citizen

plaintiff establishes an ongoing violation at the time the complaint is filed, the court is obliged to assess civil penalties for all proven violations of that parameter. *Texaco,* 2 F.3d at 503.

As, described in their opening brief, Sierra Club has established a live case and controversy under the *Gwaltney/Texaco* test by showing that Defendant violated the 2° temperature condition hundreds of times after Sierra Club filed its Complaint. Op. Br. at 2, 10–11; *see also*, Pl.'s Ex. B (Hodge Decl.) at 9–13. Sierra Club's Complaint was filed on October 8, 2019. From August through October of 2020, GenOn's own monitoring data shows temperature fluctuations at multiple locations and depths in the Allegheny River in excess of 2°F per hour. Op. Br. at 2; Pl.'s Ex. B at 9–10. GenOn's data concerning heat fluctuations in the Allegheny River from August to October 2020 and data concerning the level of its electricity production operations throughout 2019 and 2020 show that GenOn violated its permit consistently and repeatedly since the permit was issued in 2018. Pl.'s Op. Br. at 2; Pl.'s Ex. B at 13. Because Sierra Club has demonstrated continuing violations that occurred after it filed its Complaint, there is a *present wrongdoing* before this Court. If the Court finds the Defendant liable it has a duty to assess civil penalties and the case may not be considered moot. *Texaco,* 2 F.3d at 503 ("This mandatory language demonstrates that once a citizen plaintiff establishes an ongoing violation of a parameter at the time the complaint is filed, the court is obliged to assess penalties for all proven violations of that parameter.") (referring to the language of 33 U.S.C. § 1319(d).

## II.   Plaintiff Has Standing to Proceed.

### A.   Mr. Duncan's Reduced Recreational Enjoyment is Sufficient to Constitute Injury-In-Fact

During argument, the Court inquired as to whether Mr. Duncan's alleged injuries are sufficient to prove standing, in light of the fact that he continues his activities, such as kayaking in the river and serving as a caretaker of a downstream island. *See e.g.* Argument Tr. at 42–43.

Defendants' counsel argued that his concern and anxiousness, in other words, his reduced enjoyment of his recreational activities, could not serve as an injury-in-fact because he still engaged in activities on the river and enjoyed it to some extent. *Id.* at 49. Courts in this Circuit and beyond, however, have made clear that reduced enjoyment of recreational interests in the areas affected by the defendant's conduct is sufficient to confer standing.

"Congress has identified NPDES violations, however trifling, as injurious to persons such as plaintiffs' members, who use bodies of water into which a permittee's effluents flow." *Student Pub. Int. Research Grp. of N.J. v. Ga. Pac. Corp.,* 615 F. Supp. 1419, 1424 (D.N.J. 1985); *see also Pub. Int. Research Grp. v. Powell Duffryn*, 913 F.2d 64, 71 (3d Cir. 1996) ("These injuries need not be large, an 'identifiable trifle' will suffice.") (quoting *United States v. Students Challenging Regul. Agency Procedures*, 412 U.S. 669, 689 n.14 (1973)). Injury is found in those "for whom the aesthetic and recreational values of the area will be lessened by the challenged activity" *Laidlaw*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).

In his declaration and his deposition Mr. Duncan repeatedly explained that while he continues to use the area affected by the Defendant's discharge, his enjoyment and his appreciation of the beauty of the Allegheny River and its surroundings is affected by the discharges from the Cheswick plant. For example, in his declaration he explains the personal importance of his work on Sycamore Island as well as the recreation he conducts on the river between Sycamore Island and Fourteen-mile Island. Pl.'s Ex. D (Duncan Decl.) at ¶¶ 8-11. He understands that heat from the plant often reaches the area in which he uses the river. *Id.* at ¶ 8; *see also* Pl.'s Ex. E at 21-22; Pl.'s Ex. Q at 4-5 (indicating the thermal plume extended at least 3.5 miles downstream, including to the banks for Fourteen-Mile Island); 4-6 (showing heated wastewater extending to the island below the dam). He obviously takes pride in his conservation

work, and the environmental integrity of the river is part of the reason he enjoys recreating there. *Id.* at ¶¶ 9-10. The cessation of illegal discharges would cause him to enjoy his activities more. *Id.* at ¶ 12. He expanded upon these statements in his deposition. Pl.'s Ex. E at 105 ("[s]o the experience of working on the island has been a blessing to me. It's my—like I said, it's my escape. It's my way of getting away from everything and doing something that I feel is worthwhile, and it truly bothers me that there is someone out there adding a pollutant to the river to its detriment. . ."); *Id* at 108 ("I still enjoy the experiences and it's a beautiful place, but it makes me concerned for its well-being in the future, and it makes me—it makes me a little anxious for it."); *Id.* at 109 (Explaining that the violation of the NPDES affects his enjoyment of a river: "[It does i]n an emotional way. . . It makes me disturbed about what's happening and it makes me unhappy and it affects the way I view things. . . . Everything is connected. The mussels, the turtles, the bacteria. Everything is connected, so yes [it does affect my enjoyment.]").

Since the Supreme Court's decision in *Laidlaw*, which made clear that "[t]he relevant showing for standing . . . is not injury to the environment but injury to the plaintiff," courts have found injuries of the type suffered by Mr. Duncan are enough to satisfy the injury-in-fact requirement of standing. For example, in *Interfaith Community Organization v. Honeywell International, Inc.* the Third Circuit found injury in fact where plaintiffs' members averred they enjoyed recreating along a polluted river less. 399 F.3d 248, 256–57. In that case one member stated that she walked or biked along the river almost every day that the weather was warm but that the contamination of the river detracted from her enjoyment. *Id.* at 256. Similarly, another was concerned about his health when he used gas pumps once or twice a month near the area at

issue. *Id.* Following *Interfaith* and *Laidlaw,* a court in this district found that plaintiffs satisfied

the injury-in-fact requirement because,

> they have submitted sworn statements and deposition testimony from three
> members about the effect of the pollution on their recreational activities of the kind
> found sufficient in *Laidlaw,* 528 U.S. at 181–82, 120 S.Ct. 693 (averments of
> camping, picnicking, bird-watching and walking near a river), and
> *Interfaith/Honeywell,* 399 F.3d at 256 (affidavits and deposition testimony of
> walking, fishing and biking near a river contaminated with chromium waste). In
> addition, "the desire to use or observe an animal species, even for purely esthetic
> purposes, is undeniably a cognizable interest for purpose of standing." *Defenders
> of Wildlife,* 504 U.S. at 562–63, 112 S.Ct. 2130 (citation omitted). Thus, the
> individuals' statements that their enjoyment of wildlife has been diminished by
> PPG's actions can also give rise to a cognizable injury.

*PennEnvironment v. PPG Indus., Inc.* 23 F. Supp. 3d 553, 581 (W.D. Pa 2014). In

*PennEnvironment*, as in this case, the plaintiff's member had not completely stopped using or

enjoying the affected areas. *See, e.g.*, *id.* at 575–76 ("Ms. Kovacovsky continues to enjoy biking,

bird watching, and hiking along this trail, and is looking forward to doing these activities in the

future in the areas around the Allegheny River. . . . Ms. Kovacovsky also testified that her

enjoyment of those activities was diminished as a result of PPG's discharges and that her

enjoyment would increase if the pollution were cleaned up."); *see also* Pl.s' Ex. D at ¶ 12 ("If the

Sierra Club is successful and a court requires Cheswick to comply with its permit, the river will

be healthier because the excess thermal pollution will be abated. This will inspire me to spend

more time on the river and will increase my enjoyment of mu recreational activities.")

   Although GenOn's counsel has sought to trivialize the "concerns" and "anxiety" that are

the direct consequence of the GenOn's violations on Mr. Duncan, these are actual impacts which

affect him personally and are sufficient to confer standing. *See e.g. Del. Riverkeeper v. Soil Safe,

Inc.*, No. 14-1349 (RMB/KMW) 2017 WL 2829603, at *18 (D.N.J. June 30, 2017) ("While [Mr.

Perti] testified that he does not fish less because of the conduct, the Court does believe that his

concerns about damage to fish life, which is central to the fishing tournament he runs, still give

rise to a finding of injury-in-fact for purposes of standing"); *PennEnvironment v. RRI Energy Ne. Mgmt. Co.*, 744 F. Supp. 2d 466, 478–79 (W.D. Pa. 2010) ("[T]his testimony adequately supports a finding that, for these members of the plaintiff associations, the aesthetic and recreational use of the Conemaugh River has been lessened by the pollutants discharged into the river and demonstrates their concerns about the effects of that discharge."); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 556 (5th Cir. 1996) ("Whether the affiants were 'concerned' or 'believed' or 'knew to a moral certainty' that produced water would adversely affect their activities on the bay is a semantic distinction that makes little difference in the standing analysis."). Mr. Duncan's displeasure at the Defendant's discharges, anxieties about the effect on those discharges on his conservation work, and concerns while he recreates on the river are sufficient to demonstrate and injury in fact.

### B. Ms. Jacko's Cessation of Use of the River Is Sufficient to Satisfy Injury-in-Fact

Similar to Mr. Duncan, Ms. Jacko's enjoyment of the river has been diminished. So much so that Ms. Jacko now refrains from using it. She lives just five miles from the plant and can drive there in about 10 minutes. Pl.'s Ex. G at 13–14; Pl.s' Ex. F at ¶ 3. Although she loves to row and kayak, she has not used the river for those purposes since her son was born. Pl.'s Ex. F at ¶¶ 7–10; Pl.'s Ex. G at 91. Her cessation of use of the river is due to the fact that she fears the consequences of the pollutants in the river which she believes have likely, or are likely to cause, a disruption of the natural ecosystem. Pl.'s Ex. F at ¶¶ 10–12. She understands that Cheswick's permit limits are there "for a reason" Pl.'s Ex. G at 104. She has a general knowledge that excess heat "can lead. . . to things like bacterial overgrowth, algal overgrowth, and/or other disruptions to the environment." *Id.* at 89. In her words, "People who are smarter than me and have more knowledge than me about science have said this is the limit for a reason." *Id.* at 104. These fears

are bolstered by her knowledge that a friend was warned by a doctor not to kayak in the river with an open cut because of the increased risk of bacterial contamination. *Id.* at 85.

Laidlaw makes clear that refraining from use of an affected water due to fears of environmental contamination is sufficient to satisfy the injury-in-fact prong of standing. For example, one of the affiants in that case, Mr. Curtis, testified that he used to fish in the affected area as a boy, but would no longer do so because of concerns about Laidlaw's discharges. 528 U.S. at 182. Another, Ms. Pruitt lived near the facility but refrained from fishing, hiking and picnicking near the river as a result of discharges. *Id.* Other members used the river, or land adjacent to the river dozens of miles or more below the facility and averred they would like to recreate closer but would not out of fear of the defendant's pollution. *Id* at 182–83.

Courts since *Laidlaw* have followed suit consistently finding that cessation of use or refraining from use is a sufficient basis on which to find injury-in-fact. For example, one of the plaintiffs members in *Interfaith* was found to have standing based on statements that she used to walk by the Hackensack River but would no longer, and averments that her sons used to fish in the river but wouldn't do so any more. 399 F.3d at 256. Similarly, in *American Canoe Association Inc. v. City of Luisa Water & Sewer Commission*, the court found plaintiffs' member Daniel Kash has standing because "he averred that he had recreated in the affected area in the past and that he would recreate there currently, were it not for the pollution caused by the defendants' discharge of effluents in excess of the limitations imposed by the National Pollutant Discharge Elimination System permit." 389 F.3d 536, 54–42 (6th Cir. 2004). Similarly, the Seventh Circuit found standing based on the averments of a Ms. McKasson who regularly used the area in the vicinity of a proposed plant to "fish, kayak, camp, and enjoy the natural beauty and clean environment" but stated that she would no longer use the area if a permit were issued.

*Sierra Club v. Franklin Cnty. Power of Ill., LLC,* 546 F.3d 918, 925 (7th Cir. 2008). Ms. Jacko's injury is in line with that of the plaintiffs' members in these and other cases.

    C.  <u>Mr. Duncan's and Ms. Jacko's Injuries are Fairly Traceable to Defendant's Conduct</u>

        In argument, GenOn's counsel argued that the Sierra Club could not tie their injuries directly to the challenged discharges. *See* Argument Tr. at 14–16. In fact, however, Sierra Club has done just that. Through affidavits and deposition testimony both Mr. Duncan and Ms. Jacko pointed specifically to GenOn's conduct as the source of their concerns. *See* Pl's Ex. D at ¶ 10 ("My work to conserve and improve the island with the land trust is likely affected by the excessive thermal pollution from the plant."); Pl.'s Ex. E at 105 ("it truly bothers me that there is someone, something out there, adding a pollutant to the river to its detriment"); Pl.'s Ex. F ("My knowledge of the plant's violation of the condition of its permit was part of my decision not to allow my son near the water."); Pl.'s Ex. G ("It is my belief that thermal discharges disrupt the ecosystem, having potential impacts on the health of the ecosystem where I was rowing.) Ms. Jacko and Mr. Duncan have shown that they recreate (or would like to recreate) directly in the zone of discharge and the discharges from the plant reduce their recreational interests or prevent them from recreating altogether. The concerns, fears, and anxiety that give rise to their recreational injuries stem directly from the types of harm that GenOn's permit in general, and the 2° temperature condition in particular, is meant to prevent.

        In making its traceability argument, GenOn would have this Court ignore the Supreme Court's warning in *Laidlaw* that the standing inquiry should not become a hurdle "higher than the necessary showing for success of the merits." *Laidlaw,* 528 U.S. at 181. Traceability "does not mean that plaintiffs must show to a scientific certainty that defendant's effluent . . . caused the precise harm suffered by the plaintiffs." *Powell Duffryn* 913 F.2d at 712; *see also Friends of*

*the Earth v. Gaston Cooper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000). "If scientific certainty were the standard plaintiffs would be required to supply costly, strict proof of causation to meet a threshold jurisdictional requirement—even where, as hefre, the asserted cause of action does not itself require such proof." *Gaston Cooper,* 204 F.3d at 161 (citing *Powell Duffryn* 913 F.2d at 72–73; *Cedar Point Oil, Co.* 73 F.3d at 557–58; *Texaco*, 2 F.3d at 505). To construe standing to require a scientific inquiry would necessitate litigation of complicated issues of fact "that are entirely collateral to the question Congress wished resolved—namely, whether a defendant has exceeded its permit limits." *Id.* at 162.

       To meet its burden to demonstrate traceability Sierra Club may rely on evidence that the GenOn's discharge travels downstream to the area where Sierra Club's members use (or would like to use). *Id* at 161–62; *Friends of the Earth, Inc. Chevron Chem. Co.*, 900 F. Supp. 67, 75 (E.D. Tex. 1995) (finding a two-to-four-mile distance from the discharge sufficient to show causation). In this case Sierra Club has shown that the GenOn's discharge of heat (i.e., the thermal plume) extends to the area where Mr. Duncan likes to recreate and where Ms. Jacko would like to row. GenOn's expert agreed in deposition that based on one of the documents he relied for his report that the thermal plume extended below the dam to the banks of the next island and on at least one occasion extended more than 3.5 miles downstream from the plant. Pl.'s Ex. C (Lees Dep.) at 57–59; 65–66. A review of the report on which Mr. Lees relied shows that the first island below the dam is Fourteen Mile Island. Pl.'s Ex. Q at 4-2 through 4-6. Mr. Duncan testified in detail how he kayaks to this area on a bi-weekly basis. Pl.s' Ex. E at 64–67. Ms. Jacko testified that when she used to row she would row to Oakmont. Pl.'s Ex. G at 123. She still recreates with her son on the playgrounds in that area. *Id* at 100–01. Oakmont sits just below

Fourteen-Mile Island on the Allegheny River.[2] As Ms. Jacko testified, Oakmont is upstream

from one of her former rowing launch points, which itself is only five miles from the plant. *Id.* at

100 (agreeing that the Steel City Rowing launch is approximately five miles from Cheswick and

that she would row towards Oakmont which is closer to the Cheswick plant.)

      Mr. Duncan's and Ms. Jacko's concerns about the disruption of the aquatic ecosystem are

reasonable, given the purpose behind GenOn's permit limits. As the Parties have recognized, the

2°F temperature condition in the permit is based upon the regulatory requirement in 25 Pa. Code

§ 96.6(b). Def.'s Op. Br. at 11; Pl.'s Op. Br. at 19. This provision (and other requirements of

Chapter 96) are in place specifically to protect statewide water uses, including the protection of

aquatic life and recreation. *See* 25 Pa. Code § 93.4. As pointed out in Sierra Club's opening brief,

the DEP has explained the limitation as important for protecting the ecosystem from thermal

shocks and excursions above allowable temperatures. Pl.'s Op. Br. at 12; Pl.'s Ex. J. at 4. Given

its purpose, it is more than reasonable for someone to worry about the ecosystem impacts of

violations of a permit condition based upon 25 Pa. Code 96.6(b).

### III.   The Testimony of Brian Lees Does Not Create a Factual Dispute.

      During argument, the Court asked the Parties whether there was a factual dispute on the

issue of whether the permit has been violated. Argument Tr. at 4. Sierra Club's counsel

explained that there was no such dispute because the only evidence proffered by GenOn was the

Temperature Guidance Document ("TGD") and the expert report and deposition testimony of

Brian Lees. Argument Tr. at 35–38. As explained at argument and in prior briefing, the TGD is

not a basis for factual dispute. *See, Id.* at 35–37; Pl.'s Reply at 9–10. By its own provisions it

---

[2] While there is not a complete map of the area in the record, the Court may take judicial notice of facts generally known within the trail court's territorial jurisdiction. The location of Oakmont in relation to Fourteen Mile Island and the Cheswick Power Station can easily be seen from any map of the area, including on Google Maps, Apple Maps, and other generally used navigational aids.

does not condition compliance on a point of complete mix. Pl.'s Ex. J. The use (or not) of that document as an aid in interpreting GenOn's permit condition is a matter of law that is well within the competence of this court to resolve.

The testimony of Brian Lees does not create a factual dispute. In fact, his testimony resolves any factual dispute between the Parties regarding the violation of the 2° temperature condition. As an initial matter, however, Mr. Lees' testimony is not admissible for the purpose GenOn advocates—namely the interpretation of a permit condition. As explained more fully in prior briefs, there are two issues with the use of Mr. Lees testimony for such purposes. First, the interpretation of the permit is a legal matter. *Ohio Valley Env't Coal. v. Fola Coal Co.*, 845 F.3d 133, 138–39 (4th Cir. 2017); *see also, Citizens for Pa.'s Future v. Pittsburgh Water & Sewer Auth.*, 13 F. Supp. 3d 493, 499 (W.D. Pa. 2014), *vacated on other grounds*, 620 F. App'x. 96. Mr. Lees's opinions on the proper construction of the permit term are therefore inadmissible legal conclusions. *See Berckeley In. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) ("an expert witness is prohibited from rendering a legal opinion"); *United States v. Weitzenhoff*, 35 F.3d 1275, 1286–87 (9th Cir. 1993) (rejecting expert testimony interpreting a permit as an impermissible delegation of the court's duty to interpret the law).

The second problem with Mr. Lees's testimony is that his experience does not serve as a basis upon which to defer to for agency practice and policy. While he contends that he has experience working with the PA DEP on similar permit conditions, he does not work for the agency nor has he ever.  *See* Pls.'s Reply at 12.  For an agency position to receive deference, "the regulatory interpretation must be one actually made by the agency."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019).  It must reflect the agency's "authoritative" or "official position."  *Id.* As such it must "emanate from those actors, using those vehicles understood to make authoritative

17

policy in the relevant context." *Id.* Brian Lees, a consultant hired by an industry defendant, is

not someone who is in a position to provide the DEP's authoritative or official position on

anything. Nor are his statements in litigation the type of vehicle that courts credit as authoritative

interpretations of agency policy. *Id.; see also, see also Paralyzed Veterans of Am. v. D.C. Arena*

*L.P., 117 F.3d 579, 587* (D.C. Cir. 1997) ("A speech of a mid-level official of an agency,

however, is not the sort of fair and considered judgment that can be thought of as an authoritative

departmental position.") (internal citations omitted), abrogated on other grounds by Perez v.

*Mortgage Banker's Ass'n,* 575 U.S. 92 (2015). As such, just as Brian Lees cannot opine on legal

matters, nor can his factual experience serve as a basis on which to interpret DEP policy.

During argument, Sierra Club's counsel explained that he did not file a motion to exclude

Brian Lee's based on a comment to Rule 56 of the Federal Rules of Federal Procedure.

Argument Tr. at 37.  That comment provides,

> Subdivision (c)(2) provides that a party may object that material cited to support or
> dispute a fact cannot be presented in a form that would be admissible in evidence.
> The objection functions much as an objection at trial, adjusted for the pretrial
> setting. The burden is on the proponent to show that the material is admissible as
> presented or to explain the admissible form that is anticipated. There is no need to
> make a separate motion to strike. If the case goes to trial, failure to challenge
> admissibility at the summary-judgment stage does not forfeit the right to challenge
> admissibility at trial.

Fed. R. Civ. P. 56(c) Advisory Committee's Notes (2010 amendment).

For purposes of clarity, Sierra Club's counsel never meant to suggest that the

grant of a motion to strike or exclude an expert would be disfavored on the merits.

Rather, as the Advisory Committee Notes make clear, the filing of a separate motion is

disfavored when a party can simply include the basis to exclude witness testimony in the

course of a brief supporting or opposing summary judgment. Sierra Club unequivocally

asserts that the Court should exclude the portions of Brian Lees' testimony asserting a

legal conclusion (i.e. what constitutes a violation of the permit condition at issue) and his recitations of factual experience that purport to reflect the PA DEP's interpretation of the 2°F temperature condition.

## CONCLUSION

For the foregoing reasons, the Court should find that GenOn is liable for violating the 2°F temperature condition of its permit and grant Sierra Club's Motion for Partial Summary Judgment.

Respectfully submitted,

/s/ *J. Michael Becher*
J. Michael Becher
Appalachian Mountain Advocates
P.O. Box 11571
Charleston, WV 25593
mbecher@appalmad.org

Benjamin Barczewski
PA ID: 325291
Georgetown University Law Center
Institute for Public Representation
600 New Jersey Ave. N.W.
Suite 312
Washington, D.C. 20001
bb1073@georgetown.edu

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION**

**THE SIERRA CLUB,**

        **Plaintiff,**

**v.**                                                          **Civil Action No. 2:19-01284**

**GENON POWER MIDWEST LP,**

        **Defendant.**

### CERTIFICATE OF SERVICE

I, J. Michael Becher, hereby certify that on August 11, 2021 I served the foregoing Plaintiff's Motion to Compel Production of Documents through the Court's CM/ECF system, which will  provide service to the following:

Alana Fortna:      afortna@babstcalland.com
Mark Shepard:     mshepard@babstcalland.com


                    /s/ J. Michael Becher
                    J. Michael Becher

                    *Counsel for Sierra Club*