IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE SIERRA CLUB, | |
| *Plaintiff,* | Civil Action No. 2:19-cv-1284 |
| v. | Hon. William S. Stickman IV |
| GENON POWER MIDWEST LP, | |
| *Defendant.* | |

**MEMORANDUM OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

## I.     Introduction

Plaintiff The Sierra Club ("Sierra Club") pleads two claims: one under the federal Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1388, and one under the Pennsylvania Clean Streams Law ("CSL"), 35 Pa. Cons. Stat. §§ 691.1–691.1991. Both claims stem from the language of Defendant GenOn Power Midwest, L.P.'s ("GenOn") National Pollutant Discharge Elimination System ("NPDES") Permit No. PA0001627 issued by the Pennsylvania Department of Environmental Protection ("PADEP") for its Cheswick Generating Station ("Cheswick"). GenOn moves for summary judgment on two grounds: that Sierra Club lacks standing and that GenOn did not violate its permit. (ECF No. 60). Sierra Club moves for partial summary judgment on jurisdictional issues and as to GenOn's liability for violating its permit. (ECF No. 57). For the reasons explained below, Sierra Club's Motion for Partial Summary Judgment is denied[1] (ECF No. 57), and GenOn's Motion for Summary Judgment is denied (ECF No. 60).

---

[1] Sierra Club asks the Court to find that the named members, Laura Jacko and Richard Duncan, have standing as a matter of law. The Court, while determining that there is sufficient material

1

## II.     Factual Background

GenOn owns and operates Cheswick, a single unit, 560-megawatt, coal-fired power plant built in 1970 in Springdale Borough, Allegheny County, Pennsylvania. (ECF No. 17, p. 2). Cheswick uses water from the Allegheny River to cool its system. The plant takes in water from the Allegheny River through an intake designated "Outfall 004" and discharges it back into the river through an outtake designated "Outfall 003." (ECF No. 1, p. 4, ¶ 21). Cheswick operates under Permit No. PA0001627, which GenOn obtained through the NPDES program from PADEP. (ECF No. 1-2, p. 1). The permit began August 1, 2018 and ends July 31, 2023. The NPDES Permit condition at issue provides that the "discharge at Outfall 003 shall not cause a change in the stream temperature more than 2°F during any one hour" ("two-degree condition"). (ECF No. 1-2, p. 34).

GenOn conducted a study in 2011 by sampling the Allegheny River on six days between June and October. (ECF No. 1, p. 5, ¶ 30). GenOn discovered that two-degree temperature changes were apparent across nearly the entire width of the river. (*Id.* at 5, ¶¶ 31–35). Sierra Club conducted studies in 2018 and 2019 allegedly establishing that Cheswick violated the NPDES Permit's thermal discharge limitations on twelve days. (*Id.* at 9, ¶ 69).

Sierra Club presented the affidavits and transcripts of depositions of two of its members, Laura Jacko ("Jacko") and Richard Duncan ("Duncan"). Jacko and Duncan claim that their use and enjoyment of the river are diminished because of the alleged thermal pollution resulting from GenOn's permit violations. Both are longstanding, active members of the Sierra Club. (ECF No. 58-5; ECF No. 58-6, pp. 6, 7; ECF No. 58-7; ECF No. 57-8, pp. 6). Both live and recreate or

---

evidence to proceed to trial, cannot at this stage make a final determination that the named members clearly and unequivocally have standing. The Court finds that sufficient factual issues have been established for Jacko to proceed to trial, but the Court cannot grant Sierra Club's Motion for Partial Summary Judgment for now.

have recreated extensively on the Allegheny River near the Cheswick Plant. (ECF No. 58-5; ECF No. 58-6, pp. 5, 11–12, 13–14; ECF No. 58-7; ECF No. 58-8, pp. 5, 8–11, 13–14). Jacko and Duncan are worried about Cheswick's alleged NPDES permit violations. (ECF No. 58-5, p. 3; ECF No. 58-7, p. 3).

Jacko used to row and kayak on the Allegheny River about five miles from Cheswick. She stopped rowing and kayaking on the river because she is concerned that Cheswick's permit violations harm the river. (ECF No. 58-7, p. 3; ECF No. 58-8, pp. 8–11, 13–14). She and her son recreate along the river, but she does not allow her son to touch the river because of the potential permit violations. (ECF No. 58-7, p. 3; ECF No. 58-8, p. 17). In particular, she is concerned that the thermal discharge violations may lead to increased bacterial and algae growth, which can be unhealthy for humans. (ECF No. 58-7, ¶¶ 10–12; ECF No. 58-8, pp. 12, 15). Her fears are reinforced by the fact that a doctor warned her friend not to kayak in the river with an open cut because of the increased risk of bacterial contamination. (ECF No. 58-8, p. 11). Jacko testified that if Cheswick complied with its thermal discharge limits, she would consider recreating along the river with her son more. (ECF No. 58-7, pp. 3–4; ECF No. 58-8, p. 17).

Duncan is an enthusiastic outdoorsman who enjoys water activities on the Allegheny River, including canoeing and kayaking. (ECF No. 58-5, p. 2; ECF No. 58-6, p. 9). Since 2009, he has been an environmental steward of Sycamore Island situated in the Allegheny River downriver from Cheswick. (ECF No. 58-6, p. 13). He described recreating on the river as "one of the principal pleasures of [his] life." (*Id.*). Duncan is concerned, anxious, unhappy and disturbed by Cheswick's permit violations. (ECF No. 58-5, p. 3; 58-6, pp. 14, 15). The pollution has curtailed his aesthetic enjoyment of the river affecting his work as a steward of the river. (*Id.*). The thermal discharge, though, has not lessened his time recreating on the river. (ECF No. 61-14, p. 25). If

Cheswick complied with its thermal discharge limits, Duncan says he would enjoy recreating on the river more. (ECF No. 58-5, p. 3; ECF No. 58-6, p. 14).

Sierra Club filed a two-count Complaint against GenOn, alleging that the permit violations in 2018 and 2019 violated the CWA and the CSL. (*Id.* at 1, ¶ 1). GenOn filed a motion for judgment on the pleadings (ECF No. 16), which the Court denied (ECF No. 34). At the close of discovery, both parties filed motions for summary judgment advocating for their respective positions. (ECF No. 57; ECF No. 60).

### III. Standard of Review

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it must be decided to resolve the substantive claim or defense to which the motion is directed. In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must view the evidence presented in the light most favorable to the nonmoving party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof" will defeat a motion for summary judgment. *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

"When both parties move for summary judgment, '[t]he court must rule on each party's motion on an individual and separate basis, determining for each side whether a judgment may be entered under the Rule 56 standard.'" *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (quoting 10A Charles Alan Wright et al., Federal Practice and Procedure § 2720 (3d ed. 2016)). Under the same rule, if upon review of a party's motion for summary judgment, the Court, viewing the evidence in the light most favorable to the non-moving party, enters

4

summary judgment for the moving party, the Court may properly declare the opposing party's cross-motion for summary judgment as moot. *Beenick v. LeFebvre*, 684 F. App'x 200, 205–06 (3d Cir. 2017).

## IV. Analysis

### A. Mootness

In June 2021, GenOn announced that it will permanently close Cheswick in September 2021. (ECF No. 79, p. 4). It has since delayed the plans and now intends to close the plant in April 2022. (*Id.* at 8). GenOn argues that the announced closure moots Sierra Club's arguments (ECF No. 82, p. 2) and highlights that citizens lack statutory standing under CWA's citizen suit provision to sue for violations that have ceased after the time the complaint is filed. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000). Article III of the United States Constitution limits judicial authority to ongoing "cases" and "controversies." U.S. Const. Art. III, § 2, Cl. 1; *Khodara Env't ex rel. Eagle Env't, L.P. v. Beckman*, 237 F.3d 186, 192–93 (3d Cir. 2001). The United States Supreme Court, though, has made clear that a defendant seeking to dismiss the case as moot shoulders a heavy burden. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 66 (1987). "The defendant must demonstrate that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *United States v. Concentrated Phosphate Exp. Ass'n, Inc.*, 393 U.S. 199, 203 (1968)) (cleaned up). In essence, the violations must become factually "impossible for a court to grant 'any effectual relief whatever.'" *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).

GenOn argues that Sierra Club's requests for injunctive and declaratory relief are moot because the plant will close imminently. GenOn, in the same vein, argues that civil penalties will have no deterrent effect. Sierra Club counters that the plant has not yet actually closed. As long

as the plant remains operational, GenOn can continue to violate its permit limitations. The Court finds that the case is not moot. An issue is moot if subsequent events make it clear that the allegedly wrongful behavior could not reasonably recur, which GenOn has not shown here. *Laidlaw*, 528 U.S. at 189 (quoting *Concentrated Phosphate*, 393 U.S. at 203). A claim is still live "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation . . . ." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox*, 567 U.S. at 307–08). Because GenOn has not actually closed the plant and can conceivably continue to violate the terms of its permit up until that point, and because GenOn has not presented evidence that it is now in compliance with its permit, the issues remain live.

Each of the cases cited by GenOn involved inapposite issues. In *Public Interest Research Group of New Jersey, Inc. v. Hercules, Inc.*, No. 89-2291 (JBS), 2003 WL 23519620, at *11 (D.N.J. Oct. 27, 2013), the defendant established it had complied with its permit and that violations could not recur because of the "careful operation of improved permanent equipment . . . ." *Id.* at *13. GenOn has not presented evidence that it has complied with its permit or that it has improved its facilities to comply with its permit. In another case cited by GenOn, *Rogue Advocates v. Mountain View Paving, Inc.*, No. 1:15-CV-01854-CL, 2016 WL 6775636, at *1 (D. Or. Nov. 15, 2016), a case involving the Clean Air Act, the defendants physically moved its plant and improved its facilities. The district court found that because the plant had complied with its permit, including moving its facilities, civil fines would not have a deterrent effect. *Id.* at *15. Again, GenOn has shown no changes to Cheswick or its operation, only a planned future closure. The only evidence GenOn has presented for mootness is that the plant will likely close in the future. Until its closure, GenOn may continue to violate its permit. Thus, the Court finds that the case is not moot.

**B.     Standing**

GenOn challenges Sierra Club's standing and moves for summary judgment on that basis. GenOn does not believe Sierra Club can properly bring its claims because it has not shown that its harm is "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Sierra Club disagrees.

1.     Associational Standing

An association may sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Sierra Club sues under § 505(g) of the CWA and proffers Jacko and Duncan as representative members. Section 505 of the CWA authorizes a citizen suit by "any person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The CWA explicitly confers standing to the limits of the U.S. Constitution. *Pub. Int. Rsch. Grp. of N.J v. Powell Duffryn Terminals Inc.*, 913 F2d 64, 70 n.3 (3d Cir. 1990). "Standing analysis focuses on whether 'a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy.'" *Id.* at 70 (quoting *Sierra Club v. Morton*, 405 U.S., 727, 732 (1972)). In environmental litigation, "[t]he relevant showing for Article III standing is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 173. Sierra Club may sue and has standing through its members.

2.     Constitutional Standing

A plaintiff must have constitutional standing to bring a claim. The U.S. Supreme Court has held that to show constitutional standing, a plaintiff: (1) must suffer an actual or threatened

7

injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) that is fairly traceable to the challenged action by the defendant and (3) is likely to be redressed by a favorable decision of the Court. *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted).

### a) Injury in Fact

To show an injury in fact in environmental litigation, a plaintiff may allege that his or her use or enjoyment of an area has been or will be diminished by a defendant's alleged pollution. *PennEnvironment v. RRI Energy Ne. Mgmt. Co.*, 744 F. Supp. 2d 466, 477 (W.D. Pa. 2010) ("[W]here an environmental plaintiff has demonstrated that his or her use of the affected area has been curtailed or that the aesthetic and recreational value of the area has been or will be lessened, an injury in fact will be found."). The Supreme Court's holding in *Laidlaw* emphasizes that plaintiffs need only allege an injury to themselves, not to the environment, to show that they have standing to sue. *Laidlaw*, 528 U.S. at 173. The facts of *Laidlaw* are like the facts here. In *Laidlaw*, the Supreme Court described six plaintiffs and their injuries caused by discharge in the river. *Id.* 181–83. Five plaintiffs alleged that they would like to camp, hike, picnic or birdwatch closer to the point of discharge but no longer did so because of the discharge from the plant. *Id.* Some plaintiffs wished to recreate within three miles of the facility and one as far out as forty miles. *Id.* at 181–83. A sixth plaintiff claimed the value of her home one-quarter mile from the facility was diminished because of the discharge. *Id.* at 182. The Supreme Court found all the plaintiffs had standing to sue and that the statements were more than the "general averments" and "conclusory allegations" found inadequate in *Lujan v. National Wildlife Federation*. *Laidlaw*, 528 U.S. at 169 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

Using this standard, the Third Circuit has found proper averment of an injury and thus standing when the plaintiffs alleged that they enjoyed recreating less along a polluted river.

*Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 256–57 (3d Cir. 2005). In *Interfaith/Honeywell*, one plaintiff alleged she walked or biked along the river but that the contamination of the river detracted from her enjoyment. *Id.* at 256. Another was concerned for his health when he used gas pumps near the river. *Id.* The Third Circuit found that in these instances, the plaintiffs had standing to sue the defendant. A court may find standing for plaintiffs who allege injuries much like those in *Laidlaw* and *Interfaith/Honeywell*. *PennEnvironment v. PPG Indus., Inc.*, 23 F. Supp. 3d 553, 581 (W.D. Pa. 2014) ("Thus, the individuals' statements that their enjoyment of wildlife has been diminished by PPG's actions can also give rise to a cognizable injury.").

Jacko's enjoyment of the river has been diminished to the point that she now refrains from using it to recreate. (ECF No. 58-7, ¶¶ 8, 9). Jacko is concerned that the thermal effluent violations could lead to bacterial or algae overgrowth both detrimental to humans and the ecosystem. (ECF No. 58-7, ¶¶ 10–12; ECF No. 58-8, pp. 12, 15). Duncan stated that if GenOn complies with its discharge limits, "the river will be healthier," which will inspire him "to spend more time on the river" and increase his "enjoyment" of recreational activities. (ECF No. 58-5, ¶ 12).

Both Jacko and Duncan have asserted that their use and enjoyment of the river has been diminished in some capacity because of their knowledge of GenOn's potential violation of its permit's effluent limitations. GenOn highlights that Duncan has no injury because he continues to recreate on and near the river. His injury is simply generalized anxiety. The Court agrees. Duncan has shown no harm beyond his anxiety about the discharges. He continues to use the area and has no plans to curb his use. Duncan is precisely the plaintiff excluded by *Laidlaw*. *See Laidlaw*, 528 U.S. at 169 (finding generalized anxieties to be insufficient to confer standing). Duncan's generalized anxieties over GenOn's discharges do not establish an injury in fact. Jacko,

in contrast, has specified that she no longer goes near or recreates on the river. The Court finds that Jacko's diminished enjoyment *and* abated use of the river is an injury in fact.

            b)      Traceability or Causation

GenOn believes Jacko's and Duncan's concerns are trivial and do not amount to an injury cognizable under Article III standing that can be traced to GenOn's alleged pollution. GenOn argues more specifically that Sierra Club cannot tie the alleged injuries to any discharge from Cheswick.

Traceability in CWA suits "may be established by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." *Id.* Sierra Club needs to show that its members are more than "concerned bystanders." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (quoting *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 687 (1973)). The traceability test, though, is not equivalent to a tort causation requirement. *Powell Duffryn*, 913 F.2d at 72 (citing *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 78 (1978)).

GenOn questions whether Sierra Club's members' alleged injuries are traceable to any discharge. Traceability "does not mean that plaintiffs must show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs." *Powell Duffryn*, 913 F.2d at 72. Requiring scientific, strict proof-of-causation inquiries would be costly and would require litigation of complicated issues collateral to the question, "namely, whether a defendant has exceeded its permit limits." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161, 162 (4th Cir. 2000).

As the Court found only Jacko has alleged an injury, it focuses on the traceability of Jacko's injury. Jacko has stated that her enjoyment of the river is diminished because of the effluent limit violations. (ECF No. 58-7) ("My knowledge of the plant's violation of the condition of its permit was part of my decision not to allow my son near the water."); (ECF No. 58-8) ("It is my belief that thermal discharges disrupt the ecosystem, having potential impacts on the health of the ecosystem where I was rowing."); (ECF No. 58-8, p. 11) ("[A friend's] doctor had actually advised [my friend] to stop rowing in the river until the cut had been healed up. . . . And his doctor was actually concerned with the bacteria in the river, you know, being able to get into it and infect it."). GenOn's expert, Brian Lees, agreed that, based on a document he used for his report, the thermal plume extended over three miles downstream. (ECF No. 58-4, pp. 10, 12). Jacko used to recreate near the thermal plume. (ECF 67-4, pp. 21–25; ECF No. 58-8, p. 16). Jacko has shown the thermal effluent violation contributed to her aesthetic and recreational injuries. Thus, under the analytical framework, Sierra Club has established traceability.

        c)     Redressability

Violations of NPDES permit discharge limits can be remedied by civil fines and injunctive relief. *See Laidlaw*, 528 U.S. at 185–86 (finding that the imposition of civil penalties provides the appropriate deterrent effect). Sierra Club asks the Court to provide declaratory and injunctive relief and impose civil penalties. Should the Court find that GenOn was out of compliance with its permit, such relief is appropriate. These actions brought forward by Sierra Club are redressable by the Court.

        3.     Conclusion

Although the Court finds that Duncan lacks standing to sue, Sierra Club has established that Jacko does. The action of enforcing effluent permit limitations is germane to Sierra Club's purpose as an environmental advocacy group. (ECF No. 58-9, ¶ 2). The injunctive and declaratory

relief does not require the participation of Jacko. *Powell Duffryn,* 913 F.2d at 70. Sierra Club has established that it has associational standing to bring its claims.

As the Supreme Court explained in *Defenders of Wildlife,* "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." As is such, standing "must be supported at each stage of litigation in the same manner as any other essential element of the case." *Defs. of Wildlife,* 504 U.S. at 560, 561. At the summary judgment stage, the party with the burden of proving standing must show that there is a genuine issue of material fact as to the standing elements. The Court finds that Sierra Club has shown there are genuine issues of material fact that it has associational standing to sue. At trial, standing must be proved by a preponderance of the evidence.

### C. Permit Interpretation

GenOn contends that Sierra Club failed to prove that its NPDES permit required compliance with the two-degree provision. (ECF No. 60). Sierra Club alleges it has proffered enough information to show that the two-degree language is not superfluous and that it should not be disregarded. (ECF No. 57). The Court must resolve two issues: (1) whether the NPDES Permit grants GenOn a mixing zone[2] and, if not, (2) whether Sierra Club pleaded plausible allegations that GenOn violated the NPDES Permit. For reasons set forth below, the Court denies GenOn's Motion for Summary Judgment on the permit violation. The NPDES Permit does not grant GenOn a mixing zone, and Sierra Club has proffered evidence that shows a genuine issue of material fact that GenOn violated the NPDES Permit.

---

[2] The term "mixing zone" refers to "an area where an effluent discharge undergoes initial dilution and is extended to cover the secondary mixing in the ambient water body. A mixing zone is an allocated impact zone where water quality criteria can be exceeded as long as acutely toxic conditions are prevented." U.S. Env't Prot. Agency, Technical Support Document for Water Quality-Based Toxics Control xx (1991).

### 1. Mixing Zones Under the NPDES Permit

The Court first considers whether the NPDES Permit specifically authorizes a mixing zone for GenOn's Outfall 003. The language at issue states that "discharge at Outfall 003 shall not cause a change in the stream temperature of more than 2°F during any one hour." (ECF No. 1, p. 5, ¶ 28; ECF No. 1-2, p. 34). GenOn contends that the NPDES Permit's temperature change limitation tracks the language of § 96.6(b)'s temperature change limitation of Title 25 of the Pennsylvania Code, which states: "[h]eated wastewater discharges may not cause a change of surface water temperature of more than 2°F during any one hour period." GenOn asks the Court to do four things: (1) apply PDEP guidance interpreting § 96.6(b) to interpret GenOn's specific NPDES Permit; (2) afford the PDEP guidance deference as it would to a federal agency interpreting federal law; (3) construe the NPDES Permit considering the PDEP guidance and, in doing so, designate Outfall 003 as a mixing zone falling in the "complete mix" category; and (4) conclude that the allegations that GenOn violated the CWA and PSCL are implausible because none of Sierra Club's temperature readings were taken in a complete-mix area downstream of Cheswick's discharge. (*Id.*).

Sierra Club counters that § 96.6(b) and the NPDES Permit are different, so interpretation of the NPDES Permit is strictly a matter of reading the text of the permit. The Court need not incorporate § 96.6(b) or advisory documents interpreting the permit language because the language of the permit is not ambiguous. (ECF No. 67, p. 7). Because nothing in the NPDES Permit specifically references a mixing zone, Sierra Club maintains that the temperature change limitation has no flexibility based on where Outfall 003's discharge is measured. (ECF No. 67, pp. 8–10). The discharge measurements are accurate in Sierra Club's view and show a violation of the permit.

When a permittee discharges pollutants but complies with the terms of its NPDES permit, the permit shields the permittee from liability under the CWA. 33 U.S.C. § 1342(k). If a permittee

violates an NPDES permit, the permittee violates the CWA and is liable. *Nat. Res. Def. Council, Inc. v. Cnty. of L.A.*, 725 F.3d 1194, 1204 (9th Cir. 2013). To resolve the parties' contentions, the Court must consider the language of GenOn's NPDES Permit. *See id.* (highlighting that the plain language of a NPDES permit authorizes citizens to enforce all permit conditions) (citing *Nw. Env't Advocs. v. City of Portland*, 56 F.3d 979, 986 (9th Cir. 1995)). Courts construe NPDES permits under contract interpretation principles. *Tenn. Clean Water Network v. Tenn. Valley Auth.*, 905 F.3d 436, 446 (6th Cir. 2018) (citing *Piney Run Pres. Ass'n v. Cnty., Comm'rs of Carroll Cnty.*, 268 F.3d 255, 269 (4th Cir. 2001)). If the permit language is plain, that language is dispositive. *Nat. Res. Def. Council*, 725 F.3d at 1204–05 (citing *Piney Run*, 268 F.3d at 270).

The Court applies the ordinary meaning for the terms of an NPDES permit, and the Court gives every term effect. *Id.* at 1204–05, 1206 (citing *In re Crystal Props., Ltd., L.P.*, 268 F.3d 743, 748 (9th Cir. 2001)). But if the NPDES permit language is ambiguous, it may consider extrinsic evidence to help interpret its terms, including the text and purpose of the CWA and the position of the EPA regional board. *Id.* at 1207–08. Considering these principles, the Court must first establish whether the meaning of GenOn's NPDES Permit is clear. If it is ambiguous, the Court may consider extrinsic evidence, such as § 96.6 or other relevant federal and state authorities.

    2.    The Plain Language of the NPDES Permit

Mixing zones come in two varieties. A complete mixing zone occurs at the point where no measurable difference in the concentration of a pollutant between the zone and the waterbody can be detected. *Id.* An incomplete mixing zone occurs at the point where a measurable difference between the concentration of a pollutant between the zone and the waterbody-as-a-whole can be determined. Permitters calibrate and design computer models used to study discharge of pollution according to whether complete mixing of effluent occurs near the discharge point or farther downstream. *Id.* at 70, 87.

To determine whether the NPDES Permit here grants a mixing zone, the Court begins with the text of the permit. The NPDES Permit states that in a conflict between the terms of GenOn's application and its supporting documents and the terms of the permit itself, the terms of the permit control. (ECF No. 1-2, p. 3). Failure to comply with the permit is grounds for enforcement action. (*Id.*). Part C.I.F. of the NPDES Permit contains the two-degree thermal pollution limitation term. (*Id.* at 35). That term does not mention a "mixing zone."

The parties do not dispute that the NPDES Permit does not include the term "mixing zone." (ECF No. 79, p. 19). References to "mixing" can be found in three places in the NPDES Permit: one in Part A and two in Part C. (*Id.* at 25, 36, 38). Part A of the NPDES Permit governs effluent limitations and proscribes discharge of substances in concentrations that violate the general water criteria outlined in § 93.6. GenOn must engage in self-monitoring to comply with the permit. Self-monitoring includes representative samples collected "where the effluent is well mixed near the center of the discharge conveyance and at the approximate mid-depth point, where the turbulence is at a maximum and the settlement of solids is minimized." (*Id.* at 25). Part C of the NPDES Permit governs other requirements not covered in Parts A and B. Part C.I.E. requires GenOn to optimize chlorine dosages used for disinfection, which "may include an evaluation of wastewater characteristics, mixing characteristics, and contact times, adjustments to process controls, and maintenance of the disinfection facilities." (*Id.* at 36). Part C.II.C.2 states that GenOn can provide site-specific data for verifying and refining water quality-based effluent limits, including discharge mixing characteristics data. (*Id.* at 38).

The plain language of the NPDES cannot support the finding that PDEP granted GenOn a mixing zone in the permit. No language in the permit specifies any dimensions or limitations applicable to a mixing zone. The three references to "mix" or "mixing" in the permit refer to the

physical act of discharges mixing into a receiving body of water. Thus, the term "mixing" is used in an empirical sense, not a legal one. Those references are descriptive and relate to criteria compliance mixing time. They are not prescriptive in that they grant a zone allowing GenOn to deviate from the requirements of § 96.6(b). *Cf.* Pa. Dep't of Env't Protect, Draft Minutes of the March 24, 2016, Meeting of the Water Resources Advisory Committee (WRAC) 5 (Mar. 24, 2016) ("Pennsylvania does not have mixing zones; we have criteria compliance mixing time and that's not going to change."). The Court finds that under the plain language, GenOn's permit does not grant it a mixing zone.

        3.      Extrinsic Evidence

GenOn admits that its permit does not mention a mixing zone but suggests that the Court consider extrinsic evidence to supports its theory that a mixing zone can be read into the permit. (ECF No. 79, p. 19). GenOn asks the Court to read its permit as part of § 96.6(b) under Title 25 of the Pennsylvania Administrative Code. This section, however, also does not mention a mixing zone. From there, GenOn further requests that the Court consider the Department of Environmental Protection's Water Standards and Facility Regulation, a document used by permit writers. The document explicitly states, "[t]he policies and procedures herein are not an adjudication or a regulation." (ECF No. 61-18, p. 2). The guidance document makes assumptions about mixing and the maximum heat load at a complete mix basis but still does not fully define a mixing zone. Even when considering all three of these documents together, as invited by GenOn, the Court still cannot find support for the theory that Cheswick's Outfall 003 pours into a permitted mixing zone. Moreover, were a mixing zone included, the permit never mentions how such a mixing zone should be measured. Section 96.6(b) institutes a two-degree Fahrenheit temperature change limitation for thermal discharge. PDEP's implementation guidance for temperature criteria states that this limitation presumptively falls into the complete mixing category in normal

16

scenarios. (*See* ECF No. 16-4, p. 4). In the following adverse scenarios, however, the presumption does not apply:

- The discharge is to a lake, pond, impoundment or other low-gradient receiving water, leading to restricted dispersion of the plume, and horizontal and vertical stratification of the plume.

- The discharge is to a receiving water that is very wide, leading to restricted dispersion of the plume, and horizontal stratification of the plume.

- The discharge is to a receiving water channel braided, effectively limiting dispersion of the plume.

- There is the potential for overlapping thermal plumes from two or more sources.

- Field observations show excessive instream temperatures, which may signify strong solar heating effects, excessive error in estimated ambient temperatures, or inadequate facility monitoring.

- The Department's biological staff have observed adverse impacts that may threaten the protected uses of the receiving water and are potentially attributable to the heated wastewater discharge.

(*Id.* at pp. 4–5). PDEP employs a PENTOXSD water quality model derived from a technical reference guide when evaluating water quality. (ECF No. 24-1, p. 3). Even considering the PENTOXSD technical reference guide, neither the temperature implementation guidance nor the technical reference guide is entitled to deference in interpreting the PCSL or the PAC, let alone an NPDES permit. *See Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (noting that agency advisory documents are not entitled to deference). The Court cannot accept GenOn's method of interpretation.

The other permits GenOn offers as examples of instances when there are mixing zones include descriptions of the shape and size of the mixing zone. GenOn retained Lees to interpret

their monitoring reports, permits and the permits of others. (ECF No. 58-4, p. 4). GenOn suggests that Lees's analysis supports the theory that their permit provides for a mixing zone. In formulating his analysis, Lees examined GenOn's river monitoring studies, including one from 2012 and a more recent one. (*Id.*). Lees also incorporated the knowledge he gained while working with other permittees in determining the point of compliance for the two-degree condition in their respective permits. (ECF No. 66, p. 6; ECF No. 61-15, pp. 6, 8–9). In one such application, Lees noted that the permittee completed a one-year temperature monitoring study to determine the point of complete mix to determine compliance with the two-degree condition. (ECF No. 66, p. 6; ECF No.61-3; ECF No. 61-15, pp. 6, 8, 19). In another, PADEP approved a thermal study plan that included a mixing zone analysis and would have applied the two-degree condition at the point of the complete mix. (ECF No. 66, p. 6; ECF No. 61-4, p. 14; ECF No. 61-15, pp. 8, 9). In a third example, permittees used flyover imaging to determine the size of the facility's thermal plume. There, PADEP allowed a 5000-foot mixing zone downstream of the discharge channel. (ECF No. 66, p. 6; ECF No. 61-19, p. 30). PADEP, in these three examples, required compliance with a two-degree condition at or after a point of complete mix. GenOn suggests that these permits suggest that their permit also has an implied mixing zone.

Sierra Club argues Lees's expert testimony provides inadmissible legal interpretations and that Lees lacks the authority to interpret agency regulations and guidance. Without considering whether Lees is stating legal conclusions, each of these examples offered by GenOn cuts against its own argument. Lees's studies reveal the great lengths permittees go to determine the appropriate point of measurement for the mixing zone. If PADEP determined it was necessary, GenOn could have undertaken a similar analysis. It did not. And just because it did not, it does

not make the two-degree condition unenforceable. Lees's interpretation of these other permits does not prove that GenOn's permit had a mixing zone.

None of the proffered evidence proves that GenOn's NPDES Permit granted a mixing zone. No extrinsic evidence in the record supports the notion that mixing zones otherwise permissible under § 96.6(b) are implied in the terms of the NPDES Permit.

### D. Violation of the NPDES Permit

Having established that the permit does not allow a mixing zone, the Court must now determine whether GenOn violated its NPDES Permit. Part C.I.F. of the NPDES Permit states that the "discharge at Outfall 003 shall not cause a change in the stream temperature of more than 2°F during any one hour." (ECF No. 1, p. 5, ¶ 28; ECF No. 1-2, p. 34). The Court finds Sierra Club has alleged enough information that creates a genuine issue of material fact involving data from the 2011, 2018 and 2019 studies of the Allegheny River. The dispute over the accuracy of the data underlying the allegations creates a genuine issue of material fact that remains to be resolved.

### V. Conclusion

The Court finds that Sierra Club has proffered enough evidence to create a genuine issue of material fact but not enough to entitle it to judgment as a matter of law for jurisdiction issues. The Court denies Sierra Club's Motion for Partial Summary Judgment. (ECF No. 57). A genuine issue of material fact exists here as to whether GenOn violated its permit limitations, which

precludes summary judgment for GenOn's Motion for Summary Judgment. As a result, GenOn's Motion for Summary Judgment is denied. (ECF No. 60). An Order of Court will follow.

                          BY THE COURT:

                          /s/ William S. Stickman IV
                          WILLIAM S. STICKMAN IV
                          UNITED STATES DISTRICT JUDGE

9/14/21
Dated